ORAL ARGUMENT NOT YET SCHEDULED

Case No. 11-1302

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

EME HOMER CITY GENERATION, L.P.,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND
LISA P. JACKSON, ADMINISTRATOR,

*Respondents.*

_____

On Petition for Review from a Final Order of the
U.S. Environmental Protection Agency

_____

# PETITIONER'S MOTION FOR A STAY OR, IN THE ALTERNATIVE,
# EXPEDITED REVIEW

_____

<div style="margin-left:40%">

Gregory G. Garre
Claudia M. O'Brien
Lori Alvino McGill
Stacey VanBelleghem
Katherine Twomey
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
*Counsel for Petitioner*

</div>

August 25, 2011

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. i

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS .................................................................................. 4

ARGUMENT .................................................................................................... 8

I.      THIS COURT SHOULD GRANT A STAY PENDING REVIEW ................ 9

      A.      Petitioner Is Likely To Prevail On The Merits ............................................ 9

            1.      The Transport Rule Is *Ultra Vires* ...................................... 9

            2.      The Transport Rule Is Arbitrary And Capricious ........................... 15

      B.      Petitioner Will Suffer Irreparable Injury Absent A Stay ........................... 16

      C.      The Balance Of Harms And Public Interest Favor A Stay ...................... 19

II.      AT A MINIMUM, EXPEDITED REVIEW IS WARRANTED .................... 20

CONCLUSION ............................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bloate v. United States,*
    130 S. Ct. 1345 (2010) ............................................................12

*Bond v. United States,*
    131 S. Ct. 2355 (2011) ............................................................18

*California State Board of Optometry v. FTC,*
    No. 89-1190, 1989 U.S. App. LEXIS 16067 (D.C. Cir. Aug. 15, 1989) ...........18

*Chamber of Commerce of the United States v. SEC,*
    No. 04-1300, 2004 WL 2348157 (D.C. Cir. Oct. 18, 2004) ................................20

*Connecticut v. EPA,*
    696 F.2d 147 (2d Cir. 1982) ......................................................2

*General Motors Corp. v. United States,*
    496 U.S. 530 (1990) ................................................................3

*Hatch v. FERC,*
    654 F.2d 825 (D.C. Cir. 1981) ...................................................14

*Humane Society of the United States v. Cavel International, Inc.,*
    No. 07-5120, 2007 U.S. App. LEXIS 10785 (D.C. Cir. May 1, 2007) ..............18

*Michigan v. United States EPA,*
    213 F.3d 663 (D.C. Cir. 2000) ....................................................5, 14, 15

*Michigan v. EPA,*
    268 F.3d 1075 (D.C. Cir. 2001) ...................................................2

*Michigan v. EPA,*
    No. 98-1497, 1999 U.S. App. LEXIS 38833 (D.C. Cir. May 25, 1999) ........3, 18

*Motor Vehicle Manufactures Asssociation v. State Farm Insurance Co.,*
    463 U.S. 29 (1983) ................................................................15

*National Petrochemical & Refiners Association v. EPA,*
    630 F.3d 145 (D.C. Cir. 2010) ...................................................15

*New Motor Vehicle Board v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) ..................................................................18

*New York v. United States,*
    505 U.S. 144 (1992) ...................................................................9

*North Carolina v. EPA,*
    531 F.3d 896 (D.C. Cir. 2008) ........................................... 6, 10

*North Carolina v. EPA,*
    550 F.3d 1176 (D.C. Cir. 2008) ......................................... 6, 11

*Sottera, Inc. v. FDA,*
    627 F.3d 891 (D.C. Cir. 2010) ..................................................18

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ..................................................................17

*Train v. Natural Resources Defense Council, Inc.,*
    421 U.S. 60 (1975) ............................................................ 2, 10

*Union Electric Co. v. EPA,*
    427 U.S. 246 (1976) ..................................................................10

*Virginia v. EPA,*
    108 F.3d 1397 (D.C. Cir. 1997) ...................................4, 10, 14

*Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,*
    559 F.2d 841 (D.C. Cir. 1977) ...................................................9

## STATUTES AND REGULATIONS

42 U.S.C. § 7407(a)........................................................................9

42 U.S.C. § 7410(a)(1)............................................................ 4, 18

42 U.S.C. § 7401(a)(3)............................................................... 2, 9

42 U.S.C. § 7410(*l*)......................................................................18

42 U.S.C. § 7410(a)(2)(D)(i)(I)....................................................5

42 U.S.C. § 7410(c)(1)........................................................... 5, 10

                                                     **Page(s)**

42 U.S.C. § 7410(c)(1)(A) ..............................................................5

42 U.S.C. § 7401(c)(1)(B) ..............................................................5

42 U.S.C. § 7410(k)(2) ..............................................................12

42 U.S.C. § 7401(k)(3) ..............................................................5

42 U.S.C. § 7410(k)(5) .......................................................... 5, 12

42 U.S.C. § 7410(k)(6) ..............................................................12

63 Fed. Reg. 57,356 (Oct. 27, 1998) ......................................1, 6, 13

64 Fed. Reg. 28,250  (May 25, 1999) .........................................10

70 Fed. Reg. 25,162 (May 12, 2005) ...............................1, 6, 13, 14

73 Fed. Reg. 4109 (Jan. 24, 2008) ...............................................10

74 Fed. Reg. 65,446 (Dec. 10, 2009).............................................11

75 Fed. Reg. 45,210 (Aug. 2, 2010).......................................7, 15, 19

76 Fed. Reg. 48,208 (Aug. 8, 2011)............................. 1, 8, 11, 12, 13

## OTHER AUTHORITIES

Charles River Associates, *Market Power Implications of EPA's Proposed Alternative Allowance Allocations Under CATR for 2012-13* (May 9, 2011) .......................... 8, 19

E-mail from Janice Wagner, Chief, Market Operations Branch, Clean Air Markets Division, EPA, to Group Annual Reconciliation (Aug. 3, 2011) ...........8

Office of Air & Radiation, EPA, *Regulatory Impact Analysis for the Federal Implementation Plans to Reduce Interstate Transport of Fine Particulate Matter and Ozone in 27 States; Correction of SIP Approvals for 22 States* (June 2011) ... 19, 20

Office of Air & Radiation, EPA, *Status of CAA 110(a)(2)(D)(i)(I) SIPs Final Rule Technical Support Document* (July 2011) ......................................12

# INTRODUCTION

This case involves a challenge to a far-reaching rule promulgated by EPA under the Clean Air Act ("CAA" or "Act") to address the interstate transport of sulfur dioxide ("$SO_2$") and nitrogen oxides ("$NO_x$") from upwind to downwind States (hereinafter "Transport Rule" or "Rule").[1] The Rule has major policy and economic consequences for the country and an immediate and devastating impact on electric power producers like petitioner.[2] Moreover, the Rule's first compliance deadline is only five months out (January 1, 2012)—a much shorter period than the multiple *years* allowed for compliance with prior rules of similar magnitude.[3] The Rule is invalid for many reasons, including because it operates in derogation of the CAA's signature structural component—the cooperative-federalism scheme, under which EPA sets air quality standards and each State has the ability (and responsibility) to develop a plan to implement those standards within the State. A stay is warranted to prevent this

---

[1] Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 Fed. Reg. 48,208 (Aug. 8, 2011). *See* Tab 1. "Tab _" refers to attachments filed herewith in a separate volume.

[2] EME Homer City Generation, L.P., ("EME Homer City") operates three coal-fired electric generating units in Pennsylvania, that produce 1,884 MW of electricity— enough for two million homes—and employ hundreds of highly-paid, highly-skilled workers. *See* Tab 2 ¶¶ 4, 10, 22 (Declaration of Douglas R. McFarlan).

[3] *See, e.g.*, Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone, 63 Fed. Reg. 57,356 (Oct. 27, 1998) ("$NO_x$ SIP Call") (4.5 years to comply); Rule to Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule); Revisions to Acid Rain Program; Revisions to the $NO_x$ SIP Call, 70 Fed. Reg. 25,162 (May 12, 2005) ("CAIR") (3.5 years to comply).

*ultra vires* Rule from taking effect and imposing untold economic hardship and other grave harm across the country, and to petitioner specifically, during a period that EPA itself concedes the Rule would secure no meaningful environmental benefit.

Described by this Court as an "'experiment in federalism,'" *Michigan v. EPA,* 268 F.3d 1075, 1078 (D.C. Cir. 2001), the CAA assigns to the States a critical—and, indeed, "primary," 42 U.S.C. § 7401(a)(3)—role in air pollution prevention and control. EPA sets the national ambient air quality standards ("NAAQS") that States must achieve, but States have the primary responsibility and flexibility to determine how best to meet those standards. EPA has "no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies [the Act]." *Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 79 (1975). Congress thus "relegated" EPA to a "secondary role" in "determining and enforcing the specific, source-by-source emission limitations which are necessary" to reduce air pollution. *Id.* That structure—long recognized as "a bold experiment in cooperative federalism," *Connecticut v. EPA,* 696 F.2d 147, 151 (2d Cir. 1982)— represents the centerpiece of the CAA's regulatory framework. The Rule at issue in this case was enacted in derogation of the Act's cooperative-federalism framework.

Rather than setting statewide emissions reductions and allowing the States to determine how best to implement them, the Rule unilaterally imposes on upwind States a federal implementation plan ("FIP") that *dictates* the way States must meet EPA's new standards. That "FIP first" approach plainly exceeds EPA's statutory

authority, radically departs from EPA's past practice, and upends the careful balance Congress struck between state and federal decisionmaking. Instead of treating the States as "partners in the struggle against [interstate] air pollution," *General Motors Corp. v. United States*, 496 U.S. 530, 532 (1990), the Rule illegally commandeers the States into carrying out EPA's own misguided directive. This Court previously stayed an EPA rule based on similar cooperative-federalism concerns. *See Michigan v. EPA*, No. 98-1497, 1999 U.S. App. LEXIS 38833, at *10 (D.C. Cir. May 25, 1999).

Even absent that fatal structural defect, the Rule is arbitrary and capricious. The Rule allocates emissions allowances in a manner that bears no relationship to any facts found by the agency, and leaves petitioner with only 22% of the allowances it would need to continue normal operations. And because (as EPA concedes) there is absolutely *nothing* petitioner can do to meet the new allocations before 2014, petitioner and other under-allocated entities will be forced to reduce generation, or purchase emissions allowances from their over-allocated competitors to the extent they are even available and, even then, face the risk of draconian penalties. The Rule will distort electricity markets, lower electric generation output, and effect a massive (at least $1.5 billion) wealth transfer in 2012-2013. Further, the Rule effectively imposes new sanctions on past conduct and is therefore impermissibly retroactive as well.

The remaining three factors also strongly favor a stay. First, the critical flaws of the Transport Rule will cause immediate irreparable harm to petitioner, including potentially substantial curtailment in operations or an enormous unrecoverable

3

payment to its competitors. Second, a stay is clearly in the public interest. The Rule will cause a steep reduction in generation output and a resulting painful spike in consumers' electricity costs by as much as $514 million per year in 2012 and 2013, with no meaningful environmental benefits. Third, there is no possibility of substantial harm to other parties if relief is granted since the current CAA regime remains in effect during the pendency of the stay. EPA itself acknowledges that the Rule will result in no meaningful environmental benefits until 2014—long after this Court's review of the Rule is complete, even absent expedition. A stay pending review or, at a minimum, expedited review is therefore warranted.[4]

## STATEMENT OF FACTS

*Statutory Framework Under The Clean Air Act*. After EPA promulgates or revises a NAAQS, "[e]ach State shall, after reasonable notice and public hearings, adopt and submit to the [EPA], … a plan which provides for implementation, maintenance, and enforcement of a [NAAQS] … within such State." 42 U.S.C. § 7410(a)(1). As this Court has explained, "'EPA determines the ends—the standards of air quality—but Congress has given the states the initiative and a broad responsibility regarding [the] means to achieve those ends through state implementation plans'" ("SIPs"). *Virginia v. EPA*, 108 F.3d 1397, 1408 (D.C. Cir. 1997). This cooperative-federalism structure is a critical component of the Act.

---

[4] Edison Mission Energy, EME Homer City's indirect parent company, requested a stay from EPA on July 22, 2011, *see* Tab 3, which remains pending. On August 24, 2011, EME Homer City notified EPA by telephone of this motion.

A SIP must contain, among other things, "adequate provisions" "prohibiting … emissions activity within the State from emitting any air pollutant in amounts [that would] contribute significantly" to another State's inability to meet or maintain a NAAQS.  42 U.S.C. § 7410(a)(2)(D)(i)(I).  The "good neighbor" or interstate-transport provision is the subject of the Rule at issue in this case.

EPA "shall approve" a SIP that meets the requirements of the Act.  *Id.* § 7410(k)(3).  "When EPA concludes that an 'implementation plan for any area is substantially inadequate to attain or maintain the relevant [NAAQS], to mitigate adequately the interstate pollutant transport …, or to otherwise comply with any requirement of this chapter,' the CAA requires EPA to order a state to revise and correct its SIP 'as necessary.'"  *Michigan v. United States EPA*, 213 F.3d 663, 671 (D.C. Cir. 2000) (quoting 42 U.S.C. § 7410(k)(5)).  In other words, EPA "shall require" SIP revisions by issuing a SIP call, *id.* § 7410(k)(5)—and not simply impose a FIP.

Congress limited the EPA authority's to impose on a State a FIP to two particular circumstances: (1) upon a finding "that a State has failed to make a required submission" (or that submission is incomplete); or (2) when EPA "disapproves a [SIP] in whole or in part."  *Id.* § 7410(c)(1)(A), (B).  Even then, Congress stripped EPA of its limited authority to promulgate a FIP where the State has "correct[ed] the deficiency" and EPA has approved the corrected SIP.  *Id.* § 7410(c)(1).  In other words, consistent with the Act's cooperative-federalism mandate, EPA's authority to impose a FIP is the exception to the rule—and applies only where a State fails to carry

out its front-line responsibility to adopt a SIP.

***EPA's Prior Interstate Transport Rules.*** In 1998, EPA for the first time promulgated a rule addressing the interstate transport problem: the $NO_x$ SIP Call, 63 Fed. Reg. 57,356. Believing that it was better equipped than individual States to model the problem, EPA determined the emissions levels each State must meet in order to eliminate its significant contribution to another State's poor air quality and informed the States of those determinations. Consistent with the Act's insistence on cooperative federalism, however, the $NO_x$ SIP Call—as its name suggests—called upon "the *State* to determine the appropriate mix of controls to achieve those reductions." *Id.* at 57,369 (all emphases added unless otherwise noted).

EPA's next foray into interstate transport—CAIR—followed the same basic structure. 70 Fed. Reg. 25,162. There, too, EPA properly allowed States to exercise their statutory right to propose a plan in response to the new rule, stating that it "will only issue a final FIP for those jurisdictions that fail to respond adequately to" the new rule. *Id.* at 25,269. That rule was subsequently vacated by this Court on the ground that it violated several different statutory provisions. *North Carolina v. EPA,* 531 F.3d 896, 929-30 (D.C. Cir. 2008). But, at EPA's own request, the panel took the unusual step of granting rehearing for the purpose of converting its vacatur into a remand "without vacatur," thus "allowing CAIR to remain in effect" until replaced by a new rule. *North Carolina v. EPA,* 550 F.3d 1176, 1177-78 (D.C. Cir. 2008). EPA

based that request in part on the benefits of CAIR, which remains in effect today.

*The Transport Rule At Issue.* On August 8, 2011, EPA promulgated the Transport Rule. In an extraordinary departure from past practice, the Rule both sets statewide standards in furtherance of § 110(a)(2)(D)(i)(I) (limits on the amount of $SO_2$ and $NO_x$ each state may emit) *and* simultaneously imposes on States a specific implementation plan (FIP) for achieving them. The FIP dictates how much $SO_2$ and $NO_x$ each individual electric generating unit ("EGU") within a State is permitted to emit. EGUs that exceed their allowable emission limits will face severe penalties.

In the Proposed Rule, EPA conceded that it would be impossible for EGUs to install additional control technology for reducing emissions before 2014, and explained that the Phase I (2012-2013) statewide reductions were based on emissions reductions that can be achieved using existing control technology.[5] But the final Rule used an entirely different methodology—relative heat-input—to allocate allowances to individual EGUs, leaving some units, including petitioner, significantly short of the allowances needed to operate, while others have far more than they need.

EME Homer City's analysis of the heat-input-based allocation approach (first proposed by EPA in the Notice of Data Availability for the Proposed Rule) showed that it would result in a $1.5 billion redistribution of wealth from certain companies to others in 2012 and 2013, assuming no "assurance" provisions in Phase I (limits on the

---

[5] *See* Federal Implementation Plans To Reduce Interstate Transport of Fine Particulate Matter and Ozone, 75 Fed. Reg. 45,210, 45,281 (Aug. 2, 2010).

amount of purchased allowances that can be used). *See* Tab 2 ¶ 15. EME Homer

City's annual $SO_2$ allocation under the Rule is approximately 25,000 tons, which is

85,000 tons (78%) short of what it would need to operate in 2012 and 2013. *Id.* ¶ 13.

The Rule thus presents EME Homer City with a Hobson's choice: either curtail

operations and suffer losses or spend tens of millions of dollars per year to purchase

allowances from over-allocated competitors in a deregulated (and artificially

allowance-constrained) market and attempt to run at the resulting higher price, while

risking penalties that could force total shutdown. The Rule would also significantly

impact electricity cost throughout the affected region, potentially increasing consumer

power costs by $514 million per year in 2012 and 2013.[6]

EPA announced that, pursuant to the Rule, it will eliminate CAIR allowances

on October 14, 2011, underscoring the need for prompt consideration. *See* E-mail

from Janice Wagner, Chief, Market Operations Branch, Clean Air Markets Division,

EPA, to Group Annual Reconciliation (Aug. 3, 2011) (Tab 5); 76 Fed. Reg. at 48,322.

## ARGUMENT

The CAA is the model for the cooperative-federalism approach that Congress

has adopted for many environmental and other statutes. That approach leaves States

broad flexibility to act within the contours of federal standards and is built on the

recognition that "state governments remain responsive to the local electorate's

---

[6] Charles River Associates, *Market Power Implications of EPA's Proposed Alternative Allowance Allocations Under CATR for 2012-13*, 3-4 (May 9, 2011) (Tab 4).

preferences" and that "state officials remain accountable to the people." *New York v. United States,* 505 U.S. 144, 167-68 (1992). The Transport Rule violates the CAA's cooperative-federalism mandate to the detriment of not only the States, but to regulated entities, and the public at large. Because the Rule will inflict irreparable injury on petitioner and cause great harm to the public, it should be stayed pending review by this Court. Alternatively, this Court should expedite review.

## I.   THIS COURT SHOULD GRANT A STAY PENDING REVIEW

This Court considers four factors to determine whether a stay pending review is warranted: (1) the likelihood that the moving party will prevail on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of substantial harm to other parties if relief is granted; and (4) the public interest. *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842-43 (D.C. Cir. 1977). All factors strongly favor granting a stay pending review.

### A.   Petitioner Is Likely To Prevail On The Merits

#### 1.   The Transport Rule Is *Ultra Vires*

Petitioner is likely to prevail on the merits because the Transport Rule plainly exceeds EPA's authority under the Act. Title I assigns EPA and the States distinct roles consistent with their comparative expertise in our federal system. It tasks EPA with setting the national standards and assigns States the "primary responsibility" for determining the manner in which States will achieve those standards at the local level. 42 U.S.C. §§ 7407(a), 7401(a)(3). Title I of the CAA thus creates "a presumption of

state-level regulation generally." *North Carolina*, 531 F.3d at 923; *see also Union Electric Co. v. EPA*, 427 U.S. 246, 264-65 (1976); *Train*, 421 U.S. at 79; *Virginia*, 108 F.3d at 1407-08. Here, EPA has unilaterally set new statewide emissions standards and simultaneously imposed on States a particular plan for achieving them. EPA's attempt to usurp the States' role in this fashion directly contravenes the statute.

As EPA itself has explained, the agency's power to impose a FIP under § 110(c) is a "tool[] for direct federal action to address *serious failures* of state action[;] Congress' clear preference … is that states are to decide and plan how they will control their sources of air pollution, and the mechanism for imposing those controls at the state level is SIPs."[7] There was no "serious failure" by the States here—and, indeed, no state failure at all. The States have had no meaningful opportunity to even submit SIPs addressing the new interstate transport standards, because EPA set those standards in this Rule—*at the same time* that it imposed the FIP. Moreover, for the 1997 NAAQS, many States already had fully-approved SIPs in place addressing the Act's interstate transport provision. As the statute clearly mandates, 42 U.S.C. § 7410(c)(1), and EPA itself has explained, its limited authority to impose a FIP ends once it approves a SIP.[8] EPA's attempts to side-step that clear limit are unpersuasive.

---

[7] Findings of Significant Contribution and Rulemaking on Section 126 Petitions for Purposes of Reducing Interstate Ozone Transport, 64 Fed. Reg. 28,250, 28,273 (May 25, 1999).

[8] *See, e.g.*, Approval and Promulgation of Implementation Plans; New York: Clean Air Interstate Rule, 73 Fed. Reg. 4109, 4110 (Jan. 24, 2008) ("Once the SIP is fully approved, EPA no longer has authority for the FIPs.").

*First*, EPA contends that this Court's decision in *North Carolina* remanding CAIR somehow *revived* EPA's FIP authority by impliedly abrogating all previously-approved SIPs for the 1997 NAAQS. 76 Fed. Reg. at 48,219. But those SIP approvals were not before this Court in *North Carolina*. Moreover, at EPA's request, this Court agreed on rehearing to remand "without vacatur" so that CAIR would "remain in effect" until it was replaced by a new rule. 550 F.3d at 1178. *North Carolina* could not have negated the SIPs anymore than it negated CAIR, which is to say it did not negate the SIPs at all. And it would be contrary to the CAA's model of cooperative-federalism to say, as EPA does now, that the SIPs were overridden—by implication—without an opportunity to correct the deficiencies. Moreover, EPA's own actions underscore that its result-oriented reading of *North Carolina* is incorrect. EPA approved some SIPs addressing interstate transport for the 1997 NAAQS, including Pennsylvania's, *after* this Court's remand order in *North Carolina*, and acknowledged that such approval foreclosed any FIP related to the 1997 NAAQS.[9]

*Second*, EPA claims authority under § 110(k)(6) to "correct" its prior SIP approvals and retroactively disapprove them. 76 Fed. Reg. at 48,217, 48,219-220. Section 110(k)(6) provides a mechanism for EPA to correct its own errors. But even if EPA could use § 110(k)(6) in these circumstances to "undo" its prior approval of a

---

[9] *See, e.g.*, Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Clean Air Interstate Rule; NOx SIP Call Rule; Amendments to NOx Control Rules, 74 Fed. Reg. 65,446, 65,447 (Dec. 10, 2009).

State's SIP,[10] nothing in that provision lifts the Act's unqualified command that EPA act through a SIP call: "[EPA] *shall* require the *State* to revise the plan as necessary" "[w]henever" EPA finds that a SIP "is substantially inadequate to attain or maintain the relevant [NAAQS], *to mitigate adequately the interstate pollutant transport* …, or to otherwise comply with any requirement of this Act."  42 U.S.C. § 7410(k)(5).  EPA's implausible interpretation of (k)(6) as authorizing it to disown its prior SIP approvals and simultaneously impose a FIP would gut the core cooperative-federalism structure of the Act and render (k)(5) a nullity.  *See, e.g.*, *Bloate v. United States*, 130 S. Ct. 1345, 1355 (2010) (statutes should be construed, if possible, to give effect to each phrase).[11] Tellingly, EPA has never before attempted to use § 110(k)(6) in this radical manner.

*Third*, EPA says it can impose a FIP because States have "fail[ed] to submit" SIPs addressing interstate transport of $SO_2$ and $NO_X$ for the 2006 $PM_{2.5}$ NAAQS, or because States have submitted SIPs that are inadequate (because they fail to take account of EPA's newly-identified standards).[12]  As EPA explained, the Transport Rule "identif[ies] $SO_2$ and $NO_X$ emissions that must be prohibited pursuant to" the

---

[10] Section 110(k)(6) would not apply in any event because EPA's prior approvals of the SIPs at issue were not "in error."  42 U.S.C. §7410(k)(6).  EPA approved them under CAIR—the operative legal standard.  Moreover, EPA has not "corrected" any error "in the same manner as the approval" (*i.e.*, through notice and comment).  *Id.*

[11] EPA's interpretation of § 110(k)(6) would also effectively eliminate § 110(k)(2)'s requirement that EPA act "within 12 months" to approve or disapprove a SIP, 42 U.S.C. §7410(k)(2), by giving EPA unbridled authority to reconsider at any time.

[12] Office of Air & Radiation, EPA, *Status of CAA 110(a)(2)(D)(i)(I) SIPs Final Rule Technical Support Document* (July 2011) (Tab 6); *see also* 76 Fed. Reg. at 48, 219.

good-neighbor provision. 76 Fed. Reg. at 48,217. EPA's action here is analogous to promulgating a new NAAQS and simultaneously imposing a FIP on the ground that the States had not submitted SIPs *anticipating it*. *Cf.* NO$_X$ SIP Call, 63 Fed. Reg. at 57,369 ("Determining the overall level of air pollutants allowed to be emitted in a State [under § 110(a)(2)(D)(i)(I)] is comparable to determining overall standards of air quality ...."). That approach conflicts with the CAA's cooperative-federalism mandate, which clearly provides States with the opportunity to propose SIPs for new standards and to correct deficiencies EPA finds in SIPs before EPA imposes a FIP.

Both of EPA's previous rules implementing the Act's good-neighbor provision through state-specific emissions standards respect the statutorily mandated SIP process. As EPA recognized in the NO$_X$ SIP Call, determining statewide interstate transport reductions "is comparable to determining overall standards of air quality, which the courts have recognized as EPA's responsibility, and is distinguishable from determining the particular mix of controls among individual sources to attain those standards, *which the caselaw identifies as a State responsibility*." 63 Fed. Reg. at 57,369; *see id.* at 57,370 ("By notifying each State in advance of its reduction requirements, EPA enables each State to develop its plan with full knowledge of the amount and kind of reductions that must be achieved ...."). In promulgating CAIR, EPA stated that it "does not expect States to make SIP submissions … addressing interstate transport" until after EPA sets the statewide standards, 70 Fed. Reg. at 25,265 n.116; that States "need a reasonable period of time" to comply with "policy judgments from EPA

concerning" the good-neighbor provision, *id.* at 25,269, and that EPA would issue a FIP "only … for those jurisdictions that fail to respond adequately" to CAIR, *id.* Even absent the cooperative-federalism mandate, EPA could not change that policy overnight *and simultaneously penalize* States for failing to anticipate the change. *Cf. Hatch v. FERC*, 654 F.2d 825, 835 (D.C. Cir. 1981).

EPA's actions are inconsistent with this Court's precedents. Indeed, this Court has repeatedly emphasized that EPA is not authorized to "force particular control measures on the states" in the first instance. *Virginia*, 108 F.3d at 1410. In *Michigan v. EPA*, for example, this Court considered EPA's authority to issue the $NO_X$ SIP Call, which required States to incorporate certain $NO_X$ emissions reductions into their SIPs in order to meet the good-neighbor provision at issue here. 213 F.3d at 671-72. This Court concluded that EPA may "ensure that submitted SIPs adequately prohibit significantly contributing emissions" by "*prospectively* inform[ing] the states of EPA's significance determinations." *Id.* at 687. This Court upheld the rule because EPA "look[ed] to section 110(a)(2)(D) and merely provide[d] the levels to be achieved by the *state-determined* compliance mechanisms." *Id.* Critically, EPA "d[id] not tell the states how to achieve SIP compliance," and "real choice exist[ed] for the covered states." *Id.* at 687-88. *Michigan* and *Virginia* establish that EPA cannot require particular control measures in SIPs, and thereby mandate federal controls. It follows *a fortiori* that EPA cannot impose particular control measures through a *FIP* at the same time that it "inform[s] the states" of new statewide standards—and without any

SIP call at all.  *Id.* at 687.  The Transport Rule does just that, with no regard for the Act's insistence that States have the "primary responsibility" to set local controls.

## 2.    The Transport Rule Is Arbitrary And Capricious

EPA's allowance allocation methodology in the Transport Rule is arbitrary and capricious because it bears no "'rational connection'" between the "'facts found'" by EPA and the choice it made in the Rule.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  It is also impermissibly retroactive, because it requires petitioner and other similarly situated EGUs to purchase hundreds of millions of dollars in allowances for 2012 and 2013 without any opportunity (as EPA concedes) to conform their conduct and avoid (or even mitigate) that penalty. *See National Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010).

EPA found that it would be impossible for sources to install new controls before 2014, and thus concluded that the state-wide emission reductions required in Phase I of the Rule must be achievable with existing controls.  Proposed Rule, 75 Fed. Reg. at 45,281.  But EPA proceeded to ignore that fact when adopting its heat-input approach to allocating allowances to EGUs within the State.  That approach—which essentially allocates allowances to sources based on how big they are, and not based on existing control technology in place at the source—wildly over-allocates allowances to some sources and just as severely under-allocates allowances to others, like petitioner.  Tab 2 ¶ 15.  Because the allocation methodology is completely divorced from the "technology status quo" that EPA used to set state standards, it is

arbitrary and capricious. That under-allocated sources may be able to purchase allowances does not make the allocation any less arbitrary. And, even if a source could buy enough allowances, it would face severe penalties under the Rule's "assurance" provisions if the amount of purchased allowances used in the State exceeds the State's initial yearly allocation by a certain amount. *Id.* ¶ 14.

Since EPA concedes it is impossible to install new emission control technology by the compliance deadline, the only way the Rule can achieve emission reductions is to curtail the operations of under-allocated sources like EME Homer City. But even that will not result in meaningful environmental benefits because the corresponding over-allocation to competing sources provides an opportunity for those sources to actually increase output and resulting emissions. The Rule is arbitrary and irrational.

### B. Petitioner Will Suffer Irreparable Injury Absent A Stay

Petitioner will be irreparably injured absent a stay. The Rule will force EME Homer City and others either to reduce electricity generation or purchase emissions allowances to enable them to continue generating electricity at current levels, thereby making massive unrecoverable payments to their competitors (hundreds of millions of dollars). In so doing, the Rule arbitrarily penalizes companies that have not installed certain emissions controls, even though those companies complied with existing federal and state regulation (including the $NO_x$ SIP Call and CAIR) in determining the

timing for installation of various emissions controls.[13]  Companies have no statutory

or regulatory mechanism to recover these losses if the Rule is invalidated.

EME Homer City anticipates that it will likely have to substantially curtail

operations.  It received only approximately 22% of the allowances it needs to operate

normally in 2012-2013, and it would have to pay its competitors approximately $85

million in 2012 for allowances to have any ability to maintain normal operations.  Tab

2 ¶¶ 13, 20.  Such a massive and unrecoverable payment to competitors would

irreparably harm EME Homer City.  For two reasons, however, that solution will

likely not work.  First, the $85 million allowance cost would increase the marginal cost

of running the plant, which would increase the dispatch cost of the electricity the

plant generates.  Because the lowest priced electricity is dispatched first, it is unlikely

that the plant's electricity would be dispatched, so the plant would receive no revenue.

*Id.* ¶¶ 16-18. Second, EME Homer City could not actually use the necessary

allowances because it would face substantial monetary penalties under the "assurance"

provisions.  *Id.* ¶ 14.

Whether EME Homer City substantially curtails operations or attempts to

purchase and use allowances to continue operations, the harms the Rule causes

constitute irreparable injury to Homer City and similarly situated entities.  *See Thunder*

*Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and

---

[13] *See* Tab 2 ¶¶ 6-8 (EME Homer City has had $NO_x$ controls (SCRs) in place since 2003; since CAIR issued, EME Homer City has installed one scrubber and is scheduled to have the two remaining scrubbers installed by 2014).

concurring in the judgment) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."); *Sottera, Inc. v. FDA*, 627 F.3d 891, 899 (D.C. Cir. 2010) (injunctive relief appropriate to avoid unrecoverable economic injury); *Humane Soc'y of the United States v. Cavel Int'l, Inc.*, No. 07-5120, 2007 U.S. App. LEXIS 10785, at \*2-3 (D.C. Cir. May 1, 2007) (per curiam) (granting stay based on shutdown of appellant's plant during appeal).

Absent a stay, States and regulated parties also will be irreparably injured by EPA's abrogation of States' cooperative-federalism rights under the CAA.[14] *See New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (a State's interest "is infringed by the very fact that the State is prevented from engaging in" its regulatory process); *California State Bd. of Optometry v. FTC*, No. 89-1190, 1989 U.S. App. LEXIS 16067, at \*1 (D.C. Cir. Aug. 15, 1989) ("'[A]ny time a state is enjoined from effectuating statutes enacted by representatives of the people, it suffers … irreparable injury.'"). That injury directly impacts EME Homer City and other regulated entities, who have been deprived of their right to participate in the SIP process, 42 U.S.C. §§ 7410(a)(1), 7410(*l*), and are being subjected to a potentially crippling, *ultra vires* federal mandate. This Court granted a stay of the NO$_x$ SIP Call based on similar concerns—where the claimed intrusion into State authority was far less severe. *Michigan v. EPA*, 1999 U.S. App. LEXIS 38833, at \*10. It should again do so here.

---

[14] EME is directly harmed as a result of this abrogation and, in any event, has standing to raise the injury inflicted on States. *Cf. Bond v. United States*, 131 S. Ct. 2355, 2364 (2011) ("States are not the sole intended beneficiaries of federalism").

### C.     The Balance Of Harms And Public Interest Favor A Stay

The requested stay would not materially impact EPA's interests. As noted, EPA has acknowledged that "it is not possible to require the installation of post-combustion $SO_2$ controls (scrubbers) or post-combustion $NO_x$ controls (SCRs) before 2014 (because it takes about 27 months to install a scrubber and 21 months to install an SCR) …." Proposed Rule, 75 Fed. Reg. at 45,281. As a result, Phase I of the Transport Rule will not result in any meaningful environmental benefits beyond those mandated by CAIR—which will remain in effect if the Rule is stayed. Instead, the Rule simply effectuates an unauthorized wealth transfer among regulated entities.

The public interest strongly favors a stay. The negligible environmental impacts of Phase I come at an extraordinary price to ratepayers and power-sector employees. EPA projects at least $1.4 billion in compliance costs in 2012 and price hikes of up to 4% in some areas of the country.[15] These are surely underestimates, as EPA's analysis fails to account for the significant impact of market power on the allowance market. The allocation methodology will create incentives for over-allocated producers to withhold allowances, preventing under-allocated units from operating normally, reducing the supply of electricity, and driving up the price they will receive for their own production. This could cost consumers an additional $514 million annually in 2012 and 2013. Tab 4 at 3-4. The Rule will also result in plant

---

[15] *See* Office of Air & Radiation, EPA, *Regulatory Impact Analysis for the Federal Implementation Plans to Reduce Interstate Transport of Fine Particulate Matter and Ozone in 27 States; Correction of SIP Approvals for 22 States,* 255, 266 (June 2011) (Tab 7).

closures and lost jobs—EPA itself estimates that the Rule will result in a loss of about 4.8 GW of capacity, or about *1% of all nationwide capacity*, Tab 7 at 262.

## II.  AT A MINIMUM, EXPEDITED REVIEW IS WARRANTED

In a typical case, expedited review is an alternative to a stay.  *See, e.g., Portland Cement Ass'n, Inc. v. EPA,* No. 10-1359 (D.C. Cir. Jan. 19, 2011).  The expedition standard is less stringent than the standard for a stay, *see Chamber of Commerce of the U.S. v. SEC,* No. 04-1300, 2004 WL 2348157, at *1 (D.C. Cir. Oct. 18, 2004), and would be amply met here for the reasons discussed.  But the extraordinarily short compliance deadline EPA has imposed for the Rule (five months) makes expedition highly challenging if not infeasible.  To brief, argue, and decide the case before the Phase I compliance deadline, something like the following schedule would be needed: Petitioner's Brief—October 17; EPA's Brief—14 days later; Petitioner's Reply—7 days later; and oral argument in November.  Petitioner would agree to any expedition that would allow for a decision before the Rule takes effect, but the significant challenges of such a schedule for a rule of this complexity, in which multiple petitioners are likely to be involved, simply further counsels in favor of a stay.

## CONCLUSION

This Court should grant a stay pending review of the Transport Rule or, at a minimum, expedited review to allow for a decision before the Rule takes effect.

Respectfully submitted,

Dated:  August 25, 2011

 /s/ Gregory G. Garre

Gregory G. Garre
Claudia M. O'Brien
Lori Alvino McGill
Stacey VanBelleghem
Katherine Twomey
LATHAM & WATKINS LLP
555 11th Street, NW
Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: gregory.garre@lw.com

# CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August 2011, I, Gregory G. Garre, a

member of the bar of this Court, caused the foregoing Petitioner's Motion For A Stay

Or, In The Alternative, Expedited Review to be served by hand-delivery upon:

Lisa P. Jackson, Administrator
United States Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, D.C.  20460

Correspondence Control Unit
Office of General Counsel (2311)
United States Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, D.C.  20460

The Honorable Eric Holder
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530


                                        /s/ Gregory G. Garre

                                        Gregory G. Garre