ORAL ARGUMENT NOT YET SCHEDULED

## UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____
)
EME HOMER CITY GENERATION, L.P., )
)
Petitioner, )
)
v. ) Docket No. 11-1302
)
UNITED STATES ENVIRONMENTAL )
PROTECTION AGENCY, et al., )
)
Respondents. )
_____ )

## RESPONDENTS' OPPOSITION TO MOTION FOR A STAY
## OR, IN THE ALTERNATIVE, EXPEDITED REVIEW

Respondents United States Environmental Protection Agency and Lisa P.

Jackson, in her official capacity as Administrator (collectively "EPA"), submit this

Opposition to Petitioner EME Homer City Generation, L.P.'s ("EME") Motion for

a Stay or, in the Alternative, Expedited Review. The motion should be denied

because EME has not satisfied the stringent requirements for obtaining a stay of

agency action or for expediting this Court's review. The rule under review is

within EPA's authority under the Clean Air Act and is consistent with this Court's

decision in North Carolina v. EPA, 531 F.3d 896 (D.C. Cir. 2008). Furthermore,

EME's alleged harms are the result of EME's business decision to rely on the

interstate trading aspects of EPA's Clean Air Interstate Rule ("CAIR") to purchase allowances instead of installing controls, with the result that the $SO_2$ emissions from EME's plant are far higher than those from any comparable power plant in the United States. The rule will result in significant environmental and health benefits for a large portion of the United States' population, and those benefits far outweigh the self-inflicted harms alleged by EME.

## BACKGROUND

The consolidated petitions in this case seek review of an EPA regulation entitled "Federal Implementation Plans: Interstate Transport of Fine Particulate and Ozone and Correction of SIP Approvals," 76 Fed. Reg. 48,208 (Aug. 8, 2011) ("Transport Rule"). The purpose of the Transport Rule is to address the problem of interstate contribution to nontattainment of the air quality standards for 8-hour ozone ("ozone") and fine particulate matter ("$PM_{2.5}$") in the eastern United States. The Transport Rule replaces CAIR and addresses the legal flaws that this Court identified in holding CAIR to be unlawful in North Carolina .

The Transport Rule, like CAIR and EPA's earlier NOx SIP Call, are intended to address the requirements of 42 U.S.C. § 7410(a)(2)(D)(i)(I), which requires that a State Implementation Plan ("SIP") "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to

nonattainment in, or interfere with maintenance by, any other State with respect to [a National Ambient Air Quality Standard ("NAAQS")]."  In brief, the Transport Rule identifies those States that significantly contribute to nonattainment or interfere with maintenance of the ozone or $PM_{2.5}$ standards in other States, establishes an emissions budget for each such State,[1/] and promulgates Federal Implementation Plans ("FIPs") to ensure that necessary reductions are achieved in each State.  See 76 Fed. Reg. at 48,209-16.  Phase I of the rule addresses emissions beginning in 2012.  Phase II, which applies more stringent $SO_2$ standards in some States, addresses emissions in  2014 and beyond.  Under the FIPs, EPA allocates allowances to individual sources for 2012.  States can, if they choose, submit a revised SIP to EPA for approval, which would allow them to allocate the State's budgets to individual sources in subsequent years.  For ozone season NOx emissions, sources must demonstrate that they hold allowances equal to their emissions by December of the year in which the emissions occurred. 76 Fed. Reg. at 48,277 n. 57.  For annual NOx and $SO_2$ emissions, sources must make that demonstration by March of the following year.  Id.

The Transport Rule differs from CAIR in several important respects.  First, it is based on a completely new analysis of which States should be subject to its

_____

[1/] For ozone the rule establishes a budget for nitrogen oxides ("NOx"), an ozone precursor, during the ozone season.  For $PM_{2.5}$, the rule establishes annual budgets for NOx and sulfur dioxide ("$SO_2$"), which are $PM_{2.5}$ precursors.

3

requirements and the appropriate level of control to be used in establishing State budgets. Second, it includes provisions to ensure that the necessary reductions occur within each covered State. For each State, EPA established an upper limit based on the historic variability of electricity generation at the State level. If emissions from a State exceed this upper limit, sources responsible for the exceedance must surrender extra allowances. Finally, the Transport Rule does not utilize allowances from the Title IV program for $SO_2$ and does not utilize fuel factors in allocating NOx allowances.

## STANDARD OF REVIEW

A stay is a disfavored remedy. "On a motion for stay, it is the movant's obligation to justify the court's exercise of such an extraordinary remedy." Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 978 (D.C. Cir. 1985). The factors for determining whether a stay is warranted are: (1) whether the movant has demonstrated a substantial likelihood that it will prevail on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of harm to other parties if relief is granted; and (4) the public interest. Nken v. Holder, 129 S. Ct. 1749, 1761 (2009). These four prongs of the stay standard are to be applied stringently. Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency Procedures, 409 U.S. 1207, 1218 (1972).

"A stay is not a matter of right, even if irreparable injury might otherwise result."

Nken, 129 S. Ct. at 1760 (citation omitted).

To demonstrate substantial likelihood of success on the merits, a movant must show it is likely that EPA's action will be found "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). This deferential standard prohibits a court from substituting its judgment for the agency's and presumes the validity of agency actions. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43-44 (1983). Judicial deference also typically extends to an agency's interpretation of a statute it administers, Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), and of its own regulations. Auer v. Robbins, 519 U.S. 452, 457 (1997).

To establish irreparable harm, a movant must demonstrate an injury that is "both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). "[S]elf-imposed costs are not properly the subject of inquiry on a motion for stay." Cuomo, 772 F.2d at 977.

**ARGUMENT**

**I. EME CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**

    **A.    EPA Has Statutory Authority To Promulgate The Transport Rule FIPs.**

EPA's authority to issue the FIPs in the Transport Rule is provided by Clean Air Act section 110(c)(1), which provides:

> The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator –
>
>     (A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A) of this section, or
>
>     (B) disapproves a State implementation plan submission in whole or in part,
>
> unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

42 U.S.C. § 7410(c)(1).

This provision gives EPA the authority to issue the Transport Rule FIPs, and in fact requires that EPA issue the FIPs, because for each State covered by the Transport Rule, EPA has either made a finding of a failure to submit and/or disapproved a SIP submission related to CAA section 110(a)(2)(D) for one or more of the 1997 ozone NAAQS, 1997 $PM_{2.5}$ NAAQS, and 2006 $PM_{2.5}$ NAAQS.  <u>See</u> FIP TSD, EPA-HQ-OAR-2009-0491-4527 (Att. 1).  With regard to the 2006

NAAQS, none of the States for which EPA has made a finding or disapproved a SIP submission has corrected the deficiency and EPA has not approved any such SIP revisions. Id. Thus, EPA unquestionably has authority to promulgate FIPs with regard to the 2006 $PM_{2.5}$ NAAQS. With regard to the 1997 NAAQS, EPA approved SIPs implementing the requirements of CAIR for some States, id., while other States remained subject to the CAIR FIPs. This Court's decision in North Carolina made clear that neither the CAIR FIPs (which were specifically invalidated by the Court), nor the SIPs implementing the CAIR requirements, corrected the deficiency, i.e., the failure to adequately address emissions within the State that have prohibited impacts on other States.

In its motion EME seeks relief from the requirement that it comply with the Transport Rule's emission requirements for $SO_2$. EME is subject to those requirements because sources in Pennsylvania significantly contribute to nonattainment or interfere with maintenance in other States of both the 1997 and 2006 $PM_{2.5}$ NAAQS. Att. 1 at 9-10. EPA has authority to impose a FIP containing $SO_2$ requirements under either finding.

With regard to the 1997 ozone and $PM_{2.5}$ NAAQS, EPA made a finding that Pennsylvania had failed to submit a SIP to address the requirements of section 110(a)(2)(D)(i) on April 25, 2005. 70 Fed. Reg. 21,147. Pennsylvania submitted a SIP revision to implement CAIR, and EPA approved that SIP revision on

December 10, 2009. 74 Fed. Reg. 65,446. Given that this approval was made <u>after</u> this Court's decision in <u>North Carolina</u>, it cannot reasonably be construed as a determination that Pennsylvania's SIP revision had corrected the problem identified in the determination of failure to submit. Rather, it merely allowed Pennsylvania to implement the CAIR requirements during the interim period allowed by this Court's remedy decision on rehearing in <u>North Carolina</u>.

EME asserts that EPA's approval of a SIP eliminates EPA's authority to promulgate a FIP. Motion at 10-11. The Act, however, states that EPA's obligation to promulgate a FIP is terminated only if "the State corrects the deficiency, <u>and</u> the Administrator approves the plan or plan revision." 42 U.S.C. § 7410(c)(1) (emphasis added). EPA's obligation and authority to promulgate a FIP is terminated only if both prongs of the statute are met, <u>i.e.</u>, the deficiency is corrected and a SIP is approved. The first prong was not met in Pennsylvania and other States where a CAIR SIP was approved after the decision in <u>North Carolina,</u> because the Court held that CAIR did <u>not</u> correct the deficiency. 531 F.3d at 906-08. Thus, while Pennsylvania's CAIR SIP allowed the State to administer the CAIR allowance program, it did not eliminate EPA's authority to issue a FIP.

Furthermore, in those States where EPA approved a CAIR SIP prior to the decision in <u>North Carolina</u>, the Court's decision makes clear that those SIPs also did not correct the deficiency. Thus, in those States as well, EPA's obligation and

authority to issue a FIP have not been eliminated. EME misstates EPA's position when it asserts that EPA believes that the decision in <u>North Carolina</u> "impliedly abrogated" previously approved SIPs. Motion at 10. Rather, EPA recognizes that those SIPs remain in place for the purpose of administering the CAIR programs, but the decision in <u>North Carolina</u> makes clear that the first prong of the section 110(c)(1) test has not been met, <u>i.e.</u>, that simply meeting the requirements of CAIR is not enough to correct the noted deficiency. 76 Fed. Reg. at 48,219; Response to Comments, EPA-HQ-OAR-2009-0491-4513, at 70-71 (Att. 2).

EME similarly misstates (Motion at 10) EPA's action to correct the previously issued SIP approvals. EPA is not disapproving those SIPs. They remain in effect to administer the CAIR allowance program to the extent it remains applicable. Rather, the Agency is correcting those previous approvals:

> to rescind any statements that the SIP submissions either satisfy or relieve the state of the obligation to submit a SIP to satisfy the requirements of section 110(a)(2)(D)(i)(I) with respect to the 1997 ozone and/or 1997 $PM_{2.5}$ NAAQS or any statements that EPA's approval of the SIP submissions either relieve EPA of the obligation to promulgate a FIP or remove EPA's authority to promulgate a FIP.

76 Fed. Reg. at 48,220. CAA section 110(k)(6), 42 U.S.C. § 7410(k)(6), explicitly gives EPA the authority to make such corrections.

With regard to the 2006 NAAQS, EPA made a finding that Pennsylvania had failed to submit a SIP to address the requirements of section 110(a)(2)(D)(i) on June 9, 2010. 75 Fed. Reg. 32,673. That deficiency has not been corrected, and

EPA has neither received nor approved a relevant SIP submission. Thus, under the plain terms of section 110(c)(1), EPA has both an obligation and the authority to promulgate a FIP to meet the requirements of section 110(a)(2)(D)(i) with respect to the 2006 $PM_{2.5}$ NAAQS in Pennsylvania.

With respect to the 2006 NAAQS, EME does not even attempt to address the requirements of section 110(c)(1). Rather, it bases its argument on a fundamental misstatement of EPA's position. Motion at 12-13. EPA's authority to promulgate the FIPs is not based on States' failures to implement the requirements of the Transport Rule, but rather on States' failures to submit a SIP to implement the requirements of section 110(a)(2)(D)(i) with respect to a newly promulgated or revised NAAQS. The Act gives States three years to submit those SIPs, 42 U.S.C. § 7410(a)(1), and thus they were due in 2009. They are now two years overdue. Nothing in the Act excuses States from the obligation to adopt a required SIP because EPA is developing a regulation. Nor is there anything in the Act that relieves EPA of its obligation and authority to promulgate a FIP when States have failed to adopt a required SIP.

EME's assertion (at 13) that the Transport Rule is tantamount to promulgation of a NAAQS is nonsensical. A NAAQS sets standards for the allowable level of pollutants in the ambient air, and the Act sets out a specific procedure for States to develop the control requirements necessary to achieve it.

See 42 U.S.C. §§ 7409, 7410.  However, it also gives EPA the authority to promulgate a FIP, which operates in lieu of the SIP, for States that have failed to do so.  Id. § 7410(c)(1).  The States have failed to address the requirements of section 110(a)(2)(D)(I), and the Act both authorizes and obligates EPA to directly impose regulatory requirements in the form of a FIP to address those requirements.

Contrary to EME's allegations (at 13-14), EPA's approach in this rule is the same as it took in CAIR.  In CAIR, while EPA did not promulgate FIPs at the same time as the rule, EPA did promulgate immediately effective FIPs before any States had submitted SIPs to implement CAIR and provided that States could administer CAIR if they submitted, and EPA approved, a SIP containing the requisite requirements.  71 Fed. Reg. 25,328 (Apr. 28, 2006).   EPA has done the same thing here.  In the NOx SIP Call, EPA faced a different situation where it had neither made findings of failure to submit nor disapproved pending SIP submissions as inadequate to satisfy the requirements of 110(a)(2)(D)(i)(I).  EPA thus issued a SIP Call and required States to promulgate SIPs to correct the deficiency identified in the SIP Call.  That process, however, requires a significant delay in the effective date of the rule's requirements.  EPA does not believe that such a delay would have been appropriate here because the Agency is obligated to comply with the Court's holding that it must address the attainment deadlines for downwind States, 531

F.3d at 911-12, and with the Court's admonition that it act expeditiously in replacing CAIR. <u>North Carolina v. EPA</u>, 550 F.3d 1176, 1178 (D.C. Cir. 2008)

Neither <u>Virginia v. EPA</u>, 108 F.3d 1397 (D.C. Cir. 1997), nor <u>Michigan v. EPA</u>, 213 F.3d 663 (D.C. Cir. 2000), supports EME's claims because neither case involved the imposition of federal requirements through a FIP. Rather, each concerned EPA's authority to require States to adopt particular requirements as a matter of <u>state</u> law. In both cases, EPA had issued a "SIP Call" under CAA section 110(k)(5), 42 U.S.C. § 7410(k)(5), in which the Agency notified certain States that their SIPs were inadequate and required them to revise them. In <u>Virginia</u>, the Court held that EPA had improperly required the States to adopt California's motor vehicle regulations as a condition of SIP approval. 108 F.3d at 1403-04. Moreover, the Court referred to a FIP as an alternative process by which EPA can impose federal requirements. <u>Id.</u> at 1406. In <u>Michigan</u>, the Court rejected challenges to the NOx SIP Call because, while the rule established budgets for the States, it did not require the States to adopt specific regulatory measures. 213 F.3d at 685-88.

### B. The Transport Rule's Methodology For Allocating $SO_2$ Allowances Is Reasonable And Complies With <u>North Carolina</u>.

The Transport Rule FIPs allocate allowances to existing sources on the basis of heat input, with a limit based on historic emission levels. EME challenges this methodology (at 15-16) because it does not provide greater numbers of allowances

to facilities such as EME's that have chosen not to install control equipment and thus have higher levels of emissions. EME's preferred approach is analogous to the fuel factors approach that EPA used to allocate NOx allowances under CAIR, which the Court found to be unlawful in <u>North Carolina</u>. In CAIR, EPA allocated NOx allowances based on heat input adjusted by a fuel factor (1.0 for coal, 0.6 for oil, and 0.4 for natural gas and other fuels) to reflect the relative amount of NOx emissions, and thus the relative cost of control, associated with each fuel type. However, the Court held that the use of the fuel factors was unlawful because such equitable considerations were not among the factors the statute allowed EPA to consider. 531 F.3d at 918-21. EME's proposed alternative that EPA should have similarly allocated allowances under the Transport Rule to give more allowances to some sources simply because they have not yet installed controls, is inconsistent with that holding.

## II. EME'S ALLEGED HARMS ARE THE RESULT OF EME'S DELIBERATE CHOICE TO DELAY THE INSTALLATION OF CONTROLS

EME is not entitled to the equitable remedy of a stay because its alleged harm, <u>i.e.</u>, the cost to it of purchasing allowances to comply with the Transport Rule, is self-inflicted. EME's facility has, by a large margin, the highest rate of $SO_2$ emissions of any large coal-fired power plant (<u>i.e.</u>, coal-fired plants with annual heat input over 100 million Btu) in the United States, and has the highest

total emissions of $SO_2$ of any plant in the country.  In 2010 EME's plant had an $SO_2$ emission rate of 2.08 lbs $SO_2$ per million Btu ("lbs/mmBtu"), while the next highest emitting large plant had an emissions rate of only 0.83 lbs/mmBtu.  Data available at http://camddataandmaps.epa.gov/gdm/index.cfm?fuseaction=emissions.wizard. The lowest emission rate among such plants was only 0.02 lbs/mmBtu, while the weighted average for such plants was 0.35 lbs/mmBtu.  Id.  Thus, EME's emission rate is six times the average rate for plants in this class and more than 150 percent higher than the next highest emitting plant in this class.

While EME's facility is located in a State subject to CAIR because emissions from the State were found to significantly contribute to nonattainment of the $PM_{2.5}$ NAAQS in other States, EME has chosen to maintain this very high $SO_2$ emission rate through the purchase of excess allowances from other facilities under the CAIR program.  In short, EME has made a business decision to meet its Clean Air Act compliance requirements through the purchase of allowances and to defer as long as possible the installation of control equipment that has been shown to reduce emissions cost-effectively at its competitors' facilities.

In North Carolina, this Court held that CAIR was unlawful for a number of reasons and thus initially vacated the rule.  Among the bases for the Court's decision were its holding that unrestricted interstate trading of allowances was

inconsistent with the statutory requirement that States eliminate their own significant contributions to nonattainment or maintenance issues in other States and its holding that EPA could not utilize allowances from the Clean Air Act's acid rain program in CAIR. 531 F.3d at 906-08, 921-22. Although the Court on rehearing remanded CAIR without vacatur, in response to requests that it impose a schedule on EPA to complete the remand, the Court stated:

> Though we do not impose a particular schedule by which EPA must alter CAIR, we remind EPA that we do not intend to grant an indefinite stay of the effectiveness of this court's decision. Our opinion revealed CAIR's fundamental flaws, which EPA must still remedy. Further, we remind the Petitioners that they may bring a mandamus petition to this court in the event that EPA fails to modify CAIR in a manner consistent with our July 11, 2008 opinion.

550 F.3d at 1178.

Thus, in 2008 EME knew that this Court had ordered EPA to expeditiously replace CAIR and that any such replacement would not utilize either unrestricted interstate trading or Title IV allowances. EME thus also knew that by maintaining a high emissions rate rather than installing controls, it risked facing relatively greater economic consequences when EPA promulgated a rule to replace CAIR. Nevertheless, EME chose not to install $SO_2$ emission control equipment, but rather planned to rely on traded Title IV allowances until at least 2015.

As a result of these business decisions, EME has emission rates far higher than any other comparable facility. EME now argues that it is entitled to receive

additional allowances (and its competitors fewer allowances) because it chose to retain high emission rates while its competitors installed controls. It is EME's decision not to install controls, however, that placed it in the inevitable position of having either to purchase allowances or find other means to reduce emissions to comply with the regulatory changes required by this Court's 2008 decision in North Carolina. (Analyses performed by EPA demonstrate that EME's facility will remain economic to operate in compliance with the Transport Rule with only a 4 percent difference in generation level in 2012 and a 1 percent difference in 2014. See EPA-HQ-2009-0491-4420, 4421, 4431, and 4440 (available at www.regulations.gov).) Because the costs alleged by EME are the direct result of its own actions, there is no basis for it to claim the equitable relief of a stay. Cuomo, 772 F.2d at 977 ("Such self-imposed costs are not properly the subject of inquiry on a motion for stay.")

## III. A STAY WOULD HARM THIRD PARTIES AND IS CONTRARY TO THE PUBLIC INTEREST

Staying the Transport Rule would harm third parties and the public interest by delaying the public health benefits of the rule.[2] The Transport Rule will achieve significant reductions in emissions, and thus in ambient levels of ozone

---

[2] For example, although the NOx SIP Call was ultimately upheld in all major respects, a court-ordered stay pending review delayed implementation by more than a year. Michigan v. EPA, No. 98-1497, Orders dated June 22 and August 30, 2000.

and $PM_{2.5}$, beyond those achieved by CAIR, and those increased emission reductions begin in 2012. For example, the Transport Rule covers several States that are not covered by CAIR and emission reductions in those States would begin in 2012. 76 Fed. Reg. at 48,319-20. A stay would delay those reductions. The Transport Rule also implements the Court's mandate in North Carolina, including the requirements that States eliminate their own significant contributions, that they prohibit emissions that interfere with maintenance, and that the State budgets be tied to the statutory mandate. A stay would harm the public interest by delaying those benefits as well.

EME also grossly misstates EPA's position regarding the benefits of the rule in 2012 and 2013. EPA has never suggested that the Transport Rule will not produce any environmental benefits until 2014. What EPA said was that it was not possible to require the construction of new control equipment (beyond that already being constructed to comply with CAIR) before 2014. However, the fact that it takes time to build new post-combustion controls does not mean no environmental benefit occurs in the interim. To the contrary, utilities have a range of options for reducing emissions. Significant environmental benefits flow from the fully optimized use of existing pollution control equipment and from other operational emission reduction strategies such as fuel switching, both of which utilities will utilize in response to the Transport Rule. A temporary revival of CAIR would not

provide the same incentives because of the Court's mandate that it be replaced, and thus a stay would delay those benefits.[3]  Second, a stay would cause longer-term harm by encouraging facilities to delay the installation of control technologies needed to achieve the greater emission reductions required by the second phase of the Transport Rule.  A stay would thus delay the public health benefits from installation of those controls.

EME's claim that the costs of the Transport Rule outweigh the benefits is meritless.  First, many of the 2012 costs identified by EME would be incurred whether CAIR or the Transport Rule was in place.  76 Fed. Reg. at 48,224 ("EPA properly treats the costs of operating controls installed to meet CAIR requirements as costs of meeting Transport Rule requirements.") Thus, those costs would not be avoided by a stay.  Second, EME's argument (Motion at 19) that consumers' electricity costs will increase is based on an assumption that is inconsistent with observed trading activity.  EME argues that costs will increase because units with extra allowances will hoard those allowances -- an argument that not only is not supported by compelling analysis but is also inconsistent with observed behavior in past programs.  EPA's analysis of the final Transport Rule programs shows that

_____

[3]  If the Transport Rule were temporarily stayed, emitters could find it more economic to operate existing control equipment at an inferior performance level while depleting CAIR and Title IV allowance holdings in advance of the delayed start date of the Transport Rule programs, which would cause environmental backsliding.

utilities can cost-effectively comply with these emission reductions, on average, with less than a 1 percent increase in consumer energy bills.  Regulatory Impact Analysis, EPA-HQ-OAR-2009-0491-4386, at 268-69 (Att. 3).

## IV.    THERE IS NO BASIS FOR EXPEDITED REVIEW

There is no basis for the Court to grant the expedited review requested by EME (at 20).  As demonstrated above, the costs to itself that EME alleges are the foreseeable result of business decisions that EME has made to defer the installation of controls, and the costs that EME alleges to the public are largely illusory.  In contrast, both EPA and other parties with an interest in the Transport Rule would be prejudiced by having inadequate time for briefing the case.[4]

Neither is there any exigency that would warrant such expedited review, and EME's claims of such are belied by the fact that EME waited for more than two weeks after the rule's publication to file its petition for review.  While the rule applies to emissions in 2012, sources have until December 2012 to demonstrate that they hold sufficient allowances to cover their emissions for the 2012 ozone season.  For the annual $SO_2$ emissions program that is the focus of EME's motion, sources do not have to make the demonstration that they hold sufficient allowances

_____

[4] The fact that CAIR allowances for 2012 and beyond will be terminated on October 14 is a red herring.  CAIR allowances are no longer relevant because they have been replaced by the Transport Rule.  If the Transport Rule were to be stayed or vacated by the Court, EPA would reinstate the CAIR allowances.

for 2012 until March 2013.  76 Fed. Reg. at 48,277 n. 57.  Thus, there is ample time for the Court to address the case in the normal course.

Furthermore, the rule was published August 8, 2011, and EPA anticipates that there will be a number of additional petitions for review of the rule filed before the statutory review period closes on October 7, 2011.  It would be a highly inefficient use of both the Court's and EPA's resources to litigate those petitions in the piecemeal fashion that would be dictated by granting EME's request for expedited review.

## CONCLUSION

EME's motion for a stay or, in the alternative, for expedited review should be denied.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General

/S/ Norman L. Rave, JR.
NORMAN L. RAVE, JR.
Environmental Defense Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 616-7568
Counsel for Respondent

September 9, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of September, 2011, I caused a copy of the foregoing document to be served by the Court's CM/ECF system on all counsel of record in this matter.

/S/ Norman L. Rave, Jr.
Norman L. Rave, Jr.