## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

|  |  |  |
|---|---|---|
| | ) | |
| EME HOMER CITY GENERATION, L.P., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Docket  No. 11-1302 |
| | ) | (and consolidated cases) |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, et al., | ) | |
| | ) | |
| Respondents. | ) | |

_____ )

### RESPONDENTS' OPPOSITION TO
### GENON ENERGY, INC.'S MOTION FOR A STAY
### OR, IN THE ALTERNATIVE, EXPEDITED REVIEW

IGNACIA S. MORENO
Assistant Attorney General
NORMAN L. RAVE, JR.
Environmental Defense Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 616-7568

OF COUNSEL

SONJA RODMAN
United States Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

DATED:  October 6, 2011

# TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.     GENON CANNOT DEMONSTRATE A SUBSTANTIAL
         LIKELIHOOD OF SUCCESS ON THE MERITS . . . . . . . . . . . . . . 5

        A.    The Transport Rule Is Consistent With The Statutory
              Requirements And With This Court's Decision In <u>North
              Carolina</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.    The State Budgets In The Final Rule Are A Logical Outgrowth
              Of The Proposal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.    EPA Has Authority To Promulgate Federal Implementation
              Plans For The States Covered By The Transport Rule. . . . . . 11

    II.    GENON HAS NOT ESTABLISHED THAT IT WILL SUFFER
         IRREPARABLE HARM IF THE RULE IS NOT STAYED AND
         ANY HARM IT MAY SUFFER IS THE RESULT OF ITS OWN
         BUSINESS DECISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    III.   A STAY WOULD HARM THIRD PARTIES AND IS CONTRARY
         TO THE PUBLIC INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    IV.   THERE IS NO BASIS FOR EXPEDITED REVIEW . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

**Cases**

Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency
    Procedures, 409 U.S. 1207 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

American Coke & Chemicals Inst. v. EPA, 452 F.3d 930 (D.C. Cir. 2006). . . 9, 11

Auer v. Robbins, 519 U.S. 452 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,
    467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972
    (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 16

Michigan v. EPA, No. 98-1497, Orders dated June 22 and August 30, 2000. . . . 17

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Nken v. Holder, 129 S. Ct. 1749 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

North Carolina v. EPA, 531 F.3d 896 (D.C. Cir. 2008) . . . . . . . 1, 5, 6, 7, 8, 12, 15

North Carolina v. EPA, 550 F.3d 1176 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . 16

Wildearth Guardians v. Jackson, No. 11-cv-00001-CMA-MEH
    (D. Col. Sept. 27, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Wisconsin Gas Co. v. FERC, 758 F.2d 669 (D.C. Cir. 1985) . . . . . . . . . . . 5,13, 14

**Statutes**

Administrative Procedure Act

    42 U.S.C. § 7607(d)(9)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Clean Air Act

Section 110(a)(2)(D)(i)(I), 42 U.S.C. § 7410(a)(2)(D)(i)(I) . . . . . . . . . . . . 2

Section 110(c)(1), 42 U.S.C. § 7410(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . 12

**<u>Federal Register</u>**

75 Fed. Reg. 53,613 (Sept. 1, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

75 Fed. Reg. 53,614 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

75 Fed. Reg. 66,055 (Oct. 27, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

76 Fed. Reg. 1109 (Jan. 7, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

76 Fed. Reg. 48,208 (Aug. 8, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

76 Fed. Reg. 48,209-16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

76 Fed. Reg. 48,214 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

76 Fed. Reg. 48,252-53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

76 Fed. Reg. 48,259-61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

76 Fed. Reg. 48,260 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

76 Fed. Reg. 48,267. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

76 Fed. Reg. 48,277 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

76 Fed. Reg. 48,277-79 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

76 Fed. Reg. 48,319-20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Respondents United States Environmental Protection Agency and Lisa P. Jackson, in her official capacity as Administrator (collectively "EPA"), submit this Opposition to Petitioner GenOn Energy, Inc.'s ("GenOn") Motion for a Stay or, in the Alternative, Expedited Review. The motion should be denied because GenOn has not satisfied the stringent requirements for obtaining a stay of agency action or for expediting this Court's review. The rule under review is within EPA's authority under the Clean Air Act and is consistent with this Court's decision in North Carolina v. EPA, 531 F.3d 896 (D.C. Cir. 2008). Furthermore, GenOn has not established that it will suffer harm from implementation of the Transport Rule, and, to the extent it may suffer harm, GenOn's alleged harms are the result of business decisions to delay installation of emission controls at certain units. Finally, the rule will result in significant environmental and health benefits for a large portion of the United States' population, and those benefits far outweigh the harms alleged by GenOn.

## BACKGROUND

The consolidated petitions in this case seek review of an EPA regulation entitled "Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals," 76 Fed. Reg. 48,208 (Aug. 8, 2011) ("Transport Rule"). The purpose of the Transport Rule is to address the problem of interstate contribution to nonattainment of the air quality standards for 8-hour ozone ("ozone") and fine particulate matter ("$PM_{2.5}$") in the eastern United

States.  The Transport Rule replaces the Clean Air Interstate Rule ("CAIR") and addresses the legal flaws that this Court identified in holding CAIR to be unlawful in North Carolina.

The Transport Rule, like CAIR and EPA's earlier NOx SIP Call, are intended to address the requirements of 42 U.S.C. § 7410(a)(2)(D)(i)(I), which requires that a State Implementation Plan ("SIP") "contain adequate provisions prohibiting . . . any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to [a National Ambient Air Quality Standard ("NAAQS")]."  In brief, the Transport Rule identifies those States that significantly contribute to nonattainment or interfere with maintenance of the ozone or $PM_{2.5}$ standards in other States, establishes an emissions budget for each such State,[1/] and promulgates Federal Implementation Plans ("FIPs") to ensure that necessary reductions are achieved in each State.  See 76 Fed. Reg. at 48,209-16.  Phase I of the rule addresses emissions beginning in 2012.  Phase II, which applies more stringent $SO_2$ standards in some States, addresses emissions in  2014 and beyond.  Under the FIPs, EPA allocates

---

[1/]  To address significant contribution to downwind ozone problems the rule establishes a budget for nitrogen oxides ("NOx"), an ozone precursor, during the ozone season.  To address significant contribution to downwind  $PM_{2.5}$ problems, the rule establishes annual budgets for NOx and sulfur dioxide ("$SO_2$"), which are $PM_{2.5}$ precursors.

allowances to individual sources for 2012. States can, if they choose, submit a revised SIP to EPA for approval, which would allow them to allocate the State's budgets to individual sources in subsequent years. For ozone season NOx emissions, sources must demonstrate that they hold allowances equal to their emissions by December of the year in which the emissions occurred. 76 Fed. Reg. at 48,277 n. 57. For annual NOx and $SO_2$ emissions, sources must make that demonstration by March of the following year. Id.

The Transport Rule differs from CAIR in several important respects. First, it is based on a completely new analysis of which States should be subject to its requirements and the appropriate level of control to be used in establishing State budgets. Second, it includes provisions to ensure that the necessary reductions occur within each covered State. For each State, EPA established an upper limit based on the historic variability of electricity generation at the State level. If emissions from a State exceed this upper limit, sources responsible for the exceedance must surrender extra allowances. Finally, the Transport Rule does not utilize allowances from the Title IV program for $SO_2$ and does not utilize fuel factors in allocating NOx allowances.

## STANDARD OF REVIEW

A stay is a disfavored remedy. "On a motion for stay, it is the movant's obligation to justify the court's exercise of such an extraordinary remedy." Cuomo

v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 978 (D.C. Cir. 1985). The factors for determining whether a stay is warranted are: (1) whether the movant has demonstrated a substantial likelihood that it will prevail on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of harm to other parties if relief is granted; and (4) the public interest. Nken v. Holder, 129 S. Ct. 1749, 1761 (2009). These four prongs of the stay standard are to be applied stringently. Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency Procedures, 409 U.S. 1207, 1218 (1972). "A stay is not a matter of right, even if irreparable injury might otherwise result." Nken, 129 S. Ct. at 1760 (citation omitted).

To demonstrate substantial likelihood of success on the merits, a movant must show it is likely that EPA's action will be found "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). This deferential standard prohibits a court from substituting its judgment for the agency's and presumes the validity of agency actions. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43-44 (1983). Judicial deference also typically extends to an agency's interpretation of a statute it administers, Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), and of its own regulations. Auer v. Robbins, 519 U.S. 452, 457 (1997).

To establish irreparable harm, a movant must demonstrate an injury that is "both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). "[S]elf-imposed costs are not properly the subject of inquiry on a motion for stay." Cuomo, 772 F.2d at 977.

## ARGUMENT

## I. GENON CANNOT DEMONSTRATE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A. The Transport Rule Is Consistent With The Statutory Requirements And With This Court's Decision In North Carolina.

Although the basis of GenOn's first merits argument (Motion at 8-12) is obscure, GenOn appears to be challenging the limitations imposed on the interstate trading of allowances. Those limitations, however, are necessary to comply with this Court's decision in North Carolina holding CAIR to be unlawful. CAIR was similar to the Transport Rule in that it was intended to eliminate the significant contribution of some States to ozone and PM2.5 nonattainment in other States. Also like the Transport Rule, CAIR established emission budgets for each covered State and distributed emission allowances to sources within each covered State. Unlike the Transport Rule, however, CAIR allowed for the unlimited interstate trading of allowances, which, as GenOn notes, gave sources full flexibility to comply with the requirements of CAIR by either installing emission controls or purchasing allowances from sources that had installed controls. To comply with

CAIR requirements at its Ohio and Pennsylvania facilities, GenOn chose to purchase allowances rather than install controls.

However, this unlimited interstate trading was one of the provisions of CAIR that this Court rejected in <u>North Carolina</u>. Specifically, the Court held that the unlimited interstate trading programs in CAIR were insufficient to satisfy the requirement of CAA section 110(a)(2)(D)(i)(I) that each State address its own significant contribution to nonattainment or maintenance problems in other States:

> [A]ccording to Congress, individual state contributions to downwind nonattainment areas do matter. Section 110(a)(2)(D)(i)(I) prohibits sources "*within the State*" from contribut[ing] significantly to nonattainment *in . . . any other State . . . .*" (emphasis added). Yet under CAIR, sources in Alabama, which contribute to nonattainment of PM2.5 NAAQS in Davidson County, North Carolina, would not need to reduce their emissions at all. [Citation omitted.] Theoretically, sources in Alabama could purchase enough NOx and SO2 allowances to cover all their current emissions, resulting in no change in Alabama's contribution to Davidson County, North Carolina's nonattainment. . . . But EPA is not exercising its section 110(a)(2)(D)(i)(I) duty unless it is promulgating a rule that achieves something measurable toward the goal of prohibiting sources "within the State" from contributing to nonattainment or interfering with maintenance "in any other State."

531 F.3d at 907 (emphasis in original).

While the Transport Rule allows limited interstate trading to address variability in the generation of electricity in each State from year to year, it restricts that trading by imposing penalties on sources in States exceeding their budget plus

variability limit.[2]  While that restriction may impose additional costs on sources that have been relying on interstate trading to meet the requirements of CAIR, as this Court held in North Carolina, those costs are a necessary consequence of the statutory requirement that each State's significant contribution to nonattainment or interference with maintenance in other States be eliminated, and a cost that sources should have anticipated in light of the decision in North Carolina.  Further, to the extent GenOn is suggesting (Motion at 12) that EPA had an obligation to select a methodology to mitigate the cost to units that have not yet installed controls instead of the neutral allowance allocation methodology chosen, its argument has no basis in the statute or the Court's decision in North Carolina.

To the extent that GenOn is challenging the dates by which the Transport Rule requirements must be met, that argument is also foreclosed by this Court's holding in North Carolina that EPA must harmonize the requirements of any rule governing interstate transport with the deadlines for attainment of the NAAQS in downwind States, and holding unlawful the CAIR Phase II compliance date of

_____

[2]  Specifically, in the Transport Rule EPA established for each State a variability limit corresponding to 18 percent of each State's annual budgets and 21 percent for each State's ozone season budget.  76 Fed. Reg. at 48,267.  If emissions from a State for a specific control period exceed its budget plus variability limit for that control period, then sources in the State whose emissions exceed their share of the state's assurance level will be required to surrender two extra allowances for every ton of emissions they have exceeded their share of the State's assurance level.  Id. at 48,294.

2015. 531 F.3d at 911-12. The Transport Rule deadlines are coordinated with the attainment dates for the relevant NAAQS to comply with the Court's holding. 76 Fed. Reg. at 48,214; 48,277-79.

Furthermore, EPA analyzed whether the required reductions could be achieved by 2012 and 2014 at reasonable cost levels and determined that they can. 76 Fed. Reg. at 48,252-53. While EPA recognized that it would not be feasible for utilities to construct new scrubbers or other post-combustion control devices by 2012, the Agency determined that the necessary emission reductions can be achieved by more aggressive operation of existing control units, installation of combustion controls, fuel switching, and increased dispatch of lower-emitting generating units. Id. at 48,252.

GenOn does not dispute this conclusion. Rather, its complaint is that the Transport Rule will result in the preferential utilization of generating units with lower levels of pollutant emissions rather than units with higher levels of pollutant emissions (and accordingly a more negative impact on public health). Motion at 11-12. However, the purpose of the rule, and of the statutory provision it implements, is to eliminate emissions that significantly contribute to nonattainment or interfere with maintenance of air quality standards in other States. The fact that it achieves that purpose, i.e., that the rule results in reduced emission of those

pollutants, and does so in compliance with the requirements of this Court's

decision in North Carolina, cannot make the rule unlawful, arbitrary, or capricious.

**B.      The State Budgets In The Final Rule Are A Logical Outgrowth Of The Proposal.**

GenOn's second claim is that because the final SO2 budgets for

Pennsylvania, Ohio, and Maryland are lower than those in the proposal, the final

budgets are not a logical outgrowth of EPA's proposed rule.  Motion at 12-15.

However, as this Court has held, a final rule is a logical outgrowth of the proposal

"where the agency gave adequate notice of the procedures it intended to use, the

criteria by which it intended to select data, and the range of alternative sources of

data it was considering."  American Coke & Chemicals Inst. v. EPA, 452 F.3d 930,

939 (D.C. Cir. 2006).

Those criteria are met here.  The SO2 budgets for Pennsylvania, Ohio, and

Maryland represent each state's emissions in an average year after implementation

of reductions needed to eliminate emissions that significantly contribute to

nonattainment or interfere with maintenance in other states.  76 Fed. Reg. at

48,260.  To identify the necessary reductions, EPA used an air quality based

analysis to identify appropriate cost thresholds and its Integrated Planning Model

("IPM") to predict SO2 emissions from electric generating units in each State after

implementation of controls at those cost thresholds.  76 Fed. Reg. at 48,259-61.

For SO2, EPA determined that some states could eliminate their significant

contribution by installing controls costing no more than $500 per ton and that others needed controls costing no more than $2,300 per ton.  Id.  EPA determined that Pennsylvania, Ohio, and Maryland could eliminate their significant contribution by installing controls costing no more than $500 per ton in 2012 and no more than $2300 per ton in 2014.

The change in the budgets between the proposed and final rules is due primarily to modifications EPA made to the IPM to make it more accurate.  Id. at 48,260.  In response to the proposal, numerous commenters had suggested certain IPM updates were needed.  EPA agreed that some changes were appropriate, and explicitly provided an opportunity to comment on those changes.  On September 1, 2010, EPA published a Notice of Data Availability ("NODA") in the Federal Register.  75 Fed. Reg. 53,613.[3]  That NODA stated that EPA had made changes in the IPM, that detailed documentation of the changes was available in the docket (which is available on-line at www.regulations.gov), and requested comment on the changes.  Id. at 53,614.  The NODA also stated that updated information concerning the generating units included in the IPM was available for comment in the docket.  Id.  The NODA specifically stated that these changes to the IPM could impact the final rule by "[c]hanging the cost and emission projections used in the

_____

[3] This was one of three NODAs published by EPA to provide an opportunity for comment on revised data used in its analyses for the Transport Rule.  The others are at 75 Fed. Reg. 66,055 (Oct. 27, 2010) and 76 Fed. Reg. 1109 (Jan. 7, 2011).

multi-factor test to determine the amount of emissions that represent significant emissions," id., which determines the State budgets.  Therefore, GenOn had an opportunity to comment on the changes in the IPM that resulted in the changes in the final state budgets.

Because GenOn had ample opportunity to comment on the methodology used to calculate the state budgets and on the changes to the IPM and air quality model inputs, there is no basis to GenOn's claim that it lacked notice and opportunity for comment.  American Coke, 452 F.3d at 938-39 ("If interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period, then the rule is deemed to constitute a logical outgrowth of the proposed rule.").

### C.    EPA Has Authority To Promulgate Federal Implementation Plans For The States Covered By The Transport Rule.

GenOn adopts by reference the arguments made by Edison Mission Energy, Inc. ("EME") asserting that EPA lacks the authority to implement the Transport Rule through promulgation of a Federal Implementation Plan ("FIP").  Motion at 16.  As demonstrated in EPA's opposition to EME's motion for stay (Document No. 1328647), those arguments are without merit.  EPA incorporates that response by reference here.

In brief, Clean Air Act section 110(c)(1), 42 U.S.C. § 7410(c)(1), provides that EPA "shall" promulgate a FIP at any time within 2 years after EPA finds that a State has failed to make a required submission, finds that a submitted SIP does not satisfy minimum criteria, or disapproves a submitted SIP in whole or part, unless the State corrects the plan or plan revision and EPA approves the plan or plan revision. For each State covered by the Transport Rule, EPA has either made a finding of a failure to submit and/or disapproved a SIP submission related to CAA section 110(a)(2)(D) for one or more of the 1997 ozone NAAQS, 1997 $PM_{2.5}$ NAAQS, and 2006 $PM_{2.5}$ NAAQS. See FIP TSD, EPA-HQ-OAR-2009-0491-4527 (Att. 1). For the three States that are the focus of GenOn's motion, i.e., Maryland, Ohio, and Pennsylvania, EPA made one of those findings for each of the three NAAQS. Id.

With regard to the 2006 $PM_{2.5}$ NAAQS, there can be no argument that subsequent action affected EPA's authority because none of the States for which EPA has made a finding or disapproved a SIP submission has corrected the deficiency, and EPA has not approved any such SIP revisions. Id. With regard to the 1997 NAAQS, this Court's decision in North Carolina made clear that neither the CAIR FIPs (which were specifically invalidated by the Court), nor the SIPs implementing the CAIR requirements, corrected the SIP deficiency, i.e., the failure to adequately address emissions within the State that have prohibited impacts on

other States.  531 F.3d at 907.  The Court's decision to leave CAIR in place did not undo its conclusion that CAIR did not appropriately determine what reductions are required in each State by section 110(a)(2)(D)(i)(I).[4]  Thus, EPA's obligation to promulgate a FIP to address the 1997 NAAQS has not been met.  Accordingly, EPA has both the authority and an obligation to promulgate the Transport Rule FIPs.  See Wildearth Guardians v. Jackson, No. 11-cv-00001-CMA-MEH (D. Col. Sept. 27, 2011) at 17 & n.8 (Att. 2) (where EPA's FIP obligation has been triggered, submittal of SIP by State does not eliminate EPA's authority to promulgate FIP).

## II.  GENON HAS NOT ESTABLISHED THAT IT WILL SUFFER IRREPARABLE HARM IF THE RULE IS NOT STAYED AND ANY HARM IT MAY SUFFER IS THE RESULT OF ITS OWN BUSINESS DECISIONS

GenOn asserts in general terms that it will suffer economic harm from the Transport Rule because it will have to purchase allowances and may not be able to operate some units at levels it has generated at in the past.  Motion at 16-18. However, it is well-settled that "economic loss does not, in and of itself, constitute irreparable harm." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  Specifically, an alleged temporary loss in profits during a defined period of

---

[4]  EPA's obligation to promulgate a FIP to address the 1997 NAAQS also does not evaporate if EPA misses the two year deadline for federal action.  See United States v. Dolan, 571 F.3d 1022, 1027 (10th Cir. 2009) ("It would be a strange thing if a bureaucracy . . . could avoid a congressional mandate by unlawful delay").

time, as GenOn alleges it will suffer in 2012, is not considered "irreparable" except in the most extreme circumstances, i.e., where the "very existence" of the company is threatened, see Wisconsin Gas, 758 F.2d at 674. GenOn has not even suggested that is the case here.

Furthermore, GenOn makes no attempt to quantify the harm it asserts it will suffer. Nor does it compare its costs or revenues under the Transport Rule with what they would be if CAIR continued in place, which it would were the Transport Rule stayed. Most significantly, GenOn does not quantify the benefits it would receive from selling its allowances in States where its initial allocation exceeds its projected levels of emissions; these benefits would at least partially offset the costs it claims it would incur in other States. At least one independent analysis has examined that issue and concluded that the benefits to GenOn from selling allowances will have a significant mitigating effect. UBS Investment Research report on GenOn Energy, Inc., September 9, 2011 (Att. 3).

Furthermore, even if it will suffer some costs from compliance with the Transport Rule, GenOn is not entitled to the equitable remedy of a stay because those costs are the results of business decisions made by GenOn. As GenOn notes (Motion at 18), GenOn chose to meet the requirements of CAIR for its facilities in Ohio and Pennsylvania through the purchase of excess allowances from other facilities under the CAIR program. This strategy resulted in higher emissions for

GenOn's facilities compared to facilities that had installed controls. GenOn made a business decision to meet its Clean Air Act compliance requirements at certain units (most notably its coal-fired units in Pennsylvania and Ohio[5]) through the purchase of allowances and to defer the installation of controls that have been shown to reduce emissions cost-effectively at its competitors' facilities.

In North Carolina, this Court held that CAIR was unlawful for a number of reasons and thus initially vacated the rule. Among the bases for the Court's decision were its holding that unrestricted interstate trading of allowances was inconsistent with the statutory requirement that States eliminate their own significant contributions to nonattainment or maintenance issues in other States. 531 F.3d at 906-08. Although the Court on rehearing remanded CAIR without vacatur, in response to requests that it impose a schedule on EPA to complete the remand, the Court stated:

> Though we do not impose a particular schedule by which EPA must alter CAIR, we remind EPA that we do not intend to grant an

---

[5] While GenOn owns a number of cleaner facilities, its eleven coal-fired facilities in Pennsylvania and Ohio have an average $SO_2$ emission rate that is 77 percent higher and a NOx emission rate that is 69 percent higher than the averages for coal-fired units covered by the Acid Rain program or CAIR. For example, in 2010, GenOn's Niles Generating Station had the highest $SO_2$ emission rate and the fourth highest NOx emission rate of the 441 coal-fired facilities covered by the Acid Rain Program or CAIR. See http://camddataandmaps.epa.gov/gdm/. (While, as noted in our opposition to its motion for stay, EME Homer's facility had the highest emission rate of all large coal-fired facilities, the Niles plant is smaller and thus does not fall in the same category.)

indefinite stay of the effectiveness of this court's decision. Our opinion revealed CAIR's fundamental flaws, which EPA must still remedy. Further, we remind the Petitioners that they may bring a mandamus petition to this court in the event that EPA fails to modify CAIR in a manner consistent with our July 11, 2008 opinion.

550 F.3d at 1178.

Thus, in 2008 GenOn knew that this Court had ordered EPA to expeditiously replace CAIR and that any such replacement would not rely solely on unrestricted interstate trading. GenOn thus also knew that by maintaining a high emissions rate rather than installing controls, it risked facing relatively greater economic consequences when EPA promulgated a rule to replace CAIR. Nevertheless, numerous GenOn units chose not to install $SO_2$ emission control equipment. As a result of those decisions, to cover emissions from those units GenOn now must either purchase allowances, obtain allowances from other GenOn units with excess allowances, or find other means to reduce emissions to comply with the regulatory changes required by this Court's 2008 decision.

Because the costs alleged by GenOn are the direct result of its own actions, there is no basis for it to claim the equitable relief of a stay. Cuomo, 772 F.2d at 977 ("Such self-imposed costs are not properly the subject of inquiry on a motion for stay.")

### III. A STAY WOULD HARM THIRD PARTIES AND IS CONTRARY TO THE PUBLIC INTEREST

As GenOn admits (Motion at 18), staying the Transport Rule would harm third parties and the public interest by delaying the public health benefits of the rule.[9]  The Transport Rule will achieve significant reductions in emissions, and thus in ambient levels of ozone and $PM_{2.5}$, both of which are linked to respiratory and cardiac illnesses, beyond those achieved by CAIR, and those increased emission reductions begin in 2012.  For example, the Transport Rule covers several States that are not covered by CAIR, and emission reductions -- and the corresponding public health benefits -- in those States would begin in 2012.  76 Fed. Reg. at 48,319-20.  A stay would delay those reductions.  The Transport Rule also implements the Court's mandate in North Carolina, including the requirements that States eliminate their own significant contributions, that they prohibit emissions that interfere with maintenance, and that the State budgets be tied to the statutory mandate.  A stay would harm the public interest by delaying those benefits as well.

While EPA does not contemplate that new emission controls will be put in place by 2012, significant environmental benefits flow from measures that utilities

_____

[9] For example, although the NOx SIP Call was ultimately upheld in all major respects, a court-ordered stay pending review delayed implementation by more than a year.  Michigan v. EPA, No. 98-1497, Orders dated June 22 and August 30, 2000.

will take to comply with the Transport Rule's 2012 and 2013 requirements, including the fully optimized use of existing pollution control equipment and from other operational emission reduction strategies such as fuel switching. A stay that results in a temporary revival of CAIR would not provide the same incentives because of the Court's mandate that it be replaced, and thus a stay would delay those benefits.[7] A stay would also cause longer-term harm by encouraging facilities to delay the installation of control technologies needed to achieve the greater emission reductions required by the second phase of the Transport Rule. A stay would also delay the public health benefits from installation of those controls.

GenOn's claims of harm associated with alleged increases in consumers' electricity costs are unsupported and contradicted by evidence in the record. EPA's analysis of the final Transport Rule programs shows that utilities can cost-effectively comply with these emission reductions, on average, with less than a 1 percent increase in consumer energy bills. Regulatory Impact Analysis, EPA-HQ-OAR-2009-0491-4386, at 268-69 (Att. 4).

GenOn's claim that the Transport Rule will decrease the reliability of the electric generating system is also unsupported. While some high-emitting facilities

_____

[7] If the Transport Rule were temporarily stayed, emitters could find it more economic to operate existing control equipment at an inferior performance level while depleting current CAIR and Title IV allowance holdings in advance of the delayed start date of the Transport Rule programs, which would cause environmental backsliding.

may conclude that closure or reduced operations is a cost-effective compliance strategy, these outcomes are not mandated by the Transport Rule.  Further, compliance decisions are regularly coordinated with grid operating authorities allowing the electricity these facilities would have generated to be provided instead by other, lower-emitting facilities.  Furthermore, as Movant-Intervenor Exelon Corporation has demonstrated in its Opposition to EME Homer City Generation, L.P.'s Motion for Stay, a number of independent analyses have demonstrated that the Transport Rule will not cause problems with reliability.  Document No. 1328718 at 16-17.  See also US EPA, "Resource Adequacy and Reliability in the IPM Projections for the Transport Rule TSD" at 3 (Att. 5) (Transport Rule will result in less than one half of one percent reduction in operational capacity, which will have little overall impact because the weighted average reserve margin is projected to be 25 percent).

## IV.    THERE IS NO BASIS FOR EXPEDITED REVIEW

There is no basis for the Court to grant the expedited review requested by GenOn as alternative relief (at 20).  As demonstrated above, the costs to itself that GenOn alleges are the foreseeable result of business decisions that GenOn has made to defer the installation of controls, and the costs that GenOn alleges to the public are largely illusory.  In contrast, both EPA and other parties with an interest in the Transport Rule would be prejudiced by having inadequate time for briefing .

Nor is there any exigency that would warrant such expedited review. While it is true that the EGU budget in the Transport Rule will begin to apply to emissions in 2012, sources have until December 2012 to demonstrate that they hold sufficient allowances to cover their emissions for the 2012 ozone season, and until March 2013 to make this showing for the annual SO2 emissions program that is the focus of GenOn's motion. 76 Fed. Reg. at 48,277 n. 57. Thus, it is entirely likely that the merits of this case could be heard in the normal course before GenOn has to make either of these demonstrations.

## CONCLUSION

GenOn's motion for a stay or, in the alternative, for expedited review should be denied.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
/S/ Norman L. Rave, Jr.
NORMAN L. RAVE, JR.
Environmental Defense Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 616-7568
Counsel for Respondent

October 6, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of October, 2011, I caused a copy of the foregoing document to be served by the Court's CM/ECF system on all counsel of record in this matter.

/S/ Norman L. Rave, Jr.
Norman L. Rave, Jr.