No. 11-1302 (and consolidated cases) – Complex

*Oral Argument Held April 13, 2012*
*Decision Issued August 21, 2012*

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

EME HOMER CITY GENERATION, L.P.,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

Respondents

_____

On Petitions for Review of Final Action of the
United States Environmental Protection Agency

_____

**PETITION OF INTERVENORS AMERICAN LUNG ASSOCIATION, CLEAN AIR COUNCIL, ENVIRONMENTAL DEFENSE FUND, NATURAL RESOURCES DEFENSE COUNCIL, AND THE SIERRA CLUB FOR PANEL REHEARING OR REHEARING EN BANC**

Vickie L. Patton
Graham G. McCahan
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(303) 447-7215
vpatton@edf.org
gmccahan@edf.org

Sean H. Donahue
Donahue & Goldberg, LLP
2000 L St. NW Suite 808
Washington DC 30036
(202) 277-7085
sean@donahuegoldberg.com

*Counsel for Environmental Defense Fund*

George Hays
236 West Portal Ave., No. 110
San Francisco, CA 94127
(415) 566-5414
georgehays@mindspring.com

Josh Stebbins
Sierra Club
50 F Street NW Suite 800
Washington DC 20001
(202) 675-6273
josh.stebbins@sierraclub.org

*Counsel for the Sierra Club*

(Additional counsel listed on following page)

John Walke
Natural Resources Defense
    Council
1152 15th St., Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org

*Counsel for NRDC*

David Marshall
Clean Air Task Force
41 Liberty Hill Road
Building 2, Suite 205
Henniker, NH 03242
 (603) 428-8114
dmarshall@catf.us

*Counsel for American Lung
Association and Clean Air Council*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................... ii

GLOSSARY ............................................................................... v

INTRODUCTION AND RULE 35(b)(1) STATEMENT ............................1

ARGUMENT .........................................................................4

I.     THE PANEL'S DECISION CONTRAVENES THE CLEAN
       AIR ACT'S JUDICIAL REVIEW PROVISIONS AND THIS
       COURT'S INTERPRETATION OF THOSE PROVISIONS. ..............4

       A. Petitioners    Failed    to    Raise    Statutory    "Significant
          Contribution" Objections During the Comment Period, and
          the Panel Improperly Interpreted Section 307(d)(7)(B) and
          this Court's Precedents. ......................................................4

       B. The Court Vacated the Rule Based Upon Legal Challenges
          that Were Barred Under Section 307(b)(1). .................................. 11

II.    THE   PANEL'S   DECISION   IS   INCONSISTENT   WITH
       *MICHIGAN* AND *NORTH CAROLINA*. ............................................ 12

CONCLUSION ......................................................................... 15

CERTIFICATE OF SERVICE ................................................. 17

ADDENDUM: PANEL OPINION ...................................... ADD-1

ADDENDUM: CERTIFICATE AS TO PARTIES ........................ ADD-105

ADDENDUM: CORPORATE DISCLOSURE STATEMENTS ... ADD-108

# TABLE OF AUTHORITIES

## CASES

*American Family Ass'n, Inc. v. FCC*,
    365 F.3d 1156 (D.C. Cir 2004) .......................................................... 10

* *Appalachian Power Co. v. EPA*,
    251 F.3d 1026 (D.C. Cir 2001) ....................................................... 2, 6

*Avocados Plus Inc. v. Veneman*,
    370 F.3d 1243 (D.C. Cir 2004) ..........................................................9

*Boivin v. U.S. Airways, Inc.*,
    446 F.3d 148 (D.C. Cir 2006) .......................................................... 10

*Booth v. Churner*,
    532 U.S. 731 (2001) ...........................................................................9

* *Cement Kiln Recycling Coalition v. EPA*,
    255 F.3d 855 (D.C. Cir. 2001) ........................................................ 2, 7

*Charter Communications, Inc. v. FCC*,
    460 F.3d 31 (D.C. Cir. 2006) ..................................................... 6, 7, 9

* *Chevron U.S.A. Inc. v. NRDC*,
    467 U.S. 837 (1984) .................................................................. 10, 15

*Davis v. Dep't of Justice*,
    610 F.3d 750 (D.C. Cir 2010) .............................................................3

*Fertilizer Inst. v. EPA*,
    935 F.2d 1303 (D.C. Cir 1991) ........................................................ 11

* *Medical Waste Inst. & Energy Recovery Council v. EPA*,
    645 F.3d 420 (D.C. Cir 2011) ....................................................... 3, 11

* *Michigan v. EPA*,
    213 F.3d 663 (D.C. Cir. 2000) ...............................................3, 7, 13-15

\* *Mossville Envtl. Action Now v. EPA*,
   370 F.3d 1232 (D.C. Cir 2004) ........................................................ 2, 5

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
   142 F.3d 449 (D.C. Cir 1998) ................................................................5

\* *North Carolina v. EPA*,
   531 F.3d 896, *modified on reh'g*,
   550 F.3d 1176 (D.C. Cir. 2008) .........................................1- 4, 7, 13-15

\* *Slinger Drainage, Inc. v. EPA*,
   237 F.3d 681 (D.C. Cir. 2001) ........................................................ 3, 11

*South Coast Air Quality Mgmt. Dist. v. EPA*,
   472 F.3d 882 (D.C. Cir 2006) ........................................................ 6, 11

\* *Texas Mun. Power Agency v. EPA*,
   251 F.3d 1026 (D.C. Cir 2001) ....................................................... 2, 9

*UDC Chairs Chapter, Am. Ass'n v. Board of Trustees*,
   56 F.3d 1469 (D.C. Cir. 1995) ...............................................................9

*United States v. L.A. Tucker Truck Lines, Inc.*,
   344 U.S. 33 (1952) ...................................................................... 9, 11

*United Steel Workers of Am. v. Marshall*,
   647 F.2d 1189 (D.C. Cir. 1980) ...........................................................8

## CLEAN AIR ACT

\* 42 U.S.C. § 7410(a)(2)(D)(i)(I) ............................................................ 1, 13

42 U.S.C. § 7410(c)(1) ....................................................................... 13

\* 42 U.S.C. § 7607(b)(1) ........................................................... 2, 11, 12

\* 42 U.S.C. § 7607(d)(7)(B) ................................................... 2, 5, 6, 7, 9, 11

**FEDERAL REGISTER**

75 Fed. Reg. 32673 (June 9, 2010) ............................................................... 12

75 Fed. Reg. 45210 (Aug. 2, 2010) ........................................................... 7, 8

* 76 Fed. Reg. 48208 (Aug. 8, 2011) ................................................. 1, 3, 7, 8

**OTHER AUTHORITIES**

EPA, Technical Support Document, Alternative Significant Contribution
Approaches Evaluated (July 2010),
        EPA-HQ-OAR-2009-0491-4140-0077 ................................................ 15

\* Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| CAIR | Rule to Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule); Revisions to Acid Rain Program; Revisions to the NOx SIP Call, 70 Fed. Reg. 25162 (May 12, 2005) |
| Dissent | Slip opinion, dissenting opinion in *EME Homer City Generation, L.P. v. EPA, et al.*, Nos. 11-1302 (and consolidated cases) (D.C. Cir. August 21, 2012) |
| EPA Br. | Brief for Respondent |
| FIP | Federal implementation plan |
| "Good neighbor" provision | Clean Air Act Section 110(a)(2)(D)(i)(I), 42 U.S.C. § 7410(a)(2)(D)(i)(I) |
| Industry & Labor Petrs. Br. | Opening brief for Industry and Labor Petitioners |
| NAAQS | National Ambient Air Quality Standard |
| $PM_{2.5}$ | Fine particulate matter |
| SIP | State implementation plan |
| Op. | Slip opinion, majority ruling in *EME Homer City Generation, L.P. v. EPA, et al.*, Nos. 11-1302 (and consolidated cases) (D.C. Cir. August 21, 2012) |
| Transport Rule or Rule | Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 Fed. Reg. 48208 (Aug. 8, 2011) |

v

## INTRODUCTION AND RULE 35(b)(1) STATEMENT

The Public Health Intervenors respectfully seek rehearing. This case presents "question[s] of exceptional importance," and en banc review is required to "secure or maintain uniformity of the court's decisions." Fed. R. App. P. 35(a).

Much of the eastern United States cannot meet the Clean Air Act's health-based air quality standards for fine particulates and ozone because of air pollution crossing state lines. To address that interstate pollution, EPA promulgated the 2005 Clean Air Interstate Rule (CAIR), but this Court remanded that rule, largely because it failed to require sufficient and timely reductions to meet the needs of neighboring downwind States. *See North Carolina v. EPA*, 531 F.3d 896, *on rehearing*, 550 F.3d 1176 (2008). To conform to the mandate in *North Carolina*, EPA then promulgated the rule presently before the Court, the Cross-State Air Pollution Rule (Transport Rule or Rule), 76 Fed. Reg. 48,208 (Aug. 8, 2011).

The Rule implements the "good neighbor" provision of the Clean Air Act, which requires that state implementation plans (SIPs) contain adequate provisions "prohibiting * * * any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will— (I) *contribute significantly* to nonattainment in, or interfere with maintenance by, any other State with respect to any" national air quality standard. 42 U.S.C. § 7410(a)(2)(D)(i) (emphasis added). To determine which upwind States are significant contributors

to downwind nonattainment, EPA performed a two-step analysis. First, based on air pollution transport modeling and monitoring data, the agency determined which States' contributions to air quality monitors in nonattainment and maintenance areas exceeded 1% of the National Ambient Air Quality Standard (NAAQS), and therefore (provided additional criteria were met) could be subject to the Rule. *See* 76 Fed. Reg. at 48211, 48236-37. Second, for the covered States, EPA established emissions budgets based on cost-effectiveness and air quality concerns, incorporating measures (in accord with *North Carolina*'s mandate) to ensure timely reductions in interstate pollution and to allow restricted interstate emissions trading. *See id*. at 48210-12, 48246-48304.

Over a comprehensive dissent, the panel majority struck down this new rule, frustrating downwind States' access to prompt relief from the pollution of their neighbors and relegating EPA to a process, not required by the Act, that will take years to complete. In reaching both of the primary grounds on which it relied, the panel contravened express statutory limits on its jurisdiction under the Clean Air Act, 42 U.S.C. 7607(b)(1) and (d)(7)(B), and settled precedent of this Circuit enforcing those limits. *See*, *e.g*., *Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1238 (D.C. Cir. 2004).[1] The panel's rulings were also erroneous on the

---

[1]  *See also Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001); *Cement Kiln Rec. Coal. v. EPA*, 255 F.3d 855, 860 (D.C. Cir. 2001); *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996); *Med. Waste Inst. &*

merits. In particular, on the matter of how to define and enforce a State's obligation to avoid "significant contributions," the panel departed from precedent established in this Court's two major decisions reviewing prior regional transport regulations, *North Carolina* and *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000). This series of incompatible decisions (none of which may be construed to have overruled its predecessors, *Davis v. Dep't of Justice*, 610 F.3d 750, 753 (D.C. Cir. 2010)) leaves this area of law, which affects the health of millions and the core responsibilities of States under the Act, in grievous disarray.

The implications of the panel's ruling for clean air are serious. The Transport Rule, if implemented, will allow a number of downwind States to meet, in accordance with statutory deadlines, their ozone NAAQS attainment and maintenance obligations, and almost all to meet their similar obligations for fine particulates ($PM_{2.5}$). 76 Fed. Reg. at 48307-08. The Rule will save tens of thousands of lives per year, avoid hundreds of thousands of serious illnesses, and improve air quality for 240 million Americans. *Id.* at 48309, 48313-14. EPA determined that the $PM_{2.5}$ improvements under the Rule would, starting in 2014,

> annually reduce between 13,000 and 34,000 $PM_{2.5}$-related premature deaths, 15,000 non-fatal heart attacks, 8,700 incidences of chronic bronchitis, 8,500 hospital admissions, and 400,000 cases of aggravated asthma while also

---

*Energy Recovery Counc. v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011); *Slinger Drainage, Inc. v. EPA*, 237 F.3d 681, 682 (D.C. Cir. 2001); Dissent at 38 (listing additional cases).

reducing 10 million days of restricted activity due to respiratory illness and approximately 1.7 million work-loss days.

*Id.* at 48309.   EPA calculated that "the annual net benefit (social benefits minus social costs)" in 2014 would be $110 to $280 billion.  *Id.* at 48313-14.   EPA designed the Transport Rule to remedy CAIR's flaws, and the Rule provides greater health benefits than CAIR.[2]  Even though the panel's opinion leaves CAIR in place, the Transport Rule's vacatur is a serious, costly blow to public health.

## ARGUMENT

### I.  THE PANEL'S DECISION CONTRAVENES THE CLEAN AIR ACT'S JUDICIAL REVIEW PROVISIONS AND THIS COURT'S INTERPRETATION OF THOSE PROVISIONS.

#### A. Petitioners Failed to Raise Statutory "Significant Contribution" Objections During the Comment Period, and the Panel Improperly Interpreted Section 307(d)(7)(B) and this Court's Precedents.

The panel identified the Transport Rule's "significant contribution" methodology as its "fundamental" legal flaw, finding that once EPA set its initial 1% screening threshold at step one of its "significant contribution" determination, the *statute* prohibits EPA from imposing emissions reductions that would take a State's contribution below that 1% threshold.  Slip Op. ("Op.") at 35-36.  Notably, the panel did not find that the Rule's emissions budgets for any State actually

---

[2]   The record demonstrates that the emissions reductions and corresponding health benefits of the Transport Rule are very substantial relative to CAIR, particularly with the coming into effect in 2014 the Transport Rule's "assurance provisions" promulgated to comply with the mandate in *North Carolina*.   *See* Dec. of David Schoengold, Ex. A to Intervenors' Dec. 1, 2011, Stay Opp. (Doc. 1345215).

transgressed this 1% barrier; rather, it ruled that the *possibility* of such an exceedance required vacatur of the Rule. *See*, *e.g*., Op. at 34 (EPA's budgets "*could* require upwind States to reduce emissions by more than the [initial threshold] amount").

The panel lacked authority to reach this statutory argument because it was not raised in the administrative proceedings. Under Section 307(d)(7)(B) of the Act, "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment ... may be raised during judicial review." 42 U.S.C. 7607(d)(7)(B). As Intervenors can attest, this Court has "'strictly' enforce[d] this requirement." *Mossville*, 370 F.3d at 1238 (quoting *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998)).

The jurisdictional question here "is not *close*." Dissent at 27. The panel never identified anything in the Transport Rule's docket that arguably satisfies Section 307(d)(7)(B)'s requirements; rather, in a lengthy footnote, *see* Op. at 31-34 n.18, the panel proposed a variety of novel and unsupported theories about why Section 307(d)(7)(B) was not a bar to the Court's consideration of the "1% floor" argument. Not one of the panel's explanations withstand scrutiny and, if left uncorrected, each would undo the settled law of this Circuit and upset the proper relationship between administrative and judicial processes.

The principle purporting to guide the panel's interpretation of Section 307(d)(7)(B) is that EPA had "adequate notification of the general substance" of Petitioners' objections.  *See* Op. at 31, 34 at n.18 (*quoting South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 891 (D.C. Cir. 2006)).  The panel applied this principle, however, in a way that is clearly contrary to this Court's precedents.  By finding that a portion of EPA's "adequate notification" came from a prior court decision (*North Carolina*) and an objection in a prior rulemaking (CAIR), the panel did not adhere to the requirements of Section 307(d)(7)(B).  Section 307(d)(7)(B), by its terms, speaks of "objection[s]" to "a rule" that challengers "raised" during that rule's "period for public comment"; it does not allow amorphous inquiries into the broader regulatory context or history behind a rule.

This Court has rejected such an outside-the-docket approach:

> Generalized objections to agency action or objections raised at the wrong time or in the wrong docket will not do. ... Petitioners are able to cite no comments *that were in the relevant docket* that raise the significant contribution issue. ... This is insufficient; notice does not operate by osmosis.

*Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001).  This Court has also rejected the idea that the raising of an objection in a prior, related rulemaking could satisfy the applicable exhaustion requirement. *See Charter Communications, Inc. v. FCC*, 460 F.3d 31, 39 (D.C. Cir. 2006) (agencies are not "required to sift through pleadings in other proceedings in search of issues that a

petitioner raised elsewhere and might have raised here had it thought to do so.") (internal quotations and citations omitted).

Furthermore, in its *Michigan* or *North Carolina* decisions, this Court did not disturb EPA's two-step "significant contribution" methodology. *See* Dissent at 33-34.[3] EPA reasonably relied upon those decisions in crafting the Transport Rule and was under no duty to revisit its statutory approach during the rulemaking process in the absence of any objection. *See Charter Commun.,* 460 F.3d at 39.

The panel also concluded that EPA had adequate notification of the "general substance" of Petitioners' statutory argument, *see* Op. at 31-32 n.18, despite the fact that, during the Transport Rule's comment period, no one raised a statutory authority objection. The panel's consideration of that argument violated this Court's well-settled precedents. *See Cement Kiln Recycling Coalition v. EPA,* 255 F.3d 855, 860 (D.C. Cir. 2001); *see also* Dissent at 38 (citing additional cases). Moreover, the panel's approach suffers from an additional defect. The "general substance" standard must be applied in the context of Section 307(d)(7)(B)'s

---

[3] *North Carolina*'s ruling that CAIR's unlimited interstate trading scheme was arbitrary certainly did not excuse the clear failure to exhaust the different claim that EPA's two-step methodology for defining States' contributions violated the statute, particularly since *North Carolina* "*specifically* declined to disturb" that methodology. Dissent at 33; *see also North Carolina*, 531 F.3d at 917. The panel's suggestion that Section 307(d)(7)(B) was satisfied merely because EPA was "aware of" the *North Carolina* opinion, Op. at 32 n.18, is incorrect and any suggestion that EPA treated *North Carolina* casually is incompatible with the agency's careful and assiduous effort to implement this Court's instructions, *e.g.,* 76 Fed. Reg. at 48211; 75 Fed. Reg. 45,210, 45214-15 (Aug. 2, 2010).

"reasonable specificity" requirement.  In this case, however, the panel applied a dramatically relaxed "specificity" threshold to objections to the Rule on the grounds that "EPA's statements at the proposal stage indicated EPA was not open to reconsidering CAIR's earlier rejection of petitioners' argument" and that "EPA had already … indicated its firm commitment to the cost-based approach."  Op. at 33.  Therefore, the panel concluded, "the specificity of commenters such as Wisconsin and Tennessee" – commenters that had not made any statutory objection at all, *see* Dissent at 29-31 – "was 'reasonable' under the circumstances." Op. at 33.  In other words, the commenters were forgiven for not offering specific statutory authority objections because, in light of EPA's alleged intransigence, such an effort would have been futile.

Any suggestion that EPA came to this rulemaking with a mind so closed as to excuse the failure to comment (assuming Section 307(b)(7)(B) did allow such an exception) runs afoul of the strong presumption of agency objectivity, *e.g.*, *United Steelworkers of Am. v. Marshall,* 647 F.2d 1189, 1208-09 (D.C. Cir. 1980), and is irreconcilable with the evident care and earnestness with which EPA approached the complex methodological issues this task presented and, in particular, its responsibility to give effect to this Court's instructions in *North Carolina*.  *See*, *e.g.*, 76 Fed. Reg. at 48211; 75 Fed. Reg. at 45214-15.

The panel's incorporation of a futility exception into a statutory judicial review provision that does not recognize one is contrary to Circuit precedent. This Court has "explicitly decline[d]…to read the 'futility' exception present in common-law exhaustion doctrine, into a statutory provision that permits only objections raised before the agency to be 'raised during judicial review.' 42 U.S.C. § 7607(d)(7)(B)." *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996) (citations omitted). *See Booth v. Churner,* 532 U.S. 731, 741 n.6 (2001) (a court may "not read futility or other exceptions into statutory exhaustion requirements…"); *Avocados Plus Inc. v. Veneman,* 370 F.3d 1243, 1247 (D.C. Cir. 2004) ("Such 'jurisdictional exhaustion,' …may not be excused"). The text of Section 307(d)(7)(B) focuses on the content of the objections raised and not on the "mindset" of the agency or a regulations' broader history. *See also Charter Commun.*, 460 F.3d at 39 ("The petitioner has the burden of clarifying its position before the agency.") (internal quotations and citations omitted).[4] By overriding Section 307(d)(7)(B), the panel's decision threatens to undermine the integrity and effectiveness of rulemaking under the Clean Air Act and the numerous other administrative statutes that regularly come before this Court. *See U.S. v. L.A. Tucker Truck L., Inc.,* 344 U.S. 33, 37 (1952) ("[C]ourts should not topple over

---

[4] Even in common-law exhaustion, the "futility" exception applies "only in the most exceptional circumstances." *UDC Chairs Chapter, Am. Ass'n v. Bd. of Trustees*, 56 F.3d 1469, 1475 (D.C. Cir. 1995) (citations omitted).

administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").

The circumstances here highlight the importance of adhering to statutory exhaustion requirements.  Precisely because no participant to the rulemaking raised the objection, EPA had no occasion during the rulemaking to examine whether, in fact, the "red line" the Court perceived in the statute, Op. at 23-24, would in fact be crossed by the specific levels of pollution control imposed here.   Had this issue been timely raised, EPA itself could have inquired into the issue.  It might have demonstrated that the existing budgets do not drive State contributions below the 1% threshold.   (Indeed, as EPA pointed out in its merits brief regarding the potential that EPA's emissions budgets might require controls exceeding initial threshold levels, "data in the record suggest that, at the cost thresholds used in the Rule, such a scenario is extremely *unlikely* to occur." *See* EPA Br. 33 (Doc. 1364178); *see also id*. 33-34 n.20.)   Alternatively, had the issue been properly raised, EPA might have altered its approach in response to the statutory objection. And in every event, EPA would have provided a construction of the statutory requirements that would have been subject to review under *Chevron USA, Inc. v. NRDC*, 467 U.S. 837 (1984).  *See Boivin v. U.S. Airways, Inc.,* 446 F.3d 148, 156 (D.C. Cir. 2006); *American Family Ass'n, Inc. v. FCC*, 365 F.3d 1156, 1168 (D.C.

Cir. 2004).[5]  Exhaustion is especially important in complex, technical areas.  *See*

*Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1313 (D.C. Cir. 1991) ("the agency should

have full opportunity to apply its expertise and discretion to scientific and technical

matters such as this. … this court is not made up of engineers, computer modelers,

economists or statisticians") (internal quotations and citations omitted).

### B. The Court Vacated the Rule Based Upon Legal Challenges that Were Barred Under Section 307(b)(1).

Section 307(b)(1) provides that a petition for review of a final EPA action

"shall be filed within sixty days from the date notice of such [action] appears in the

Federal Register." 42 U.S.C. 7607(b)(1).  This 60-day filing period is jurisdictional

and strictly construed.  *See Med. Waste Inst. & Energy Rec. Council vs. EPA*, 645

F.3d 420, 427 (D.C. Cir. 2011); *Slinger Drainage, Inc. v. EPA*, 237 F.3d 681, 682

(D.C. Cir. 2001).  Despite these directives, the panel entertained two sets of claims

that were not filed within 60 days of the relevant EPA action.

First, the panel allowed an untimely challenge to a set of "failure-to-submit"

(and similar) findings by EPA, in which EPA determined that twenty-nine States

---

[5]  Consistent enforcement of exhaustion requirements is matter of "simple fairness" to agency and litigants alike.  *See L.A. Tucker Truck Lines,* 344 U.S. at 37. Departing from its requirements rewards "sandbagging of appellees and respondents," *S. Coast Air Quality Mgmt. Dist. v. EPA*, 554 F.3d 1076, 1081 n.* (D.C. Cir. 2009) (citation omitted).  For organizations like intervenors, assessments of whether to seek judicial review and whether to intervene are often made in part in reliance upon an understanding of what issues may, under Section 307(d)(7)(B), properly be subjected to the Court's jurisdiction.

and territories had failed to submit SIPs that met their "good neighbor" obligations. *See*, *e.g*., 75 Fed. Reg. 32,673 (June 9, 2010).  Once EPA made those findings, States had 60 days to raise, if they cared to, the argument that States' "good neighbor" obligations are not triggered until EPA quantifies their "significant contributions." The States waived this argument by not raising it within 60 days, as required by Section 307(b)(1).  *See* Dissent at 13-15.

Second, the panel *sua sponte* raised an objection concerning EPA's statutory authority to calculate emissions reductions amongst the States on a non-proportional basis.  *See* Op. at 37-38; Dissent at 40.  Although the industry Petitioners argued in their brief that the sulfur dioxide budgets for 2014 were arbitrary and capricious, Industry & Labor Petrs' Br. at 33, no party claimed that EPA's budget-setting method violated the Clean Air Act.  This issue was not raised within the 60-day filing period, and, pursuant to Section 307(b)(1),  this Court had no jurisdiction to address it.  *See* Dissent at 40.

## II.    THE PANEL'S DECISION IS INCONSISTENT WITH *MICHIGAN* AND *NORTH CAROLINA*.

The panel nonetheless reached the merits regarding both the Transport Rule's FIPs and EPA's method of addressing significant contribution.  On both issues, as the dissent demonstrated, the panel reached conclusions that are inconsistent with this Court's prior holdings.  *See* Dissent at 21-25, 41-42.

On the FIP issue, the panel's decision conflicts with this Court's mandate in *North Carolina* that upwind States' obligations under Section 110(a)(2)(D)(i) must be harmonized with the NAAQS attainment deadlines for downwind States. *See North Carolina*, 531 F.3d at 912. The *North Carolina* Court required EPA to "decide what date, whether 2015 or earlier, is as expeditious as practicable for states to eliminate their significant contributions to downwind nonattainment." *Id.* at 930. And in this Court's subsequent remand decision, it made clear that it did "not intend to grant an indefinite stay" for EPA to correct CAIR's flaws. *See* 550 F.3d at 1178. In response to *North Carolina*'s mandate, EPA incorporated a FIP into the Transport Rule pursuant to Section 110(c). *See* 42 U.S.C. 7410(c)(1) (*requiring* EPA to promulgate a FIP "at any time" within 2 years after a State fails to meet its SIP obligations). In disallowing this approach, the panel's decision conflicts with the text of the Act (*see* Dissent at 14-15), and *North Carolina*.[6]

On the significant contribution issue, the panel imposed two requirements that are inconsistent with *Michigan* and *North Carolina*. First, it found that once EPA set a screening threshold in step 1 of its contribution finding, States could not be required to reduce emissions below that floor (in this case, 1%) as part of EPA's

---

[6] The panel's erroneous ruling that States' obligations to avoid significant contributions to nonattainment in other States must await the end of EPA rulemaking is wrong for reasons the dissent set out, and is especially harmful to the statutory program for ensuring timely attainment of air quality standards. As *North Carolina* recognized, but the panel overlooked, Congress recognized that time is of the essence when essential public health protections are at stake.

cost-based approach in step 2.  *See* Op. at 34-35.  By doing so, the panel improperly de-coupled EPA's two-step approach and found that EPA's "significance" determination at step 1 superseded and limited EPA's "significance" determination at step 2.  The panel's conclusion was contrary to this Court's rulings in *Michigan* and *North Carolina* that EPA's two-step approach was permissible.  *See North Carolina*, 531 F.3d at 917 ("[p]etitioners do not quarrel with EPA drawing the line at 0.2 $\mu/m^3$ or its *different measure of significance* for determining states' $SO_2$ budgets. Again, *we do not disturb this approach*") (emphasis added); *Michigan*, 213 F.3d at 679 (in discussing proportionality, stating "[t]his of course flows ineluctably from the EPA's decision *to draw the 'significant contribution' line on a basis of cost differentials.  Our upholding of that decision logically entails upholding this consequence.*") (emphasis added).

Second, the panel concluded that EPA violated the Clean Air Act by not calculating the required emissions reductions on a proportional basis as between upwind States.  Op. at 37-38.  This conclusion is contrary to *North Carolina's* holding that EPA need not determine each State's individualized air quality impact on downwind States "relative to other upwind states."  531 F.3d at 908.  *See also Michigan*, 213 F.3d at 679 (permitting use of uniform cost thresholds and the

14

"ineluctabl[e]" result that small and large contributors could have the same amount of emissions reductions); Dissent at 41.[7]

The interstate pollution problem EPA confronted here – involving dozens of upwind states contributing to dozens of downwind nonattainment and maintenance problems – presents unusually complex, technically demanding problems that are not simply resolved by *a priori* reasoning. *See also Michigan*, 213 F.3d at 674 (the statutory text provides no "criterion for classifying 'emissions activity' as 'significant'"). The panel erred in imposing rigid requirements compelled neither by the statute nor *Michigan*/*North Carolina* and usurping the agency's role. *See Chevron*, 457 U.S. at 843-44. The evident tensions between the panel's decision and those two prior transport rulings will make it all the more difficult to implement effective and expeditious controls on interstate pollution that frustrates attainment and maintenance of health-based air quality standards.

## CONCLUSION

This Court should grant rehearing and uphold the Transport Rule.

---

[7] EPA's analysis pointed to serious difficulties with such an approach under real-world conditions in which pollution from multiple upwind States contributes to nonattainment in multiple downwind areas. *See* Technical Support Document, Alternative Significant Contribution Approaches Evaluated (JA 2312) ("[W]hile it is possible to determine an emission reduction percentage if there is a single downwind monitor, most upwind states contribute to multiple downwind monitors (in multiple states) and would have a different reduction percentage for each one. The technical difficulty lies in determining what percent emission reduction is appropriate for each upwind state").

Respectfully submitted,

/s/ *Sean H. Donahue*
Sean H. Donahue

Graham G. McCahan
Vickie L. Patton
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(303) 440-4901
gmccahan@edf.org
vpatton@edf.org

Sean H. Donahue
Donahue & Goldberg, LLP
2000 L St. NW Suite 808
Washington DC 20036
(202) 277-7085
sean@donahuegoldberg.com

*Counsel for Environmental
     Defense Fund*

John Walke
Natural Resources Defense
     Council
1152 15th St., Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org

*Counsel for NRDC*

George Hays
236 West Portal Ave., No. 110
San Francisco, CA 94127
 (415) 566-5414
georgehays@mindspring.com

Josh Stebbins
Sierra Club
50 F Street NW Suite 800
Washington DC 20001
 (202) 675-6273
josh.stebbins@sierraclub.org

*Counsel for the Sierra Club*

David Marshall
Clean Air Task Force
41 Liberty Hill Road
Building 2, Suite 205
Henniker, NH 03242
 (603) 428-8114
dmarshall@catf.us

*Counsel for American Lung
     Association and Clean Air
         Council*

16

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing petition electronically via this Court's CM/ECF system, which will automatically serve copies upon registered counsel.

October 5, 2012

*/s/ Sean H. Donahue*

Sean H. Donahue
Donahue & Goldberg, LLP
2000 L St. NW, Suite 808
Washington, DC 30036
(202) 777-7085
sean@donahuegoldberg.com

17

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 13, 2012        Decided August 21, 2012

No. 11-1302

EME HOMER CITY GENERATION, L.P.,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
RESPONDENTS

SAN MIGUEL ELECTRIC COOPERATIVE, ET AL.,
INTERVENORS

———

Consolidated with 11-1315, 11-1323, 11-1329, 11-1338,
11-1340, 11-1350, 11-1357, 11-1358, 11-1359, 11-1360,
11-1361, 11-1362, 11-1363, 11-1364, 11-1365, 11-1366,
11-1367, 11-1368, 11-1369, 11-1371, 11-1372, 11-1373,
11-1374, 11-1375, 11-1376, 11-1377, 11-1378, 11-1379,
11-1380, 11-1381, 11-1382, 11-1383, 11-1384, 11-1385,
11-1386, 11-1387, 11-1388, 11-1389, 11-1390, 11-1391,
11-1392, 11-1393, 11-1394, 11-1395

———

On Petitions for Review of a Final Rule
of the Environmental Protection Agency

———

ADD-1

2

*Bill Davis*, Assistant Solicitor General, Office of the Attorney General for the State of Texas, argued the cause for Governmental Petitioners.  With him on the briefs were *Greg Abbott*, Attorney General, *Jonathan F. Mitchell*, Solicitor General, *Jon Niermann*, Chief, Environmental Protection Division, *Luther J. Strange, III*, Attorney General, Office of the Attorney General for the State of Alabama, *Leslie Sue Ritts*, *Pamela Jo Bondi*, Attorney General, Office of the Attorney General for the State of Florida, *Jonathan A. Glogau*, Chief, Complex Litigation, *Samuel S. Olens*, Attorney General, Office of the Attorney General for the State of Georgia, *John E. Hennelly* and *Diane L. DeShazo*, Senior Assistant Attorneys General, *Thomas M. Fisher*, Solicitor General, Office of the Attorney General for the State of Indiana, *Valerie Marie Tachtiris*, Deputy Assistant Attorney General, *Jeffrey A. Chanay*, Deputy Attorney General, Office of the Attorney General for the State of Kansas, *Henry V. Nickel*, *George P. Sibley, III*, *James D. "Buddy" Caldwell*, Attorney General, Office of the Attorney General for the State of Louisiana, *Megan K. Terrell*, Chief, Environmental Section, *Herman Robinson*, *Jackie Marie Scott Marve*, *Deidra L. Johnson*, *Kathy M. Wright*, *Donald James Trahan*, *David Richard Taggart*, *Jeffrey Winston Price*, *John Joseph Bursch*, Solicitor General, Office of the Attorney General for the State of Michigan, *Neil David Gordon*, Assistant Attorney General, *Sean Peter Manning*, Chief, Environmental, Natural Resources, and Agriculture Division, *Harold Edward Pizzetta, III*, Special Attorney, Office of the Attorney General for the State of Mississippi, *Jon Cumberland Bruning*, Attorney General, Office of the Attorney General for the State of Nebraska, *Katherine J. Spohn*, Special Counsel, *Dale T. Vitale*, *Gregg H. Bachmann*, and *Chris Kim*, Assistant Attorneys General, Office of the Attorney General for the State of Ohio, *Thomas Bates*, Chief, Public Protection Unit, Office of the Attorney General for the State of Oklahoma,

3

*Patrick Wyrick*, Solicitor General, *P. Clayton Eubanks*, Assistant Attorney General, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *James Emory Smith, Jr.*, Assistant Deputy Attorney General, *Kenneth T. Cuccinelli, II*, Attorney General, Office of the Attorney General for the Commonwealth of Virginia, *E. Duncan Getchell, Jr.*, Solicitor General, and *Thomas James Dawson*, Assistant Attorney General, Wisconsin Department of Justice.

*Peter D. Keisler* argued the cause for Non-Governmental Petitioners. With him on the briefs were *Roger R. Martella, Jr.*, *C. Frederick Beckner III*, *Timothy K. Webster*, *F. William Brownell*, *Gregory G. Garre*, *Claudia M. O'Brien*, *Lori Alvino McGill*, *Jessica E. Phillips*, *Katherine I. Twomey*, *Stacey VanBelleghem*, *Janet J. Henry*, *Steven G. McKinney*, *Terese T. Wyly*, *William M. Bumpers*, *Joshua B. Frank*, *Megan H. Berge*, *P. Stephen Gidiere, III*, *Richard Alonso*, *Jeffrey R. Holmstead*, *Gary C. Rikard*, *Robert J. Alessi*, *Chuck D'Wayne Barlow*, *Peter P. Garam*, *Kyra Marie Fleming*, *Richard G. Stoll*, *Brian H. Potts*, *Julia L. German*, *Robert A. Manning*, *Joseph A. Brown*, *Mohammad O. Jazil*, *Eric J. Murdock*, *Andrea Bear Field*, *Norman W. Fichthorn*, *E. Carter Chandler Clements*, *James S. Alves*, *Gary V. Perko*, *William L. Wehrum, Jr.*, *David M. Flannery*, *Gale Lea Rubrecht*, *Maureen N. Harbourt*, *Tokesha M. Collins*, *Bart E. Cassidy*, *Katherine L. Vaccaro*, *Diana A. Silva*, *William F. Lane*, *Jordan Hemaidan*, *Todd Palmer*, *Douglas E. Cloud*, *David Meezan*, *Christopher Max Zygmont*, *Matthew J. Splitek*, *Gary M. Broadbent*, *Michael O. McKown*, *Terry Russell Yellig*, *Dennis Lane*, *Karl R. Moor*, *Margaret Claiborne Campbell*, *Byron W. Kirkpatrick*, *Hannah Williams*, *Peter S. Glaser*, *Tameka M. Collier*, *Grant F. Crandall*, *Arthur Traynor, III*, *Eugene M. Trisko*, *Jeffrey L.*

4

*Landsman*, *Vincent M. Mele*, *Elizabeth P. Papez*, *John M. Holloway III*, *Elizabeth C. Williamson*, and *Ann M. Seha*.

    *Michael J. Nasi*, *Shannon L. Goessling*, and *Douglas A. Henderson* were on the brief for intervenor San Miguel Electric Cooperative and *amici* Industrial Energy Consumers of America, et al., in support of petitioners. *Robert M. Cohan* entered an appearance.

    *Norman L. Rave, Jr.*, *David S. Gualtieri*, and *Jon M. Lipshultz*, Attorneys, U.S. Department of Justice, argued the causes for respondent. With them on the briefs were *Jessica O'Donnell*, *Sonja Rodman*, and *Stephanie Hogan*, Attorneys.

    *Simon Heller*, Assistant Solicitor General, Office of the Attorney General for the State of New York, argued the cause for State/City Respondent-Intervenors. With him on the brief were *Eric T. Schneiderman*, Attorney General, *Barbara D. Underwood*, Solicitor General, *Andrew G. Frank* and *Michael J. Myers*, Assistant Attorneys General, *Benna R. Solomon*, *James B. Dougherty*, *Joseph R. Biden, III*, Attorney General, Office of the Attorney General for the State of Delaware, *Valerie M. Satterfield*, Deputy Attorney General, *Douglas F. Gansler*, Attorney General, Office of the Attorney General for the State of Maryland, *Mary E. Raivel*, Assistant Attorney General, *Peter F. Kilmartin*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Gregory S. Schultz*, Special Assistant Attorney General, *Martha Coakley*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Frederick D. Augenstern*, Assistant Attorney General, *Scott J. Schwarz*, *William H. Sorrell*, Attorney General, Office of the Attorney General for the State of Vermont, *Thea J. Schwartz*, Assistant Attorney General, *Lisa Madigan*, Attorney General, Office of the Attorney General for the State of Illinois, *Gerald T. Karr*,

5

Assistant Attorney General, *Irvin B. Nathan*, Attorney General, Office of the Attorney General for the District of Columbia, *Amy E. McDonnell*, Deputy General Counsel, *George Jepsen*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kimberly P. Massicotte*, *Scott N. Koschwitz*, and *Matthew I. Levine*, Assistant Attorneys General, *William R. Phelan, Jr.*, *Roy Cooper*, Attorney General, Office of the Attorney General for the State of North Carolina, *James C. Gulick*, Senior Deputy Attorney General, *Marc Bernstein* and *J. Allen Jernigan*, Special Deputies Attorney General, and *Christopher King*. *William J. Moore, III* entered an appearance.

*Brendan K. Collins* argued the cause for Industry Respondent-Intervenors. With him on the brief were *Robert B. McKinstry, Jr.* and *James W. Rubin*.

*Sean H. Donahue* argued the cause for Public Health Respondent-Intervenors. With him on the brief were *David T. Lifland*, *Vickie L. Patton*, *George Hays*, *Josh Stebbins*, *John Walke*, and *David Marshall*. *Ann Brewster Weeks* entered an appearance.

Before: ROGERS, GRIFFITH, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Circuit Judge* GRIFFITH joins.

Dissenting opinion filed by *Circuit Judge* ROGERS.

KAVANAUGH, *Circuit Judge*: Some emissions of air pollutants affect air quality in the States where the pollutants are emitted. Some emissions of air pollutants travel across State boundaries and affect air quality in downwind States.

6

To deal with that complex regulatory challenge, Congress did not authorize EPA to simply adopt limits on emissions as EPA deemed reasonable. Rather, Congress set up a federalism-based system of air pollution control. Under this cooperative federalism approach, both the Federal Government and the States play significant roles. The Federal Government sets air quality standards for pollutants. The States have the primary responsibility for determining how to meet those standards and regulating sources within their borders.

In addition, and of primary relevance here, upwind States must prevent sources within their borders from emitting federally determined "amounts" of pollution that travel across State lines and "contribute significantly" to a downwind State's "nonattainment" of federal air quality standards. That requirement is sometimes called the "good neighbor" provision.

In August 2011, to implement the statutory good neighbor requirement, EPA promulgated the rule at issue in this case, the Transport Rule, also known as the Cross-State Air Pollution Rule. The Transport Rule defines emissions reduction responsibilities for 28 upwind States based on those States' contributions to downwind States' air quality problems. The Rule limits emissions from upwind States' coal- and natural gas-fired power plants, among other sources. Those power plants generate the majority of electricity used in the United States, but they also emit pollutants that affect air quality. The Transport Rule targets two of those pollutants, sulfur dioxide ($SO_2$) and nitrogen oxides ($NO_x$).

Various States, local governments, industry groups, and labor organizations have petitioned for review of the Transport Rule. Although the facts here are complicated, the

7

legal principles that govern this case are straightforward: Absent a claim of constitutional authority (and there is none here), executive agencies may exercise only the authority conferred by statute, and agencies may not transgress statutory limits on that authority.

Here, EPA's Transport Rule exceeds the agency's statutory authority in two independent respects.  *First*, the statutory text grants EPA authority to require upwind States to reduce only their own significant contributions to a downwind State's nonattainment.  But under the Transport Rule, upwind States may be required to reduce emissions by more than their own significant contributions to a downwind State's nonattainment.  EPA has used the good neighbor provision to impose massive emissions reduction requirements on upwind States without regard to the limits imposed by the statutory text.  Whatever its merits as a policy matter, EPA's Transport Rule violates the statute.  *Second*, the Clean Air Act affords States the initial opportunity to implement reductions required by EPA under the good neighbor provision.  But here, when EPA quantified States' good neighbor obligations, it did not allow the States the initial opportunity to implement the required reductions with respect to sources within their borders.  Instead, EPA quantified States' good neighbor obligations and *simultaneously* set forth EPA-designed Federal Implementation Plans, or FIPs, to implement those obligations at the State level.  By doing so, EPA departed from its consistent prior approach to implementing the good neighbor provision and violated the Act.

For each of those two independent reasons, EPA's Transport Rule violates federal law.  Therefore, the Rule must be vacated.

8

In so ruling, we note that this Court has affirmed numerous EPA clean air decisions in recent years when those agency decisions met relevant statutory requirements and complied with statutory constraints. *See, e.g.*, *National Environmental Development Association's Clean Air Project v. EPA*, No. 10-1252 (D.C. Cir. July 20, 2012); *API v. EPA*, No. 10-1079 (D.C. Cir. July 17, 2012); *ATK Launch Systems, Inc. v. EPA*, 669 F.3d 330 (D.C. Cir. 2012); *NRDC v. EPA*, 661 F.3d 662 (D.C. Cir. 2011); *Medical Waste Institute & Energy Recovery Council v. EPA*, 645 F.3d 420 (D.C. Cir. 2011); *American Trucking Ass'ns v. EPA*, 600 F.3d 624 (D.C. Cir. 2010). In this case, however, we conclude that EPA has transgressed statutory boundaries. Congress could well decide to alter the statute to permit or require EPA's preferred approach to the good neighbor issue. Unless and until Congress does so, we must apply and enforce the statute as it's now written. Our decision today should not be interpreted as a comment on the wisdom or policy merits of EPA's Transport Rule. It is not our job to set environmental policy. Our limited but important role is to independently ensure that the agency stays within the boundaries Congress has set. EPA did not do so here.[1]

---

[1] The dissent argues that petitioners' challenge to EPA's approach to the significant contribution issue is not properly before us because that issue was not sufficiently raised before the agency in the rulemaking proceeding. We fundamentally disagree with the dissent's reading of the record on that point.

The dissent also claims that petitioners' challenge to EPA's issuance of the FIPs is not properly before us because the affected States should have raised such a challenge earlier in the process. We again disagree. The dissent's analysis on the FIPs issue conflates (i) EPA's rejection of certain States' SIPs and (ii) EPA's decision in the Transport Rule to set States' "good neighbor" obligations and emissions budgets and simultaneously issue FIPs.

9

I

A

Under the Clean Air Act, the Federal Government sets air quality standards, but States retain the primary responsibility (if the States want it) for choosing how to attain those standards within their borders. *See Train v. NRDC*, 421 U.S. 60, 63-67 (1975); *Virginia v. EPA*, 108 F.3d 1397, 1406-10 (D.C. Cir. 1997). The Act thus leaves it to the individual States to determine, in the first instance, the particular restrictions that will be imposed on particular emitters within their borders. (If a State refuses to participate, the Federal Government regulates the sources directly.)

To spell this out in more detail: The Clean Air Act charges EPA with setting National Ambient Air Quality Standards, or NAAQS, which prescribe the maximum permissible levels of common pollutants in the ambient air. *See* 42 U.S.C. § 7409(a)-(b). EPA must choose levels which, "allowing an adequate margin of safety, are requisite to protect the public health." 42 U.S.C. § 7409(b)(1).

After a lengthy process, the details of which are not relevant here, EPA designates "nonattainment" areas – that is, areas within each State where the level of the pollutant exceeds the NAAQS. *See* 42 U.S.C. § 7407(d).

---

The States here are challenging only the latter issue, and they have done so in a timely fashion. Indeed, they could not have done so until EPA, in the Transport Rule, simultaneously set the States' individual emissions budgets and issued FIPs.

We will explain both points more below. Suffice it here to say that, much as we might like to do so, we respectfully do not believe we can avoid the merits of this complex case, as the dissent urges.

10

Once EPA sets a NAAQS and designates nonattainment areas within the States, the lead role shifts to the States. The States implement the NAAQS within their borders through State Implementation Plans, or SIPs. (As the experienced reader knows, there is no shortage of acronyms in EPA-land.) In their SIPs, States choose which individual sources within the State must reduce emissions, and by how much. For example, a State may decide to impose different emissions limits on individual coal-burning power plants, natural gas-burning power plants, and other sources of air pollution, such as factories, refineries, incinerators, and agricultural activities.

States must submit SIPs to EPA within three years of each new or revised NAAQS. *See* 42 U.S.C. § 7410(a)(1). Section 110(a)(2) of the Act lists the required elements of a SIP submission.

Section 110(a)(2)(D)(i)(I), the "good neighbor" provision at issue in this case, is one of the required elements of a SIP. The good neighbor provision requires that SIPs:

> (D) contain adequate provisions –
> (i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will –
> (I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard . . . .

42 U.S.C. § 7410(a)(2)(D).

The good neighbor provision recognizes that emissions "from 'upwind' regions may pollute 'downwind' regions." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1037 (D.C.

11

Cir. 2001).   To put it colloquially, the good neighbor provision requires upwind States to bear responsibility for their fair share of the mess in downwind States.   By placing the good neighbor requirement in Section 110(a)(2), Congress established the upwind State's SIP as the vehicle for implementing the upwind State's good neighbor obligation. Of course, an upwind State will not know what it needs to do to meet its good neighbor obligation until it learns the level of air pollution in downwind States, and further learns how much it is contributing to the problems in the downwind States.   EPA plays the critical role in gathering information about air quality in the downwind States, calculating each upwind State's good neighbor obligation, and transmitting that information to the upwind State.   With that information, the upwind State can then determine how to meet its good neighbor obligation in a new SIP or SIP revision.   *See* 42 U.S.C. § 7410(k)(5).

After EPA quantifies a State's good neighbor obligation, if a State does not timely submit an adequate SIP (or an adequate SIP revision) to take account of the good neighbor obligation as defined by EPA, responsibility shifts back to the Federal Government.   Within two years of disapproving a State's SIP submission or SIP revision, or determining that a State has failed to submit a SIP, EPA must promulgate a Federal Implementation Plan to implement the NAAQS within that State.   *See* 42 U.S.C. § 7410(c)(1).

B

The good neighbor provision – and EPA's attempts to implement it – are familiar to this Court from past cases.

In *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000), we considered a challenge to EPA's 1998 $NO_x$ Rule, commonly referred to as the $NO_x$ SIP Call, which quantified the good

12

neighbor obligations of 22 States with respect to the 1997 ozone NAAQS. *See* 63 Fed. Reg. 57,356, 57,358 (Oct. 27, 1998).

The 1998 NO$_x$ Rule did not define "amounts which will . . . contribute significantly to nonattainment" solely on the basis of downwind air quality impact, as one might have expected given the statutory text. Rather, EPA also considered how much NO$_x$ could be eliminated by sources in each State if those sources installed "highly cost-effective" emissions controls. *See Michigan*, 213 F.3d at 675. On review, some States argued that the statutory text required EPA to order reductions based on air quality impact alone, not cost of reduction. But the *Michigan* Court found no "clear congressional intent to preclude consideration of cost." *Id.* at 677 (citation omitted). The Court thus held that EPA may "consider differences in cutback costs, so that, after reduction of all that could be cost-effectively eliminated, any remaining 'contribution' would not be considered 'significant.'" *Id.* at 677; *see also id.* at 677-79. In other words, EPA could use cost considerations to lower an upwind State's obligations under the good neighbor provision.[2]

In *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008), we considered a challenge to EPA's 2005 Clean Air Interstate Rule, or CAIR. *See* 70 Fed. Reg. 25,162 (May 12, 2005). CAIR built on the 1998 NO$_x$ Rule and defined 28 States'

---

[2] Judge Sentelle dissented. In his view, the statutory text unambiguously "set forth one criterion: the emission of an amount of pollutant sufficient to contribute significantly to downwind nonattainment." *Id.* at 696 (Sentelle, J., dissenting); *cf. Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 467 (2001) ("We have therefore refused to find implicit in ambiguous sections of the CAA an authorization to consider costs that has elsewhere, and so often, been expressly granted.").

13

good neighbor obligations with respect to the 1997 ozone NAAQS and the 1997 NAAQS for annual levels of fine particulate matter, or annual $PM_{2.5}$. *See id.*

CAIR employed two different formulas – both of which incorporated cost considerations – to quantify each State's obligations for the pollutants covered by CAIR, $SO_2$ and $NO_x$. The *North Carolina* decision held that the formulas went beyond *Michigan*'s authorization to use cost and that the formulas therefore exceeded EPA's statutory authority.  EPA may use cost to "require termination of only a subset of each state's contribution," the Court explained, but "EPA can't just pick a cost for a region, and deem 'significant' any emissions that sources can eliminate more cheaply."   531 F.3d at 918 (citation, emphasis, and some internal quotation marks omitted).  The Court also held that "section 110(a)(2)(D)(i)(I) gives EPA no authority to force an upwind state to share the burden of reducing other upwind states' emissions.  Each state must eliminate its own significant contribution to downwind pollution."  *Id.* at 921.  The Court emphasized that EPA "may not require some states to exceed the mark."  *Id.*

*North Carolina* thus articulated an important caveat to *Michigan*'s approval of cost considerations.   The statute permits EPA to use cost to lower an upwind State's obligation under the good neighbor provision. *See Michigan*, 213 F.3d at 675, 677.  But EPA may not use cost to increase an upwind State's obligation under the good neighbor provision – that is, to force an upwind State to "exceed the mark."   *North Carolina*, 531 F.3d at 921.  Put simply, the statute requires every upwind State to clean up at most *its own* share of the air pollution in a downwind State – not other States' shares.

14

C

The *North Carolina* Court remanded CAIR without vacatur, leaving CAIR in place "until it is replaced by a rule consistent with our opinion." *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (on rehearing).

The Transport Rule is EPA's attempt to develop a rule that is consistent with our opinion in *North Carolina*. EPA proposed the Transport Rule in August 2010 and finalized it in August 2011. *See* 75 Fed. Reg. 45,210 (Aug. 2, 2010) (proposed); 76 Fed. Reg. 48,208 (Aug. 8, 2011) (final). The Transport Rule addresses States' good neighbor obligations with respect to three NAAQS: the 1997 annual $PM_{2.5}$ NAAQS, the 1997 ozone NAAQS, and the 2006 24-hour $PM_{2.5}$ NAAQS. *See id.* at 48,209.[3]

The Transport Rule contains two basic components. First, the Rule defines each State's emissions reduction obligations under the good neighbor provision. Second, the Rule prescribes Federal Implementation Plans to implement those obligations at the State level. We describe each component here in some detail.

EPA began by quantifying the "amounts" of pollution that each State must prohibit under the good neighbor provision – that is, "amounts which will . . . contribute significantly to nonattainment" or "interfere with maintenance" of the three NAAQS in other States. 42 U.S.C. § 7410(a)(2)(D)(i).[4]

---

[3] The 2006 24-hour $PM_{2.5}$ NAAQS post-dated and therefore was not covered by CAIR.

[4] EPA bases different aspects of the Transport Rule on distinct sources of statutory authority. EPA relied on its general

ADD-14

15

EPA used a two-stage approach to quantify each State's obligations under the good neighbor provision.

In the first stage, EPA determined whether a State emits "amounts which will . . . contribute significantly" to a downwind State's nonattainment of any of the three NAAQS. EPA identified the significantly contributing upwind States based on "linkages" between each upwind State and specific downwind "nonattainment" or "maintenance" areas – that is, downwind areas that EPA modeling predicted would not attain, or absent regulation would not maintain, the NAAQS. Transport Rule, 76 Fed. Reg. at 48,236. An upwind State was linked to a downwind nonattainment or maintenance area for a given NAAQS if EPA modeling showed that the upwind State's contribution to that downwind area exceeded a numerical "air quality threshold" – that is, a specific amount of air pollution sent from the upwind State into the downwind State's air. *Id.* EPA set the air quality threshold for each pollutant at an amount equal to 1% of the relevant NAAQS. The resulting thresholds were (i) 0.8 ppb for ozone, (ii) 0.15 $\mu g/m^3$ for annual $PM_{2.5}$, and (iii) 0.35 $\mu g/m^3$ for 24-hour $PM_{2.5}$. *Id.* If modeling showed that an upwind State would send more than those amounts into a downwind State's air, as measured at a receptor site in a downwind State, the upwind State was deemed a "significant contributor" to the downwind State's air pollution problem.

---

rulemaking authority under Section 301(a)(1) of the Clean Air Act, 42 U.S.C. § 7601(a)(1), to construe Section 110(a)(2)(D)(i)(I) and to quantify the States' obligations to reduce emissions. *See* Transport Rule, 76 Fed. Reg. at 48,217; *see also Michigan*, 213 F.3d at 687. EPA relied on its authority under Section 110(c)(1), 42 U.S.C. § 7410(c)(1), to issue the Transport Rule FIPs. *See* Transport Rule, 76 Fed. Reg. at 48,217.

16

Those numerical air quality thresholds determined which upwind States had to reduce their $SO_2$ and $NO_x$ emissions and which upwind States did not – that is, the thresholds determined which upwind States' emissions "contribute significantly" to downwind States' air pollution problems. Upwind States "whose contributions are below these thresholds," EPA found, "do not significantly contribute to nonattainment or interfere with maintenance of the relevant NAAQS" in downwind States. *Id.* Because their emissions did not "contribute significantly," those States were not required to cut their emissions for purposes of the good neighbor provision.

As one would expect, this "significant contribution" threshold produced some close cases at the margins. For example, Maryland and Texas were covered for annual $PM_{2.5}$ based on downwind contributions of 0.15 and 0.18 $\mu g/m^3$, respectively – just barely meeting the 0.15 $\mu g/m^3$ threshold. *See id.* at 48,240. And Texas exceeded the annual $PM_{2.5}$ threshold at just a single downwind receptor, in Madison, Illinois. *See id.* at 48,241.[5] By contrast, Minnesota and Virginia, with maximum downwind contributions of 0.14 and 0.12 $\mu g/m^3$, respectively, just missed being covered for annual $PM_{2.5}$. *See id.* at 48,240.

For annual $PM_{2.5}$, a total of 18 States[6] exceeded the threshold and were therefore deemed "significant

---

[5] Texas also narrowly exceeded the 0.35 $\mu g/m^3$ threshold for 24-hour $PM_{2.5}$; its maximum downwind contribution was 0.37 $\mu g/m^3$. *See* Transport Rule, 76 Fed. Reg. at 48,242.

[6] Those States were: Alabama, Georgia, Illinois, Indiana, Iowa, Kentucky, Maryland, Michigan, Missouri, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, West Virginia, and Wisconsin. *See* Transport Rule, 76 Fed. Reg. at 48,240.

17

contributors." For 24-hour $PM_{2.5}$, a total of 22 States[7] exceeded the threshold. *See id.* at 48,241-42. Those States were thus included in the Rule's reduction programs for $SO_2$ and annual $NO_x$, pollutants that contribute to $PM_{2.5}$ formation. *See id.* at 48,210. For ozone, a total of 26 States[8] exceeded the threshold. *See id.* at 48,245. Those States were thus included in the Rule's reduction program for ozone-season $NO_x$, which contributes to ozone formation. *See id.* at 48,210; *see also* 76 Fed. Reg. 80,760 (Dec. 27, 2011) (finalizing six States' inclusion in the Transport Rule for ozone-season $NO_x$).

At the second stage, however, EPA abandoned the air quality thresholds – that is, the stage one standard for whether an upwind State's emissions "contribute significantly" to a downwind State's nonattainment of air quality standards. Instead, at stage two, EPA used a cost-based standard: EPA determined how much pollution each upwind State's power plants could eliminate if the upwind State's plants applied all controls available at or below a given cost per ton of pollution reduced. The cost-per-ton levels applied without regard to the size of each State's "significant contribution" at stage one. In other words, how much pollution each upwind State was

---

[7] Those States were: Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Virginia, West Virginia, and Wisconsin. *See* Transport Rule, 76 Fed. Reg. at 48,242.

[8] Those States were: Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin. *See* Transport Rule, 76 Fed. Reg. at 48,245.

18

required to eliminate was not tied to how much the upwind State contributed to downwind States' air pollution problems.

EPA predicted how far emissions would fall if power plants throughout the State were required to install controls available at or below various cost levels. The cost levels, or thresholds, were expressed in terms of cost per ton of pollutant reduced, with the idea being that plants would install all controls that cost less than the designated threshold.[9]

EPA then added up the emissions from all of the covered States to yield total regionwide emissions figures for each pollutant, at each cost threshold. *See* Transport Rule, 76 Fed. Reg. at 48,250-53. The higher the cost level selected, the greater the reduction of emissions, but also the greater the costs and burdens imposed on sources within the States.

Next, EPA used computer modeling to estimate the downwind air quality effects of imposing different cost-per-ton levels on the upwind States. *Id.* at 48,253. EPA modeled the air quality effects of applying a $500/ton cost level for $NO_x$ and ascending cost-per-ton levels for $SO_2$. *See id.* at

---

[9] For example, a technology that cost $1,000 to install and eliminated 2 tons of $NO_x$ from a power plant's emissions would cost $500/ton. In effect, EPA predicted how far emissions would fall if plants installed all of the controls from $1/ton to $500/ton.

EPA used a computer model to predict the reductions that would occur in each State at various cost thresholds. *See* EPA, Documentation for EPA Base Case v.4.10, at 2-1 (Aug. 2010), J.A. 2339. For example, for annual $NO_x$, EPA modeled cost levels of $500, $1,000, and $2,500/ton. *See* Transport Rule, 76 Fed. Reg. at 48,249-50. EPA went as high as $5,000/ton for ozone-season $NO_x$. *See id.* at 48,250. For $SO_2$, EPA modeled emissions at cost levels of $500, $1,600, $2,300, $2,800, $3,300, and $10,000 per ton. *See id.* at 48,251. At a later stage in the process, EPA used those predictions to decide how much each State would have to cut.

19

48,255; EPA, Analysis to Quantify Significant Contribution Technical Support Document 15 & n.9 (July 2010), J.A. 2177.

Armed with those two sets of modeling data, EPA proceeded to choose which regionwide cost-per-ton threshold to apply for each of the three pollutants – $SO_2$, annual $NO_x$, and ozone-season $NO_x$. EPA consulted both its cost-of-reduction modeling and its air quality modeling and identified what it termed "significant cost thresholds" – that is, cost-per-ton levels at which steep drops in upwind emissions or jumps in downwind air quality would occur. Transport Rule, 76 Fed. Reg. at 48,255; *see also id.* at 48,255-56. EPA then weighed both air quality and cost concerns in a "multi-factor assessment" to choose the final cost-per-ton levels. *Id.* at 48,256. The "multi-factor assessment" did not employ any hard formula to weigh those factors.

In the end, EPA settled on a single $500/ton threshold for ozone-season and annual $NO_x$. *See id.* at 48,256-57.

For $SO_2$, instead of using a single cost threshold for all of the $SO_2$ States, EPA divided the upwind States into two groups for the 2014 program year (that is, the emissions cuts required in 2014). EPA modeling showed that applying a $500/ton cost threshold resolved the attainment problems in the downwind areas to which seven upwind States were linked. *See id.* at 48,257. Those seven upwind States became the Group 2 States, which were subject to a $500/ton threshold for $SO_2$. *See id.* But $500/ton did not resolve attainment problems in the downwind areas to which 16 other upwind States were linked. Those 16 upwind States became the Group 1 States, which were subject to a stricter $2,300/ton cost threshold for $SO_2$. *See id.* at 48,259.

EPA determined the amount of $SO_2$, annual $NO_x$, or ozone-season $NO_x$ that each covered State could eliminate if

20

its power plants installed all cost-effective emissions controls – that is, those controls available at or below the applicable cost-per-ton thresholds. *See id.* at 48,260. EPA then used those figures to generate 2012, 2013, and 2014 emissions "budgets" for each upwind State, for each pollutant for which that State was covered. *See id.* at 48,259-63. The budget is the maximum amount of each pollutant that a State's power plants may collectively emit in a given year, beginning in 2012.[10]

EPA did not stop there and leave it to the States to implement the required reductions through new or revised State Implementation Plans, or SIPs. *Cf.* 42 U.S.C. § 7410(k)(5). Instead, EPA simultaneously promulgated Federal Implementation Plans, or FIPs.

The FIPs require power plants in covered upwind States to make the $SO_2$ and $NO_x$ reductions needed to comply with each upwind State's emissions budget, as defined by EPA. The FIPs also create an interstate trading program to allow covered sources to comply as cost-effectively as possible. *See* Transport Rule, 76 Fed. Reg. at 48,271.

The FIPs convert each State's emissions budget into "allowances," which are allocated among power plants in the State. Under the FIPs, it is EPA, and not the States, that decides how to distribute the allowances among the power plants in each State. *See id.* at 48,284-88.[11]

---

[10] States may augment their budgets somewhat by buying out-of-state allowances. *See* Transport Rule, 76 Fed. Reg. at 48,263-68.

[11] Each power plant is "required to hold one $SO_2$ or one $NO_x$ allowance, respectively, for every ton of $SO_2$ or $NO_x$ emitted" during the relevant year. Transport Rule, 76 Fed. Reg. at 48,271; *see also id.* at 48,296-97 (describing penalties for noncompliance).

21

The Rule retains a limited, secondary role for SIPs. States have the option of submitting SIPs that modify some elements of the FIPs. *See id.* at 48,327-28. The first program year for which States can submit such SIPs is 2014. *See id.* States may also seek to replace the FIPs wholesale, as long as the SIP prohibits the amounts of $NO_x$ and $SO_2$ emissions that EPA specified. *See id.* at 48,328. EPA says it would "review such a SIP on a case-by-case basis." *Id.* But, importantly, the States do not have a post-Rule opportunity to avoid FIPs by submitting a SIP or SIP revision: The FIPs "remain fully in place in each covered state until a state's SIP is submitted and approved by EPA to revise or replace a FIP." *Id.*

Since it issued the final rule in August 2011, EPA has taken several subsequent regulatory actions related to the Transport Rule. *See* 76 Fed. Reg. 80,760 (Dec. 27, 2011) (finalizing six States' inclusion in the Rule for ozone-season $NO_x$); 77 Fed. Reg. 10,324 (Feb. 21, 2012) (making technical

---

Sources were required by the Rule to begin complying with the annual $SO_2$ and $NO_x$ requirements by January 1, 2012 for the 2012-13 budgets and by January 1, 2014 for the post-2014 budgets. *See id.* at 48,277. (This Court stayed the Rule before it took effect.) The ozone-season $NO_x$ requirements would kick in on May 1 of those years. *See id.* EPA chose those compliance deadlines in light of this Court's holding in *North Carolina* that the deadlines must be "consistent with the provisions in Title I mandating [NAAQS] compliance deadlines for downwind states." 531 F.3d at 912; *see also* Transport Rule, 76 Fed. Reg. at 48,277-78.
    The FIPs use allowance trading to enable covered plants within the States to comply as cost-effectively as possible. The program creates four allowance trading markets: one for annual $NO_x$, one for ozone-season $NO_x$, one for the Group 1 $SO_2$ States, and one for the Group 2 $SO_2$ States. *See* Transport Rule, 76 Fed. Reg. at 48,271. Power plants in Group 1 $SO_2$ States may not purchase Group 2 $SO_2$ allowances, and vice versa. *See id.* at 48,271-72. Otherwise, interstate trading is generally permitted.

22

adjustments to modeling and delaying assurance penalty provisions until 2014); 77 Fed. Reg. 34,830 (June 12, 2012) (revising budgets for 13 States).

D

An array of power companies, coal companies, labor unions, trade associations, States, and local governments petitioned for review of EPA's Transport Rule.

On December 30, 2011, this Court stayed the Rule pending a decision on the merits. *See* Order, No. 11-1302, slip op. at 2 (D.C. Cir. Dec. 30, 2011). The Court's order instructed EPA to "continue administering the Clean Air Interstate Rule pending the court's resolution of these petitions for review." *Id.*

In Part II of this opinion, we address whether the Rule exceeds EPA's authority to order upwind States to reduce "amounts which will . . . contribute significantly to nonattainment" in downwind States. In Part III, we address whether the statute permits EPA to issue FIPs without giving the States an initial opportunity to implement the required reductions through SIPs or SIP revisions. In Part IV, we consider the remedy.

II

In this Part, we analyze petitioners' argument that EPA exceeded its statutory authority under the "good neighbor" provision. Under the statute, EPA is limited to ordering upwind States to reduce "amounts which will . . . contribute significantly to nonattainment" in downwind States. 42 U.S.C. § 7410(a)(2)(D)(i).

23

A

The Transport Rule defines States' obligations under Section 110(a)(2)(D)(i)(I) of the Clean Air Act, a provision sometimes described as the "good neighbor" provision. *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I); *Michigan v. EPA*, 213 F.3d 663, 671 (D.C. Cir. 2000). The good neighbor provision requires that a State Implementation Plan, or SIP:

> (D) contain adequate provisions –
>> (i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will –
>>> (I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard . . . .

42 U.S.C. § 7410(a)(2)(D). The good neighbor provision recognizes that not all air pollution is locally generated: Some ambient air pollution "is caused or augmented by emissions from other states. Emissions from 'upwind' regions may pollute 'downwind' regions." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1037 (D.C. Cir. 2001).

Although the statute grants EPA significant discretion to implement the good neighbor provision, the statute's text and this Court's decisions in *Michigan* and *North Carolina* establish several red lines that cabin EPA's authority. Those red lines are central to our resolution of this case.

*First*, and most obviously, the text of Section 110(a)(2)(D)(i)(I) tells us that the "amounts which will . . . contribute" to a downwind State's nonattainment are at most those amounts that travel beyond an upwind State's borders

24

and end up in a downwind State's nonattainment area.[12]  The statute is not a blank check for EPA to address interstate pollution on a regional basis without regard to an individual upwind State's actual contribution to downwind air quality.

Moreover, the statutory text and this Court's decision in *North Carolina v. EPA* demonstrate that EPA may not force a State to eliminate more than its own "*significant*" contribution to a downwind State's nonattainment area – that is, to "exceed the mark," as we put it in *North Carolina*.  531 F.3d 896, 921 (D.C. Cir. 2008).  Thus, once EPA reasonably designates some level of contribution as "insignificant" under the statute, it may not force any upwind State to reduce more than its own contribution to that downwind State minus the insignificant amount.[13]

*Second*, under the terms of the statute and as we explained in *North Carolina*, the portion of an upwind State's contribution to a downwind State that "contribute[s] significantly" to that downwind State's "nonattainment" necessarily depends on the relative contributions of that upwind State, of other upwind State contributors, and of the

---

[12] At oral argument, EPA's counsel refused to concede this point.

[13] For example, suppose that EPA determined that any upwind State whose contribution to a downwind State was less than 3 units did not "contribute significantly to nonattainment."  That would mean EPA had established 3 units as the significance floor.  Other upwind contributors to that downwind State could not be required to reduce their downwind contributions below that floor.  So an upwind State whose contribution to that downwind State is 30 units could be required to reduce its contribution by *at most* 27 units.

Of course, that is not the *only* constraint on EPA's authority to force the State to reduce its emissions.  The other legal constraints described in this Part can further lower a State's maximum obligation.

25

downwind State itself. Each upwind State may be required to eliminate only its own "amounts which will . . . contribute significantly" to a downwind State's "nonattainment." As explained in *North Carolina*, EPA may not require any upwind State to "share the burden of reducing other upwind states' emissions." *Id.* In other words, the statutory text – which refers to "amounts" which will "contribute significantly" to a downwind State's "nonattainment" – contains not just an absolute component (meaning that an upwind State's insignificant amounts are not covered) but also a relative component (meaning that each State's relative contribution to the downwind State's nonattainment must be considered).

Moreover, the end goal of the statute is attainment in the downwind State. EPA's authority to force reductions on upwind States ends at the point where the affected downwind State achieves attainment.

Therefore, if the downwind State would attain the NAAQS but for upwind States' contributions – that is, if the entire above-NAAQS amount is attributable to upwind States' emissions – then the upwind States' *combined* share is the entire amount by which the downwind State exceeded the NAAQS. And as we said in *North Carolina*, when EPA allocates that burden *among* the upwind States, EPA may not force any upwind State to "share the burden of reducing other upwind states' emissions." *Id.* Each upwind State must bear its own fair share. Therefore, the "significance" of each upwind State's contribution cannot be measured in a vacuum, divorced from the impact of the other upwind States. Rather, the collective burden must be allocated among the upwind States in proportion to the size of their contributions to the

26

downwind State's nonattainment. Otherwise, EPA would violate the statute and our decision in *North Carolina*.[14]

A specific example helps illustrate that point. Suppose the NAAQS is 100 units, but the downwind State's nonattainment area contains 150 units. Suppose further that the downwind State contributes 90 units, and three upwind States contribute 20 units each. Because the upwind States are responsible for the downwind State's exceeding the NAAQS by 50 units, the downwind State is entitled to at most 50 units of relief from the upwind States so that the downwind State can achieve attainment of the NAAQS. Distributing those obligations in a manner proportional to their contributions, each of the three upwind States' significant contribution would be, at most, 16 ⅔ units. Or suppose instead that the three upwind States contribute 10, 20,

---

[14] Before Congress adopted the current text in the Clean Air Act Amendments of 1990, the statutory text targeted amounts from an upwind State that would "*prevent* attainment" in a downwind State. 42 U.S.C. § 7410(a)(2)(E) (1988) (emphasis added); *cf.* Pub. L. No. 101-549, § 101(b), 104 Stat. 2399, 2404 (1990). Under the "prevent attainment" standard, none of the three upwind States in that hypothetical would by itself be a but-for cause of the downwind State's nonattainment. By moving from "prevent attainment" to "contribute significantly to nonattainment," the 1990 Amendments dropped the requirement that an individual upwind State's emissions *on their own* prevent downwind attainment or maintenance. *See* S. REP. NO. 101-228, at 21 (1989) ("Since it may be impossible to say that any single source or group of sources is the one which actually prevents attainment, the bill changes 'prevent attainment or maintenance' to 'contribute significantly to nonattainment or interfere with maintenance by,' thus clarifying when a violation occurs."). Instead, it now suffices if EPA identifies upwind emissions that, *together with emissions from other upwind contributors*, push a given downwind maintenance area above the NAAQS.

27

and 30 units respectively. Distributing those obligations in a manner proportional to their contributions, those three States' significant contributions would be at most 8 ⅓, 16 ⅔, and 25 units, respectively, leading to the combined reduction of 50 units needed for the downwind State to reach attainment.[15]

In addition, our decisions in *Michigan* and *North Carolina* establish that EPA may consider cost, but only to further lower an individual State's obligations. *See Michigan*, 213 F.3d at 675; *North Carolina*, 531 F.3d at 918. Under *Michigan*, moreover, EPA may do so in a way that benefits some upwind States more than others. *See* 213 F.3d at 679. In other words, in order to prevent exorbitant costs from being imposed on certain upwind States, EPA may lower the obligations imposed on those States.

_____

[15] If the downwind State's contribution alone would push it above the NAAQS, then the entire above-NAAQS amount cannot be attributed *only* to upwind States. The downwind State is responsible for its own share of the above-NAAQS amount. In that scenario, upwind States that contribute to the downwind State are collectively on the hook for that share of the above-NAAQS amount that is attributable to upwind States' contributions. And, again, that collective burden must be allocated among the upwind States in proportion to the size of their contributions to the downwind State. Otherwise, one upwind State would be forced to "share the burden of reducing other upwind states' emissions," in violation of the statute. *North Carolina*, 531 F.3d at 921.

An example helps illustrate that point. Suppose the NAAQS is 100 units, and the downwind State's air contains 180 units. The downwind State contributes 120 units, and three upwind States contribute 20 units each. The downwind State is 80 units over the NAAQS – but 20 units of that is its own responsibility. The upwind States must therefore provide at most 60 units of relief. Distributing those obligations proportionally, each of the three upwind States' significant contribution would be, at most, 20 units.

28

*Third*, to conform to the text of the statute, EPA must also ensure that the combined obligations of the various upwind States, as aggregated, do not produce more than necessary "over-control" in the downwind States – that is, that the obligations do not go beyond what is necessary for the downwind States to achieve the NAAQS.

Even when EPA carefully conforms to the above limits on its authority, the possibility of over-control in downwind States still arises because multiple upwind States may affect a single downwind State and, conversely, a single upwind State may affect multiple downwind States. The requirement to prevent such over-control comes directly from the text of the statute: The good neighbor provision of the statute targets those emissions from upwind States that "contribute significantly *to nonattainment*" of the NAAQS. EPA may require only those reductions that are necessary for downwind States to attain the NAAQS. The good neighbor provision is not a free-standing tool for EPA to seek to achieve air quality levels in downwind States that are *well below* the NAAQS. Therefore, if modeling shows that a given slate of upwind reductions would yield more downwind air quality benefits than necessary for downwind areas to attain the NAAQS, EPA must attempt to ratchet back the upwind States' obligations to the level of reductions necessary and sufficient to produce attainment in the downwind States.[16]

---

[16] For example, suppose that under the proportional approach explained above, State A would have to cut 5,000 tons of $NO_x$ to achieve its largest downwind obligation, while State B would have to cut 2,000 tons to achieve its largest downwind obligation. If EPA modeling showed that all downwind nonattainment would be resolved if those two upwind States' combined reduction obligations were, say, 10% lower, EPA would have to ratchet back the upwind States' reduction obligations by a total of 10%. That

ADD-28

29

To be sure, as even petitioners acknowledge, there may be some truly unavoidable over-control in some downwind States that occurs as a byproduct of the necessity of reducing upwind States' emissions enough to meet the NAAQS in other downwind States. *See* Industry & Labor Reply Br. 11 n.2. For those reasons, EPA must have some discretion about how to reasonably avoid such over-control. Moreover, because multiple upwind States may affect a single downwind State, and because a single upwind State may affect multiple downwind States, it may not be possible to accomplish the ratcheting back in an entirely proportional manner among the upwind States. Our cases recognize as much. *See Michigan*, 213 F.3d at 679; *North Carolina*, 531 F.3d at 908. But the point remains: EPA must avoid using the good neighbor provision in a manner that would result in unnecessary over-control in the downwind States. Otherwise, EPA would be exceeding its statutory authority, which is expressly tied to achieving attainment in the downwind States.

B

We now apply those principles to the EPA Transport Rule. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *see also Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) ("EPA is a federal agency – a creature of statute," and may exercise "only those authorities conferred upon it by Congress."). An agency may not exceed a statute's authorization or violate a statute's limits. If a statute is ambiguous, an agency that administers the statute may choose a reasonable interpretation of that ambiguity – but the agency's interpretation must still stay

_____

would ensure that upwind States were only forced to prohibit those emissions that "contribute significantly to nonattainment."

30

within the boundaries of the statutory text. *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-44 (1984).[17]

In the Transport Rule, EPA used a two-stage approach to define "amounts which will . . . contribute significantly" to downwind attainment problems. The first stage identified those upwind States that were "significant contributors" to downwind attainment problems. EPA determined that a State's contribution to a downwind nonattainment or maintenance area was significant if it exceeded a numerical "air quality threshold" of 0.8 ppb for ozone, 0.15 µg/m$^3$ for annual PM$_{2.5}$, and 0.35 µg/m$^3$ for 24-hour PM$_{2.5}$. Transport Rule, 76 Fed. Reg. 48,208, 48,236 (Aug. 8, 2011). States "whose contributions are below these thresholds," EPA found, "do not significantly contribute to nonattainment or interfere with maintenance of the relevant NAAQS." *Id.* Those upwind States were off the hook altogether.

But an upwind State that exceeded the significance threshold at even one downwind State's receptor was drawn wholesale into the Rule's second stage – cost-based emissions reductions. At that second stage, EPA abandoned the previous measure of significance – the numerical air quality thresholds, which were based on the quantity of pollution an upwind State sent to a downwind area. Instead, EPA switched over to relying on cost of reduction alone. EPA required each State's power plants to cut all of the emissions

---

[17] We set aside EPA's action here if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." The standard we apply "is the same" under the judicial review provision of the Clean Air Act, 42 U.S.C. § 7607(d)(9), as under the Administrative Procedure Act, 5 U.S.C. § 706(2). *Motor Vehicle Manufacturers Ass'n v. EPA*, 768 F.2d 385, 389 n.6 (D.C. Cir. 1985).

31

they could eliminate at a given cost per ton of pollution reduced – regardless of the "amounts" of the State's emissions EPA deemed to "contribute significantly" at stage one and regardless of the relative contributions of the other upwind States and the downwind State.

We perceive at least three independent but intertwined legal flaws in EPA's approach to the good neighbor provision. Those flaws correspond to the three requirements we outlined above that come from the statutory text.

*First*, and most fundamentally, the Transport Rule is flawed because the requirement that EPA imposed on upwind States was not based on the "amounts" from upwind States that "contribute significantly to nonattainment" in downwind States, as required by the statute and our decision in *North Carolina*.

Petitioners claim that the initial stage of EPA's analysis – the numerical air quality thresholds, which used a bright-line test for whether a State's downwind emissions "contribute significantly" – created a "'floor' below which any contribution is, by definition, viewed as insignificant." Industry & Labor Br. 20. Petitioners argue that EPA has no statutory authority to compel States to reduce amounts of pollution that are "insignificant." Therefore, petitioners contend that EPA could not ignore that floor at the later stage, when it calculated each State's "significant contribution" based on cost.[18]

---

[18] The dissent contends that this point was not preserved for judicial review and that the agency was not aware of this issue during the agency proceedings. *See* 42 U.S.C. § 7607(d)(7)(B). For several reasons, we are convinced EPA had more than "adequate notification of the general substance" of petitioners'

32

_____

argument. *NRDC v. EPA*, 571 F.3d 1245, 1259 (D.C. Cir. 2009) (quoting *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 891 (D.C. Cir. 2006)). Indeed, one of the central questions in the long history of EPA's efforts to implement the good neighbor provision has been whether EPA has complied with the basic statutory limits on its authority. So it is here.

First, the Transport Rule proceeding arose out of this Court's decision in *North Carolina*, on which petitioners' argument relies. *See* Transport Rule, 76 Fed. Reg. at 48,211 ("EPA is promulgating the Transport Rule in response to the remand of the Clean Air Interstate Rule (CAIR) by the U.S. Court of Appeals for the District of Columbia Circuit"). In *North Carolina v. EPA*, this Court explained the applicable statutory limitations and instructed EPA on remand to craft a new rule "consistent with our opinion." 550 F.3d 1176, 1177 (D.C. Cir. 2008) (on rehearing). Instructing EPA to proceed in a manner "consistent with" *North Carolina* presupposes that EPA is *aware* of the Court's opinion. And the opinion made clear that once EPA defines each upwind State's "significant contribution," it may not "require some states to exceed the mark." 531 F.3d at 921. In sum, EPA knew from the beginning that it was required to comply with *North Carolina*, including that part of the Court's holding on which petitioners rely here.

Second, EPA considered – and rejected – precisely the same argument in CAIR. EPA first acknowledged the comment: "Some commenters stated, more broadly, that the threshold contribution level selected by EPA should be considered a floor, so that upwind States should be obliged to reduce their emissions only to the level at which their contribution to downwind nonattainment does not exceed that threshold level." CAIR, 70 Fed. Reg. 25,162, 25,176-77 (May 12, 2005). It then dismissed that argument: "Most important for present purposes, as long as the controls yield downwind benefits needed to reduce the extent of nonattainment, the controls should not be lessened simply because they may have the effect of reducing the upwind State's contribution to below the initial threshold." *Id.* at 25,177. EPA's rejection of the same argument in a prior rulemaking – indeed, in a prior rulemaking that is the direct progenitor of the current one – is highly relevant to

ADD-32

33

---

whether the argument is preserved here. *See, e.g.*, *American Petroleum Institute v. EPA*, 52 F.3d 1113, 1120 n.1 (D.C. Cir. 1995); *NRDC v. EPA*, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (en banc); *see also Appalachian Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998) ("The purpose of the exhaustion requirement is to ensure that the agency is given the first opportunity to bring its expertise to bear on the resolution of a challenge to a rule."). EPA's prior rejection of the same argument in CAIR, together with this Court's opinion in *North Carolina*, show that EPA "had notice of this issue and could, or should have, taken it into account." *NRDC*, 824 F.2d at 1151.

Third, EPA's statements at the proposal stage indicated EPA was not open to reconsidering CAIR's earlier rejection of petitioners' argument. *See* Proposed Transport Rule, 75 Fed. Reg. 45,210, 45,299 (Aug. 2, 2010) ("EPA evaluated a number of alternative approaches to defining significant contribution and interference with maintenance in addition to the approach proposed in this rule. Stakeholders suggested a variety of ideas. EPA considered all suggested approaches. . . . EPA is not proposing any of the alternative approaches listed here."). By that point, EPA had already dismissed the two air quality-only approaches it considered and had indicated its firm commitment to the cost-based approach. *See* EPA, Alternative Significant Contribution Approaches Evaluated Technical Support Document 7 (July 2010) (EPA, Significant Contribution TSD), J.A. 2312 (uniform cost-per-ton approach "has been successfully implemented before, with excellent environmental results"); *see also id.* at 3-7, J.A. 2308-12. In light of the indications that EPA was aware of their objection but had no intention to revisit its approach (and indeed had already rejected the objection), the specificity of commenters such as Wisconsin and Tennessee was "reasonable" under the circumstances. 42 U.S.C. § 7607(d)(7)(B); *see, e.g.*, Wisconsin Cmt., J.A. 1293 ("EPA needs to primarily depend on air quality results instead of control costs in defining" significant contributions); Tennessee Cmt., J.A. 556 ("A lower cost threshold should be considered for any State that can reduce their contribution below 1% significance using cost thresholds below the

34

We agree with petitioners. The Transport Rule includes or excludes an upwind State based on the amount of that upwind State's significant contribution to a nonattainment area in a downwind State. That much is fine. But under the Rule, a State then may be required to reduce its emissions by an amount greater than the "significant contribution" that brought it into the program in the first place. That much is not fine.

Put more plainly, EPA determined that a State was subject to the good neighbor provision if it contributed at least a certain threshold amount to air pollution in a downwind State. But EPA then imposed restrictions based on region-wide air quality modeling projections; those restrictions could require upwind States to reduce emissions by more than the amount of that contribution.

---

maximum values ($2,000/ton for $SO_2$ and $500/ton for $NO_x$), if applicable. . . . We would like to see a summary for each State and pollutant that indicates, independently of cost, the amounts necessary to eliminate the significant contribution and interference with maintenance from upwind States."); Delaware Cmt., J.A. 1756 (challenging EPA's decision to depart from the air quality thresholds used for inclusion and to quantify States' significant contributions based on cost considerations, not air quality); *see also Appalachian Power*, 135 F.3d at 817 ("the word 'reasonable' cannot be read out of the statute in favor of a hair-splitting approach"); *id.* at 818 (an objection need not be "phrased in exactly the same way in each forum"); *South Coast*, 472 F.3d at 891 (petitioners have "some leeway in developing their argument" on review).

In sum, we are confident here that EPA had more than "adequate notification of the general substance of the complaint." *South Coast*, 472 F.3d at 891. EPA was plainly on notice that its disregard of the significance floor was a potential legal infirmity in its approach.

35

EPA's approach poses a fundamental legal problem – one that derives from the text of the statute and from our precedents. Our decision in *Michigan* held that EPA may use cost considerations to require "termination of only a subset of each state's contribution." 213 F.3d at 675. And our decision in *North Carolina* made clear that EPA may not use cost to force an upwind State to "exceed the mark." 531 F.3d at 921.[19]

By using a numerical threshold at the initial stage – and thereby creating a floor below which "amounts" of downwind pollution were not significant – EPA defined the "mark," to use the term employed in *North Carolina*. EPA could not then ignore that mark and redefine each State's "significant contribution" in such a way that an upwind State's required reductions could be *more* than its own significant contribution to a downwind State.[20]

---

[19] The Court in *North Carolina* reached these conclusions in its discussion of EPA's use of power plant fuel mix to distribute $NO_x$ reduction obligations among the CAIR States. *See* 531 F.3d at 904, 918-21. EPA claims that the reasoning of that analysis is not relevant here because it did not relate to "general significant contribution issues," but rather to the manner of calculating each State's emissions budget. EPA Br. 23.

That is a distinction without a difference. The fuel mix analysis increased some States' obligations and reduced others'. EPA's argument overlooks that no step in its analysis – however the step is labeled – may impose burdens on States or private entities unless those burdens are anchored in statutory authority. Under the statute, States are required to prohibit only those "amounts which will . . . contribute significantly to nonattainment" or "interfere with maintenance." 42 U.S.C. § 7410(a)(2)(D)(i); *see also North Carolina*, 531 F.3d at 919.

[20] This particular issue was not presented in *Michigan*. In the 1998 $NO_x$ Rule, EPA balanced various air quality factors using a

36

EPA now claims that the Rule's air quality thresholds were established for a "limited analytical purpose" and "otherwise say nothing about what part of each State's contribution should be considered 'significant.'" EPA Br. 33. That claim rings hollow. EPA itself said in the final rule that "states whose contributions are below these thresholds do not significantly contribute to nonattainment or interfere with maintenance of the relevant NAAQS." Transport Rule, 76 Fed. Reg. at 48,236. EPA therefore acknowledged that amounts below the threshold are not "amounts which will . . . contribute significantly" to downwind attainment problems.[21]

In short, EPA used the air quality thresholds to establish a floor below which "amounts" of air pollution do not

---

"weight-of-evidence approach." 63 Fed. Reg. 57,356, 57,381 (Oct. 27, 1998). Unlike the Transport Rule, the 1998 $NO_x$ Rule did not employ a numerical threshold, nor any other "bright line criterion," to screen out States at the first stage. Id. at 57,383.

[21] EPA cannot avoid North Carolina by declining to quantify the "amount" of each State's downwind contribution, "beginning its analysis with cost," 531 F.3d at 918, and simply designating the output of that cost-based analysis each State's "significant contribution." The statutory term "amounts which will . . . contribute significantly" is not so elastic. See id. at 920 ("When a petitioner complains EPA is requiring a state to eliminate more than its significant contribution, it is inadequate for EPA to respond that it never measured individual states' significant contributions."). As explained above, "amounts which will . . . contribute" logically cannot exceed the amount of a pollutant that leaves a State's borders and reaches a nonattainment area. And insignificant amounts must be excluded. Moreover, the "significance" of an upwind State's emissions for a downwind area's attainment problem cannot be divorced from the relative impact of other States' contributions to that problem.

37

"contribute significantly."[22]   The statute requires a State to prohibit at most those "amounts" which will "contribute significantly" – and no more.  If amounts below a numerical threshold do not contribute significantly to a downwind State's nonattainment, EPA may not require an upwind State to do more.  The Transport Rule does not adhere to that basic requirement of the statutory text and our precedents.[23]

*Second*, EPA's Transport Rule also runs afoul of the statute's proportionality requirement as described in our decision in *North Carolina*:  EPA has "no authority to force an upwind state to share the burden of reducing other upwind states' emissions."  531 F.3d at 921; *see* Industry & Labor Br. 33 (in imposing $SO_2$ budgets, EPA "did not even consider the *relative* contributions of the various States").      EPA's "redistributional instinct may be laudatory," *North Carolina*, 531 F.3d at 921, but it cannot trump the terms of the statute. Under the statute, each upwind State that contributes to a

_____

[22] EPA protests that it used the numerical thresholds only to determine "which upwind State contributions to downwind problems are so small as to warrant exclusion."  EPA Br. 31.  But that must mean those "amounts" that are "so small as to warrant exclusion" are not "significant."  (It would be illogical to carve out a de minimis exception for emissions that are statutorily "significant.")

[23] EPA seems reluctant to acknowledge any textual limits on its authority under the good neighbor provision.  At oral argument, EPA suggested that "reasonableness" is the only limit on its authority to use cost-effectiveness to force down States' emissions. Tr. of Oral Arg. at 44-45.  EPA would not rule out the possibility that under the good neighbor provision, it could require a State to reduce *more than the State's total emissions that go out of State*. *See id.* at 43-45.  But such a claim of authority does not square with the statutory text – "amounts" of pollution obviously cannot "contribute" to a downwind State's pollution problem if they don't even reach the downwind State.

38

downwind nonattainment area is responsible for no more than its own "amounts which will . . . contribute significantly" to the downwind State's pollution problem. To be sure, under *Michigan*, EPA may rely on cost-effectiveness factors in order to allow some upwind States to do *less* than their full fair share. *See* 213 F.3d at 675; *cf.* Petitioning States' Br. 17, *Michigan*, 213 F.3d 663 (No. 98-1497). But when EPA asks one upwind State to eliminate *more* than its statutory fair share, that State is necessarily being forced to clean up another upwind State's share of the mess in the downwind State. Under the statute and *North Carolina*, that is impermissible.

Here, EPA's Transport Rule violated the statute because it made no attempt to calculate upwind States' required reductions on a proportional basis that took into account contributions of other upwind States to the downwind States' nonattainment problems.

In the same vein, EPA's Transport Rule failed to take into account the downwind State's own fair share of the amount by which it exceeds the NAAQS. *See* Industry & Labor Br. 24-25. How "significantly" an upwind State contributes to a downwind State's nonattainment also depends in part on how much of the above-NAAQS amount comes from the downwind State itself. As we explained above, EPA therefore must factor in the downwind State's own contribution, alongside those of the various upwind States. But EPA did not do that here.

*Third*, and relatedly, EPA also failed to ensure that the collective obligations of the various upwind States, when aggregated, did not produce unnecessary over-control in the downwind States. EPA's statutory authority, once again, is limited to attaining the NAAQS in the downwind States.

39

EPA may not require upwind States to do more than necessary for the downwind States to achieve the NAAQS. Here, EPA did not try to take steps to avoid such over-control.[24]

In sum, EPA's authority derives from the statute and is limited by the statutory text.[25]  EPA's reading of Section 110(a)(2)(D)(i)(I) – a narrow and limited provision – reaches far beyond what the text will bear.

_____

[24] At the proposal stage in the proceeding that culminated in the Transport Rule, EPA considered a proportional approach that reflected many of the essential principles described above.  *See* EPA, Significant Contribution TSD at 6-7, J.A. 2311-12.  Under that approach, the upwind contributors to a given downwind area would collectively have to provide a "defined air quality improvement" to the downwind State, in the amount by which the downwind State exceeded the NAAQS.  *Id.* at 6, J.A. 2311.  And the upwind States' individual shares of that collective duty would be defined "in direct proportion to their original contribution[s]" to the downwind State.  *Id.*  EPA ultimately chose not to adopt that approach, however.

[25] The statute also requires upwind States to prohibit emissions that will "interfere with maintenance" of the NAAQS in a downwind State.  "Amounts" of air pollution cannot be said to "interfere with maintenance" unless they leave the upwind State and reach a downwind State's maintenance area.  To require a State to reduce "amounts" of emissions pursuant to the "interfere with maintenance" prong, EPA must show some basis in evidence for believing that those "amounts" from an upwind State, together with amounts from other upwind contributors, will reach a specific maintenance area in a downwind State and push that maintenance area back over the NAAQS in the near future.  Put simply, the "interfere with maintenance" prong of the statute is not an open-ended invitation for EPA to impose reductions on upwind States.  Rather, it is a carefully calibrated and commonsense supplement to the "contribute significantly" requirement.

40

Although the statutory text alone prohibits EPA's Rule, the statutory context provides additional support for our conclusion. The Supreme Court, in analyzing Section 109 of the Clean Air Act, rejected the premise that Congress would "alter the fundamental details of a regulatory scheme" in "ancillary provisions" – in other words, that Congress would "hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The good neighbor provision is one of more than 20 SIP requirements in Section 110(a)(2). It seems inconceivable that Congress buried in Section 110(a)(2)(D)(i)(I) – the good neighbor provision – an open-ended authorization for EPA to effectively force every power plant in the upwind States to install every emissions control technology EPA deems "cost-effective." Such a reading would transform the narrow good neighbor provision into a "broad and unusual authority" that would overtake other core provisions of the Act. *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006). We "are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

\* \* \*

States are obligated to prohibit only those "amounts" of pollution "which will . . . contribute significantly" to downwind attainment problems – and no more. Because the Transport Rule exceeds those limits, and indeed does not really try to meet those requirements, it cannot stand.

III

There is a second, entirely independent problem with the Transport Rule. EPA did not stop at simply quantifying each upwind State's good neighbor obligations. Instead, in an

41

unprecedented application of the good neighbor provision, EPA also simultaneously issued Federal Implementation Plans, or FIPs, to implement those obligations on sources in the States. EPA did so without giving the States an initial opportunity to implement the obligations themselves through their State Implementation Plans, or SIPs.

The Clean Air Act ordinarily gives States the initial opportunity to implement a new air quality standard on sources within their borders; States do so by submitting SIPs. *See* 42 U.S.C. §§ 7407(a), 7410(a)(1). Here, by preemptively issuing FIPs, EPA denied the States that first opportunity to implement the reductions required under their good neighbor obligations. EPA justifies its "FIP-first" approach by pointing to its earlier findings that the States had failed to meet their good neighbor obligations. But those findings came *before* the Transport Rule quantified the States' good neighbor obligations. EPA's approach punishes the States for failing to meet a standard that EPA had not yet announced and the States did not yet know.

Under the Act, EPA has authority to set standards, but the statute reserves the first-implementer role for the States. That division of labor applies not just to the NAAQS but also to the good neighbor provision, Section 110(a)(2)(D)(i)(I), as EPA itself has recognized several times in the past. When EPA defines States' good neighbor obligations, it must give the States the first opportunity to implement the new requirements.

A

"Under the Clean Air Act, both the Federal Government and the States exercise responsibility for maintaining and improving air quality." *American Trucking Ass'ns v. EPA*, 600 F.3d 624, 625 (D.C. Cir. 2010). The Act sets forth a

42

basic division of labor: The Federal Government establishes air quality standards, but States have primary responsibility for attaining those standards within their borders. *See Train v. NRDC*, 421 U.S. 60, 63-67 (1975); *American Trucking*, 600 F.3d at 625-26; *Virginia v. EPA*, 108 F.3d 1397, 1406-10 (D.C. Cir. 1997); *see also* 42 U.S.C. § 7401(a) ("The Congress finds . . . that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments . . . ."); 42 U.S.C. § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State . . . .").[26]

That statutory division of authority is strict. This Court has described the *Train-Virginia* line of cases as erecting a statutory "federalism bar" under Section 110 of the Act. *See Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1046 (D.C. Cir. 2001) (citing *Train*, 421 U.S. 60; *Virginia*, 108 F.3d 1397); *Michigan v. EPA*, 213 F.3d 663, 687 (D.C. Cir. 2000). That statutory federalism bar prohibits EPA from using the SIP process to force States to adopt specific control measures. *See Michigan*, 213 F.3d at 687; *Virginia*, 108 F.3d at 1410.

In *Train*, the Supreme Court invoked that statutory division of labor in holding that the Clean Air Act gives EPA

---

[26] The 1970 Amendments, which "sharply increased federal authority" in *setting* air quality standards, at the same time "explicitly preserved the principle" of State primacy in *implementing* pollution controls. *Train*, 421 U.S. at 64. The 1990 Amendments, which enacted the current text of Section 110(a)(2)(D)(i)(I), "did not alter the division of responsibilities between EPA and the states in the section 110 process." *Virginia*, 108 F.3d at 1410.

43

"no authority to question the wisdom of a State's choices of emission limitations," so long as the State's SIP submission would result in "compliance with the national standards for ambient air." 421 U.S. at 79. The Court stated:

> The Agency is plainly charged by the Act with the responsibility for setting the national ambient air standards. Just as plainly, however, *it is relegated by the Act to a secondary role* in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met.

*Id.* (emphasis added); *see also Union Electric Co. v. EPA*, 427 U.S. 246, 256, 269 (1976) (EPA may not reject a SIP on grounds of technical or economic infeasibility; that "would permit the Administrator or a federal court to reject a State's legislative choices in regulating air pollution, even though Congress plainly left with the States, so long as the national standards were met, the power to determine which sources would be burdened by regulation and to what extent").

Similarly, in *Virginia*, this Court held that EPA had no authority under Section 110 to condition its approval of northeastern States' SIPs on the States' adoption of California's vehicle emission control measures. *See* 108 F.3d at 1401-10. The Court relied on the basic principle that the States, not EPA, are the primary implementers under Section 110. *See id.* at 1410 ("section 110 does not enable EPA to force particular control measures on the states").

In sum, Title I of the Act establishes a "partnership between EPA and the states." *NRDC v. Browner*, 57 F.3d 1122, 1123 (D.C. Cir. 1995). The terms of that partnership are clear: EPA sets the standards, but the States "bear primary responsibility for attaining, maintaining, and

44

enforcing these standards." *American Lung Ass'n v. EPA*, 134 F.3d 388, 389 (D.C. Cir. 1998).

B

With that basic structure in mind, we consider the question presented here: whether EPA may use its rulemaking authority to quantify States' obligations under Section 110(a)(2)(D)(i)(I) and *simultaneously* issue Federal Implementation Plans, without giving the States a first opportunity to comply.

We begin by briefly describing the set of statutory provisions on which EPA relies here.

EPA is the first mover in regulating ambient air pollution in Title I of the Clean Air Act. Section 109 requires EPA to promulgate NAAQS for common air pollutants. *See Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 462 (2001) (citing 42 U.S.C. § 7409(a)). But once EPA sets a NAAQS, "responsibility under the Act shifts from the federal government to the states." *Lead Industries Ass'n v. EPA*, 647 F.2d 1130, 1137 (D.C. Cir. 1980).

Section 110 governs State Implementation Plans. Section 110(a)(1) requires States to submit SIPs to implement each new or revised NAAQS. *See* 42 U.S.C. § 7410(a)(1). Section 110(a)(2) lists many elements that a SIP must contain in order to ensure that the Plan will be comprehensive enough to enable the State to attain the NAAQS. *See* 42 U.S.C. § 7410(a)(2).[27] The good neighbor provision, Section 110(a)(2)(D)(i)(I), is one of those required elements.

---

[27] *See, e.g.*, 42 U.S.C. § 7410(a)(2)(A) (SIP shall "include enforceable emission limitations and other control measures," "as

45

Section 110(c)(1) creates a federal backstop if the States fail to submit adequate SIPs. When EPA finds that a State "has failed to make a required submission" or "disapproves a State implementation plan submission in whole or in part" because of a SIP "deficiency," EPA must "promulgate a Federal implementation plan" within two years, "unless the State corrects the deficiency" in the meantime in a manner approved by EPA. 42 U.S.C. § 7410(c)(1). In essence, the issue here is whether a State's implementation of its good neighbor obligation can be considered part of the State's "required submission" in its SIP (or whether the SIP can be deficient for failing to implement the good neighbor obligation) even before EPA quantifies the State's good neighbor obligation. We think not. EPA's quantifying of a State's good neighbor obligation and setting of a State's emissions budget is what "require[s]" the State to make a "submission" implementing that obligation on sources within the State. After EPA has set the relevant emissions budgets for each State, EPA may require States to submit new SIPs under Section 110(a)(1) or to revise their SIPs under Section 110(k)(5). That is the approach EPA has used in the past. In short, once EPA defines or quantifies a State's good neighbor obligation, the State must have a reasonable time to

---

well as schedules and timetables for compliance"), 7410(a)(2)(B) (SIP shall provide for means to "monitor, compile, and analyze data on ambient air quality" and provide the data to EPA upon request), 7410(a)(2)(C) (SIP shall "include a program to provide for the enforcement of" the control measures required by subparagraph (A)), 7410(a)(2)(E) (SIP shall provide assurances that State and local authorities "will have adequate personnel, funding, and authority" under State and local law "to carry out such implementation plan"), 7410(a)(2)(F) (SIP shall require "the installation, maintenance, and replacement of equipment" by "stationary sources to monitor emissions from such sources").

46

implement that requirement with respect to sources within the State.[28]

In short, the triggers for a FIP are EPA's finding that the SIP fails to contain a "required submission" or EPA's disapproving a SIP because of a "deficiency." But logically, a SIP cannot be deemed to lack a required submission or be deemed deficient for failing to implement the good neighbor obligation until after EPA has defined the State's good neighbor obligation. Once it defines the obligation, then States may be forced to revise SIPs under Section 110(k)(5) or to submit new SIPs under Section 110(a)(1). Only if that revised or new SIP is properly deemed to lack a required submission or is properly deemed deficient may EPA resort to a FIP for the State's good neighbor obligation.

C

1

In light of Section 110(c)(1), EPA here made "a finding of failure to submit and/or disapproved a SIP submission" for each State with respect to each NAAQS for which that State would be covered. EPA Br. 44 (citing 42 U.S.C. § 7410(c)(1)); *see also* EPA, Status of CAA 110(a)(2)(D)(i)(I) SIPs Final Rule Technical Support Document (July 2011) (EPA, SIPs TSD), J.A. 3167.[29] On the basis of those

---

[28] Section 110(k)(5), the SIP call provision, authorizes EPA to "establish reasonable deadlines" not to exceed 18 months for SIP revisions, once notice is given. 42 U.S.C. § 7410(k)(5); *cf.* 1998 $NO_x$ Rule, 63 Fed. Reg. at 57,451 (12-month deadline).

[29] EPA was cognizant of another potential obstacle: its own past approval of CAIR SIPs. CAIR covered the 1997 ozone and annual $PM_{2.5}$ NAAQS, two of the three NAAQS at issue here. *See* 70 Fed. Reg. 25,162, 25,165 (May 12, 2005). Many covered States

ADD-46

47

findings, EPA asserted authority to issue the Transport Rule FIPs.

But EPA's many SIP disapprovals and findings of failure to submit share one problematic feature: EPA made all of those findings *before* it told the States what emissions reductions their SIPs were supposed to achieve under the good neighbor provision. *See* EPA, SIPs TSD, J.A. 3167.

EPA sees no problem with that. In EPA's view, there is no difference between a State's obligation to comply with the NAAQS and a State's good neighbor obligation: States must

---

had submitted and received EPA approval of CAIR SIPs. *See* EPA, SIPs TSD, J.A. 3167. EPA apparently was concerned that those approved CAIR SIPs might deprive EPA of authority under Section 110(c)(1) to issue Transport Rule FIPs for those two NAAQS.

EPA tried to address this in the final rule. It claimed that because *North Carolina* invalidated CAIR, approved CAIR SIPs no longer fulfilled States' Section 110(a)(2)(D)(i)(I) obligations. *See* Transport Rule, 76 Fed. Reg. 48,208, 48,219 (Aug. 8, 2011). It bears noting, however, that EPA continued to approve CAIR SIPs after *North Carolina*. *See, e.g.*, 74 Fed. Reg. 65,446 (Dec. 10, 2009).

But to try to make sure, in the final Transport Rule EPA retrospectively "corrected" its past approvals of CAIR SIPs, to clarify its view that an approved CAIR SIP did not shield a State from the Transport Rule FIPs. *See* 76 Fed. Reg. at 48,219; *see also* 42 U.S.C. § 7410(k)(6) (EPA may "revise" any approval the Administrator determines "was in error"). EPA made those "corrections" without using notice and comment rulemaking, despite the statutory requirement that EPA make any corrections "in the same manner as the approval." 42 U.S.C. § 7410(k)(6).

Because the Transport Rule must be vacated in any event, we need not address here whether EPA's "corrections" of CAIR SIP approvals exceeded its authority under Section 110(k)(6).

48

submit SIPs addressing both within three years of a NAAQS, or face FIPs.

But there is a difference – a glaring one – between the two obligations. A NAAQS is a clear numerical target. For example, the NAAQS for annual $PM_{2.5}$ is 15 µg/m$^3$. Every State knows precisely what numerical goal its SIP must achieve. If a State misses that clear numerical target, it has only itself to blame.

By contrast, the good neighbor obligation is not a clear numerical target – far from it – until EPA defines the target. Even after EPA sets a NAAQS, an upwind State's good neighbor obligation for that pollutant is nebulous and unknown. The statutory standard is "amounts" of pollution which will "contribute significantly to nonattainment" or "interfere with maintenance" of the new NAAQS in a downwind State. There is no way for an upwind State to know its obligation without knowing levels of air pollution in downwind States and then apportioning its responsibility for each downwind State's nonattainment. Therefore, the upwind State's obligation remains impossible for the upwind State to determine *until EPA defines it*.[30] Without further definition by EPA, a prohibition on "amounts which will . . . contribute significantly" is like a road sign that tells drivers to drive "carefully." The regulated entities – here, the upwind States –

---

[30] As EPA itself has recognized in the past: "The precise nature and contents of such a submission is [sic] not stipulated in the statute. EPA believes that the contents of the SIP submission required by section 110(a)(2)(D)(i) may vary depending upon the facts and circumstances related to the specific NAAQS." EPA, Guidance for State Implementation Plan Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and $PM_{2.5}$ National Ambient Air Quality Standards 3 (Aug. 15, 2006) (EPA, 2006 Guidance).

49

need more precise guidance to know how to conform their conduct to the law.  A SIP logically cannot be deemed to lack a "required submission" or deemed to be deficient for failure to meet the good neighbor obligation before EPA quantifies the good neighbor obligation.

EPA faults the States for not hitting that impossible-to-know target with their SIP submissions.  In effect, EPA's view is that the only chance States have to hit the target is *before* EPA defines the target.  By the time EPA makes the target clear, it's already too late for the States to comply.

Interestingly, outside of this litigation, EPA has itself recently and repeatedly recognized that it makes no sense for States to act until EPA defines the target.  Just a few weeks ago, for example, in a separate proceeding EPA said that while some elements of a SIP submission are "relatively straightforward," "others clearly require interpretation by EPA through rulemaking, or recommendations through guidance, in order to give specific meaning for a particular NAAQS."  77 Fed. Reg. 46,361, 46,363 (Aug. 3, 2012).  "For example, section 110(a)(2)(D)(i) requires EPA to be sure that each state's SIP contains adequate provisions to prevent significant contribution to nonattainment of the NAAQS in other states.  This provision contains numerous terms that require substantial rulemaking by EPA in order to determine such basic points as what constitutes significant contribution." *Id.* at n.7.  Thus, EPA has said that the good neighbor provision "clearly require[s] interpretation by EPA through rulemaking, or recommendations through guidance, in order to give specific meaning for a particular NAAQS." *Id.*; *see also, e.g.*, 77 Fed. Reg. 45,320, 45,323 & n.7 (July 31, 2012) (same); 77 Fed. Reg. 43,196, 43,199 & n.7 (July 24, 2012) (same); 77 Fed. Reg. 22,533, 22,536 & n.7 (Apr. 16, 2012)

50

(same); 76 Fed. Reg. 40,248, 40,250 & n.5 (July 8, 2011) (same).

In this litigation, however, EPA insists that the text of Section 110(c)(1) compels its FIP-first approach. But EPA pursues its reading of the statutory text down the rabbit hole to a wonderland where EPA defines the target *after* the States' chance to comply with the target has already passed. *Cf. FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."); *id.* ("regulated parties should know what is required of them so they may act accordingly"); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance . . . .").

We take a different view. Statutory text "cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Services, Inc.*, 132 S. Ct. 1350, 1357 (2012) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

Title I's core two-step process is that the Federal Government sets end goals and the States choose the means to attain those goals. *See Michigan*, 213 F.3d at 687; *see also Virginia*, 108 F.3d at 1410. EPA's theory – that EPA can define the end goals for the good neighbor provision and *simultaneously* issue federal plans to implement them – upends that process and places the Federal Government firmly

51

in the driver's seat at both steps. The FIP-first approach is incompatible with the basic text and structure of the Clean Air Act.

In our view, determining the level of reductions required under Section 110(a)(2)(D)(i)(I) is analogous to setting a NAAQS. And determining the level of reductions under the good neighbor provision triggers a period during which States may submit appropriate SIPs under Section 110(a)(1) or SIP revisions under Section 110(k)(5).

That approach fits comfortably within the statutory text and structure. In both situations – setting a NAAQS and defining States' good neighbor obligations – EPA sets the numerical end goal. And in both cases, once the standards are set, "determining the particular mix of controls among individual sources to attain those standards" remains "a State responsibility." 1998 NO$_x$ Rule, 63 Fed. Reg. 57,356, 57,369 (Oct. 27, 1998).

2

Other contextual and structural factors also support our conclusion that Section 110(a)(2)(D)(i)(I) preserves the basic principle that States, not the Federal Government, are the primary implementers after EPA has set the upwind States' good neighbor obligations.

Section 110's particular function in the statutory scheme is to give the States the first opportunity to implement the national standards EPA sets under Title I. *See* 42 U.S.C. § 7410(a)-(c); *see also Train*, 421 U.S. at 79; *Virginia*, 108 F.3d at 1410; *Michigan*, 213 F.3d at 686-87. The good neighbor requirement's placement in Section 110(a) – a provision calling for State-level regulation – strongly suggests that Congress intended *States* to implement the obligations set

52

forth in Section 110(a)(2)(D)(i)(I).  By contrast, if EPA's FIP-first interpretation were to prevail, Section 110(a)(2)(D)(i)(I) would not fit well in Section 110(a).

Moreover, Title I contains a separate provision, Section 126, that explicitly contemplates direct EPA regulation of specific sources that generate interstate pollution.  *See* 42 U.S.C. § 7426(b)-(c); *see also Appalachian Power*, 249 F.3d at 1046.  Section 126(b) permits a State to petition EPA for a finding that a source in a neighboring State emits pollution in violation of Section 110(a)(2)(D)(i).[31]  *See* 42 U.S.C. § 7426(b).  Section 126(c) gives EPA discretion to impose severe sanctions, including "emission limitations and compliance schedules," on a source for which a finding has been made.  42 U.S.C. § 7426(c); *see also* 42 U.S.C. § 7509.  The fact that Congress explicitly authorized EPA to use direct federal regulation to address interstate pollution suggests it did not contemplate direct Federal regulation in Section 110(a)(2)(D)(i)(I).  *Cf. Whitman*, 531 U.S. at 467-68; *General Motors Corp. v. United States*, 496 U.S. 530, 541 (1990).  And as this Court has previously held, that Section 126 imposes "extrinsic legal constraints" on State autonomy "*does not affect a state's discretion under § 110.*"  *Appalachian Power*, 249 F.3d at 1047 (emphasis added).

In sum, the text and context of the statute, and the precedents of the Supreme Court and this Court, establish the States' first-implementer role under Section 110.  We decline

---

[31] Section 126(b)'s text refers to "section 7410(a)(2)(D)(ii)." 42 U.S.C. § 7426(b).  This Court has identified the cross-reference to paragraph (ii), instead of paragraph (i), as scrivener's error.  *See Appalachian Power*, 249 F.3d at 1040-44.

53

to adopt a reading of Section 110(a)(2)(D)(i)(I) that would blow a hole in that basic structural principle.[32]

3

The novelty of EPA's approach underscores its flaws. In the past, EPA has applied the good neighbor provision in the States-first way we have outlined here.

The 1998 $NO_x$ Rule (which we addressed in *Michigan*) quantified each State's good neighbor obligation but then gave the States 12 months to submit SIPs to implement the required reductions. *See* 63 Fed. Reg. at 57,358, 57,450-51; 42 U.S.C. § 7410(k)(5). Indeed, EPA explicitly assured States that the Rule did not intrude on their authority to choose the means to achieve the EPA-defined end goal. *See* 1998 $NO_x$ Rule, 63 Fed. Reg. at 57,369. EPA then explained, persuasively, why it made sense not to deviate from Title I's standard division of labor in the good neighbor context:

> The task of determining the reductions necessary to meet section 110(a)(2)(D) involves allocating the use of the downwind States' air basin. This area is a commons in the sense that the contributing State or States have a greater interest in protecting their local interests than in protecting an area in a downwind State over which they do not have jurisdiction and for which they are not politically accountable. Thus, in general, it is reasonable to assume that *EPA may be in a better position to determine the appropriate goal*, or budget, for the

---

[32] We conclude that EPA's interpretation on the FIPs issue is contrary to the text and context of the statute (a *Chevron* step 1 violation), in the alternative is absurd (a *Chevron* step 1 violation), and again in the alternative is unreasonable (thus failing *Chevron* step 2 if we get to step 2).

54

contributing States, *while leaving [it] to the contributing States' discretion to determine the mix of controls* to make the necessary reductions.

*Id.* at 57,370 (emphases added).

In *Michigan*, this Court held that the 1998 Rule did not transgress the *Train-Virginia* federalism bar. But the terms of the *Michigan* Court's approval highlight how flagrantly the new Transport Rule crosses that line. We said: "EPA does not tell the states how to achieve SIP compliance. Rather, EPA looks to section 110(a)(2)(D) and *merely provides the levels to be achieved by state-determined compliance mechanisms*." 213 F.3d at 687 (emphasis added). We emphasized that States had a "real choice" how to implement the required reductions. *Id.* at 688.

Like the 1998 $NO_x$ Rule, the 2005 Clean Air Interstate Rule gave States the first crack at implementing the reductions required by EPA. *See* 70 Fed. Reg. 25,162, 25,263 (May 12, 2005) (requiring SIPs within 18 months). When EPA issued CAIR FIPs in April 2006, about a year after it promulgated CAIR, it clarified that it intended the FIPs to serve as a "Federal backstop" to the ongoing SIP process, and did not intend to "take any other steps to implement FIP requirements that could impact a State's ability to regulate their sources in a different manner" until "a year after the CAIR SIP submission deadline." *See* CAIR FIPs, 71 Fed. Reg. 25,328, 25,330 (Apr. 28, 2006). That timetable, EPA assured the States, would allow EPA "to approve timely SIPs *before* implementation of FIP requirements occurs." *Id.* at 25,331 (emphasis added).

In both the 1998 $NO_x$ Rule and the 2005 CAIR, EPA was therefore careful not to infringe the States' first-implementer

55

role.  EPA's own past practice and statements illustrate the anomaly of its new FIP-first approach.

D

On a separate tack, EPA does not concede that it denied the States their rightful chance to implement their good neighbor obligations.  It contends States *did* have an opportunity to submit SIPs.  In EPA's view, once it issued the 2006 24-hour PM$_{2.5}$ NAAQS, States had three years under Section 110(a)(1) to seek and obtain EPA approval of SIPs addressing their good neighbor obligations.

But to reiterate, the problem is that the three-year period expired *before* EPA issued the Transport Rule and defined the good neighbor obligations of upwind States.  EPA has an answer for that – one we find extraordinarily unpersuasive.  In its view, each State should have come up with (i) its own definition of "amounts which will . . . contribute significantly" and (ii) its own modeling and methodology for applying that definition.  *See* EPA Br. 48 ("EPA has never stated that its methodology is the only way") (emphasis omitted).

In effect, EPA claims the statute requires each State to take its own stab in the dark at defining "amounts which will . . . contribute significantly" to a downwind State's nonattainment.  The State would then have to apply that homemade definition using its own homemade methodology.[33]

_____

[33] EPA points to guidance documents it issued in 2006 and 2009.  Those documents further undermine EPA's contention that the stab in the dark was a realistic opportunity for States to avoid being pulled into the Transport Rule FIPs.

ADD-55

56

Of course, once a State takes its stab, EPA could disapprove it – especially if the State defined its own

---

The 2006 document, published after CAIR but before *North Carolina*, did not apply to CAIR States. *See* EPA, 2006 Guidance at 4. It told non-CAIR States that "EPA anticipates, based upon existing information developed in connection with the CAIR, that emissions from sources in States not covered by the CAIR do not contribute significantly to nonattainment or interfere with maintenance of the 8-hour ozone or $PM_{2.5}$ NAAQS in any other State." *Id.* at 5.

The 2009 guidance document concerned the 2006 24-Hour $PM_{2.5}$ NAAQS, which was not covered by CAIR. The seven-page document included three paragraphs of vague guidance on "significant contribution" under Section 110(a)(2)(D). *See* EPA, Guidance on SIP Elements Required Under Sections 110(a)(l) and (2) for the 2006 24-Hour Fine Particle ($PM_{2.5}$) National Ambient Air Quality Standards (NAAQS) 3 (Sept. 25, 2009) (EPA, 2009 Guidance) ("The state's conclusion must be supported by an adequate technical analysis. Information to support the state's determination with respect to significant contribution to nonattainment might include, but is not limited to, information concerning emissions in the state, meteorological conditions . . . , monitored ambient concentrations . . . , the distance to the nearest area that is not attaining the NAAQS in another state, and air quality modeling."); *cf.* 1998 $NO_x$ Rule, 63 Fed. Reg. at 57,370 (if EPA does not identify the "acceptable level of $NO_x$ reductions, the upwind State would not have guidance as to what is an acceptable submission").

The 2009 document ordered the States, equipped with that vague guidance, to submit SIPs to address Section 110(a)(2)(D)(i)(I) for 24-hour $PM_{2.5}$. But in the same breath, it warned them that EPA itself intended to "complete a rule to address interstate pollution transport in the eastern half of the continental United States." EPA, 2009 Guidance at 3. EPA did not say what would happen if a State's approach did not coincide with the approach EPA was developing for its own rule, but experience tells the tale.

57

obligation to be less than what EPA deemed it to be. Experience appears to bear that out: Petitioners point out that every Transport Rule State that submitted a good neighbor SIP for the 2006 24-hour $PM_{2.5}$ NAAQS was disapproved. *See* State & Local Br. 29-31; State & Local Reply Br. 5-7.

That should not come as a surprise. In the 1998 $NO_x$ Rule, EPA acknowledged that pre-Rule stabs in the dark were bound to fail. "Without determining an acceptable level of $NO_x$ reductions," EPA warned, "the upwind State would not have guidance as to what is an acceptable submission." 63 Fed. Reg. at 57,370. And States would incur significant costs developing those SIP submissions.

As EPA repeatedly reminds this Court, interstate pollution is a collective problem that requires a comprehensive solution. *See* EPA Br. 5 ("Absent effective federal control, individual States often have little economic or political incentive to self-impose regulatory controls (and attendant costs) within their States solely to address air quality problems in other States."). And EPA itself has recognized that having each State independently guess at its own good neighbor obligations is not a plausible solution to interstate pollution: "It is most efficient – *indeed necessary* – for the Federal government to establish the overall emissions levels for the various States." 1998 $NO_x$ Rule, 63 Fed. Reg. at 57,370 (emphasis added).

Yet EPA now encourages us to suspend disbelief and conclude that under the statute, a State's only chance to avoid FIPs is to make a successful stab in the dark – a feat that not one Transport Rule State managed to accomplish. EPA clearly does not believe the stab-in-the-dark approach would really permit States to avoid FIPs – its own past statements

58

show that.  But EPA's authority to issue these FIPs rests on our accepting its rickety statutory logic.

We decline the invitation.  Our duty is to "interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations and internal quotation marks omitted). EPA's FIP-first approach fails that test.

When EPA quantifies States' good neighbor obligations, it must give the States a reasonable first opportunity to implement those obligations.  That approach reads Section 110(a)(2)(D)(i)(I) in harmony with the rest of Section 110.  It preserves Title I's Federal-State division of labor – a division repeatedly reinforced by the Supreme Court and this Court. And it accords with the commonsense notion that Congress did not design the good neighbor provision to set the States up to fail.[34]

---

[34] The dissent contends that the States' challenge on this issue comes too late. We disagree.  The dissent conflates (i) EPA's prior disapproval of certain States' SIPs and (ii) EPA's decision to quantify the good neighbor obligation and to simultaneously issue FIPs rather than to issue a SIP call for SIP revisions (or to allow new SIPs).  Petitioners are challenging only the latter point.  And EPA announced its final decision to proceed that way in the Transport Rule itself.  Put another way, the statute says that EPA must issue a FIP within two years after a State fails to make a "required submission" or submits a deficient SIP.  But a State cannot be "required" to implement its good neighbor obligation in a SIP "submission" – nor be deemed to have submitted a deficient SIP for failure to implement the good neighbor obligation – until it knows the target set by EPA.  In this case, EPA set the relevant target in the Transport Rule.  Petitioners' challenge to the Transport Rule's FIPs is entirely timely.

59

IV

The decision whether to vacate a flawed rule "depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks omitted); *see also Davis County Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997).

Here, we have no doubt that the agency chose incorrectly. The Transport Rule stands on an unsound foundation – including EPA's flawed construction of the statutory term "amounts which will . . . contribute significantly to nonattainment."    42 U.S.C. § 7410(a)(2)(D)(i).    That deficiency is too fundamental to permit us to "pick and choose portions" of the rule to preserve. *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008). And as with the Clean Air Interstate Rule, the Transport Rule's "fundamental flaws foreclose EPA from promulgating the same standards on remand." *Id.* (internal quotation marks omitted). EPA's chosen manner of implementing the Rule – issuing FIPs without giving the States a post-Rule opportunity to submit SIPs – also rests on a misreading of the statute.

We therefore vacate the Transport Rule rulemaking action and FIPs, and remand to EPA.

The remaining question is the status of CAIR. In *North Carolina*, this Court initially held that CAIR's "fundamental flaws" required vacatur. 531 F.3d at 929. On rehearing, the Court reconsidered its initial decision and modified its order to remand CAIR without vacatur. *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008). The Court noted that under our precedents, it is appropriate to remand without

60

vacatur "where vacatur would at least temporarily defeat the enhanced protection of the environmental values covered by the EPA rule at issue."    *Id.* (internal quotation marks, brackets, and ellipsis omitted).  The Court was "convinced that, notwithstanding the relative flaws of CAIR, allowing CAIR to remain in effect until it is replaced by a rule consistent with our opinion would at least temporarily preserve the environmental values covered by CAIR." *Id.*

In accordance with our Order granting the motions to stay the Transport Rule, EPA has continued to administer CAIR. *See* Order, No. 11-1302, at 2 (D.C. Cir. Dec. 30, 2011); *see also* http://www.epa.gov/cair.    Vacating CAIR now would have the same consequences that moved the *North Carolina* Court to stay its hand – and indeed might be more severe now, in light of the reliance interests accumulated over the intervening four years.  We therefore conclude, as did the Court in *North Carolina*, that the appropriate course is for EPA to continue to administer CAIR pending its development of a valid replacement.[35]

\* \* \*

We vacate the Transport Rule and the Transport Rule FIPs and remand this proceeding to EPA.  EPA must continue administering CAIR pending the promulgation of a valid replacement.

*So ordered.*

---

[35] The *North Carolina* Court did "not intend to grant an indefinite stay of the effectiveness" of its decision.  550 F.3d at 1178.  We likewise expect that EPA will proceed expeditiously on remand.

ROGERS, *Circuit Judge*, dissenting: To vacate the Transport Rule, the court disregards limits Congress placed on its jurisdiction, the plain text of the Clean Air Act ("CAA"), and this court's settled precedent interpreting the same statutory provisions at issue today. Any one of these obstacles should have given the court pause; none did. The result is an unsettling of the consistent precedent of this court strictly enforcing jurisdictional limits, a redesign of Congress's vision of cooperative federalism between the States and the federal government in implementing the CAA based on the court's own notions of absurdity and logic that are unsupported by a factual record, and a trampling on this court's precedent on which the Environmental Protection Agency ("EPA") was entitled to rely in developing the Transport Rule rather than be blindsided by arguments raised for the first time in this court.

Congress has limited the availability of judicial review of challenges to final rules promulgated by the EPA in two ways that are relevant here. Under CAA section 307(b)(1), 42 U.S.C. § 7607(b)(1), petitions for judicial review must be filed within sixty days of promulgation of a final rule, and under CAA section 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B), "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment . . . may be raised during judicial review." The court has, until today, strictly enforced these requirements, which exist for two important reasons: to enforce repose so that the rulemaking process is not crippled by surprise challenges to matters that were rightfully presumed settled, and to guarantee an agency's expert consideration and possible correction of any flaws in its rules *before* the matter reaches a court. Instead the court casts aside both jurisdictional provisions, upending these two fundamental principles. In so doing, the court thus fails to "maintain uniformity of the court's decisions" on these "question[s] of exceptional importance." FED. R. APP. P. 35(a)(1) & (2).

2

As one basis underlying its vacatur of the Transport Rule, the court permits a collateral attack on prior final rules in which EPA disapproved state implementation plan ("SIP") submissions with respect to the "good neighbor provision," CAA § 110(a)(2)(D)(i)(I), 42 U.S.C. § 7410(a)(2)(D)(i)(I), or found States failed to submit such a SIP at all. In those Final SIP Rules, EPA unambiguously stated its interpretation that States had an independent obligation under section 110(a) to submit "good neighbor" SIPs regardless of whether EPA first quantified each State's emission reduction obligations. Under section 307(b)(1), States had sixty days to seek judicial review of those Final SIP Rules to challenge EPA's interpretation of section 110(a). EPA's authority to promulgate the federal implementation plans ("FIPs"), pursuant to section 110(c), in the Transport Rule was *triggered* by EPA having published those Final SIP Rules, and under section 307(b)(1) States may not collaterally attack the propriety of those Final SIP Rules now. This is not a mere technicality — EPA developed and promulgated the Transport Rule with the knowledge that all but three States did not seek judicial review of its interpretation of section 110(a) and in light of this court's opinion in *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008). The court therefore lacks jurisdiction under section 307(b)(1) to consider States' belated challenge to EPA's interpretation of section 110(a) as part of its review of the Transport Rule; the petitions challenging the Final SIP Rules filed by three States are not consolidated with the petitions challenging the Transport Rule, as they involve separate provisions of the CAA and different final rules. The court glosses over the plain text and structure of section 110 to avoid that reality, and in the process rewrites sections 110(a) and 110(c), altering the triggering mechanism for States' obligations to submit "good neighbor" SIPs and EPA's obligation to promulgate FIPs, based on its own speculative conclusion that the process Congress adopted is "impossible" for States to follow. To reach its conclusion, the

3

court today holds that the CAA *requires* what it previously held the CAA ambiguously *permits* EPA to do.

As another ground to vacate the Transport Rule, the court concludes that, under EPA's two-step approach to defining "significant contribution" under the "good neighbor" requirement in section 110(a)(2)(D)(i)(I), a State "may be required to reduce its emissions by an amount greater than the 'significant contribution' that brought it into the program in the first place." Op. at 34. No objection was made during the Transport Rule administrative proceedings to EPA's approach, let alone its *statutory authority*, to use different, unrelated measures of significance for inclusion and budget-setting. Acknowledging this, the court reaches beyond the Transport Rule administrative record, despite section 307(d)(7)(B)'s clear command, to find jurisdiction. But the three reasons it offers do not add up. By suggesting that EPA acted inconsistently with *North Carolina* in adopting a two-step approach, with different, unrelated measures of "significant contribution" for inclusion and budget-setting, the court ignores that in *North Carolina* this court expressly declined to disturb that same approach. 531 F.3d at 916-17. In relying on a comment expressing a policy preference made during the administrative proceedings of the predecessor of the Transport Rule (to which petitioners failed to alert the court until *rebuttal* oral argument), the court ignores that the comment does not challenge EPA's statutory authority to pursue its two-step approach, and the fact that no one petitioned the court in *North Carolina* for judicial review based on that comment, which is why the court in *North Carolina* left that approach undisturbed, *see id.* The court also ignores that the prior rulemaking docket was not incorporated into the Transport Rule administrative proceedings. Together, these "ignored" facts demonstrate that EPA had no reason to suspect any party before it in the Transport Rule administrative proceedings subscribed to the objection stated in the old

4

comment, nor even to locate and consider that comment. Finally, EPA's rejection on technical grounds of alternative approaches for measuring "significant contribution" based solely on air quality, not cost and air quality, during the Transport Rule administrative proceedings says nothing about whether EPA would have refused to entertain petitioners' new objection in this court that EPA was statutorily required to modify its two-step approach by making the inclusion threshold of step-one a floor for reductions under the cost approach of step-two. The alternative approaches EPA considered and rejected are not even the approaches petitioners now endorse, and, in any event, cannot excuse a failure to state their objection with "reasonable specificity" during the Transport Rule administrative proceedings.

The court's remaining reasons for vacatur lack merit. First, the court concludes EPA violated the "good neighbor" provision's "proportionality" requirement, but petitioners presented no such statutory authority argument in their briefs, instead challenging EPA's grouping of States for purposes of $SO_2$ reduction as arbitrary and capricious. Even if they had, the court lacks jurisdiction because the argument is premised on speculation that EPA's two-step approach to measuring "significant contribution" might require States to reduce emissions by *more* than the amount that triggered their inclusion in the Transport Rule in the first place — the same argument over which the court lacks jurisdiction due to petitioners' failure to challenge EPA's statutory authority for its approach during the Transport Rule administrative proceedings. On the merits, the court's "proportionality" conclusion contradicts the court's opposite conclusion in *North Carolina* that EPA's measurement of a State's "significant contribution" did not have to correlate directly with its air quality impact "relative to other upwind states." 531 F.3d at 908 (citing *Michigan v. EPA*, 213 F.3d 663, 679 (D.C. Cir. 2000)).

5

Similarly, the court's holding that EPA failed to consider the effect of in-state emissions is likewise premised on the sub-threshold argument. Further, the court's "in-State emissions" and its "over-control" conclusions are contradicted by the Transport Rule administrative record.

## I.

Section 307(b)(1) of the CAA, 42 U.S.C. § 7607(b)(1), requires a petition for judicial review of EPA final actions to be filed within sixty days of publication in the Federal Register. "The filing period in the Clean Air Act 'is jurisdictional in nature'; if the petitioners have failed to comply with it, we are powerless to address their claim." *Med. Waste Inst. & Energy Recovery Council v. EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011) (quoting *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 460 (D.C. Cir. 1998)).

> The Supreme Court has explained that "judicial review provisions are jurisdictional in nature and must be construed with strict fidelity to their terms. This is all the more true of statutory provisions specifying the timing of review, for those time limits are, as we have often stated, mandatory and jurisdictional, and are not subject to equitable tolling."

*Slinger Drainage, Inc. v. EPA*, 237 F.3d 681, 682 (D.C. Cir. 2001) (quoting *Stone v. Immigration & Naturalization Serv.*, 514 U.S. 386, 405 (1995) (internal quotation marks, alterations, and citation omitted)). Accordingly, in *Medical Waste* this court dismissed a challenge to a final rule for lack of jurisdiction where petitioners failed to seek judicial review when EPA "*first use[d]*" its statutory approach, 645 F.3d at 427 (emphasis added). "An objection is considered a collateral attack only if 'a reasonable [petitioner] . . . would have perceived a very

6

substantial risk that the [rule] meant what the [agency] now says it meant." *S. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 45 (D.C. Cir. 2005) (internal quotations marks, citation, and alterations omitted).

The Transport Rule, responding to States' failures to submit adequate "good neighbor" SIPs, is a FIP that addresses the interstate transport of emissions in twenty-seven States in the eastern United States for three national ambient air quality standards ("NAAQS"): the 1997 8-hour ozone NAAQS, the 1997 annual $PM_{2.5}$ NAAQS, and the 2006 24-hour $PM_{2.5}$ NAAQS.[1]  *See* Transport Rule, 76 Fed. Reg. 48,208 (Aug. 8, 2011).  In the Transport Rule, EPA determined that the same level of emission reduction obligations would apply for each of these three NAAQS.  *See id.* at 48,264.  Over a year prior to promulgating the Transport Rule, EPA promulgated Final SIP Rules publishing findings that twenty-nine States and territories had failed to submit SIPs with the required "good neighbor"

---

[1] Section 110(a)(1) of the CAA provides that States must submit SIPs within three years (or less, if set by EPA) of promulgation of a NAAQS.  Section 110(a)(2)(D), in turn, requires States to submit SIPs with "adequate provisions"

(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will--

(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard.

42 U.S.C. § 7410(a)(2)(D)(i)(I).

7

provisions for the 2006 24-hour PM$_{2.5}$ NAAQS.[2] *See* Failure to Submit Good Neighbor SIP Finding, 75 Fed. Reg. 32,673 (June 9, 2010); Tennessee Failure to Submit Good Neighbor SIP Finding, 76 Fed. Reg. 43,180 (July 20, 2011). In these Final SIP Rules, EPA stated:

> This finding establishes a 2-year deadline for promulgation by EPA of a FIP, in accordance with section 110(c)(1), for any state that either does not submit or EPA can not approve a SIP as meeting the attainment and maintenance requirements of [the "good neighbor" provision] for the 2006 24-hour PM$_{2.5}$ NAAQS. . . . This action . . . does not pertain to . . . a SIP Call pursuant to section 110(k)(5).

*Id.* at 32,674; *see also* 76 Fed. Reg. at 43,180-81 (Tennessee). The Final SIP Rules further state that the findings of failure to submit were of nationwide scope and effect, and therefore pursuant to section 307(b)(1), 42 U.S.C. § 7607(b)(1), a petition for judicial review had to be filed with the D.C. Circuit within sixty days of the publication of the findings in the Federal Register. *See* Failure to Submit Good Neighbor SIP Finding, 75

---

[2] The States and territories were: Alaska, Colorado, Hawaii, Idaho, Illinois, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nebraska, North Dakota, Oklahoma, Oregon, Pennsylvania, South Dakota, Utah, Virginia, Washington, West Virginia, Wisconsin, Wyoming, the District of Columbia, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, and the U.S. Virgin Islands. *See* Failure to Submit Good Neighbor SIP Findings, 75 Fed. Reg. at 32,674. (On July 20, 2011, EPA published an additional finding that Tennessee had failed to submit a "good neighbor" SIP for the 2006 24-hour PM$_{2.5}$ NAAQS. *See* Tennessee Failure to Submit Good Neighbor SIP Finding, 76 Fed. Reg. 43,180 (July 20, 2011). Tennessee is not a petitioner here.

8

Fed. Reg. at 32,675-76; Failure to Submit Good Neighbor SIP Finding (Tennessee), 76 Fed. Reg. at 43,182-83. No State filed a petition for judicial review.

Other States submitted 2006 24-hour $PM_{2.5}$ SIPs with "good neighbor" provisions, but EPA disapproved that portion of the SIP submissions of ten States covered by the Transport Rule: Alabama, Georgia, Indiana, Kansas, Kentucky, Missouri, New Jersey, New York, North Carolina, and Ohio.[3] In the Final SIP Rules, EPA rejected objections that States had no obligation to submit SIPs until EPA had quantified the States' amount of "significant contribution" and that EPA was required to permit States to revise their SIPs prior to imposing a FIP pursuant to 42 U.S.C. § 7410(c)(1).[4] The Final SIP Rules disapproving the "good neighbor" SIP submissions alerted the affected States that "petitions for judicial review must be filed in the United States Court of Appeals for the appropriate circuit by September 19,

---

[3] *See* Approval and Promulgation of Air Quality Implementation Plan; Alabama; Disapproval of Interstate Transport Submission for the 2006 24-Hour $PM_{2.5}$ Standards, 76 Fed. Reg. 43,128 (July 20, 2011); 76 Fed. Reg. 43,159 (Georgia); 76 Fed. Reg. 43,175 (Indiana & Ohio); 76 Fed. Reg. 43,143 (Kansas); 76 Fed. Reg. 43,136 (Kentucky); 76 Fed. Reg. 43,156 (Missouri); 76 Fed. Reg. 43,153 (New Jersey & New York); 76 Fed. Reg. 43,167 (North Carolina).

[4] *See* 76 Fed. Reg. at 43,131-33 (Alabama); 76 Fed. Reg. at 43,162-64 (Georgia); 76 Fed. Reg. at 43,176-79 (Indiana & Ohio); 76 Fed. Reg. at 43,145-47 (Kansas); 76 Fed. Reg. at 46,139-41 (Kentucky); 76 Fed. Reg. at 43,170-72 (North Carolina). No comments were submitted to the proposed disapproval of Missouri's "good neighbor" SIP submission, *see* 76 Fed. Reg. at 43,156, and only one unrelated comment was submitted to New York and New Jersey's proposed disapproval, *see* 76 Fed. Reg. at 43,154. None of these three States is a petitioner here.

9

2011," *see, e.g.*, 76 Fed. Reg. at 43,136 (Alabama), the sixty day deadline prescribed by CAA section 307(b)(1), 42 U.S.C. § 7607(b)(1). Only Georgia, Kansas, and Ohio filed petitions for judicial review of EPA's disapproval action and their petitions are not consolidated with the petitions now under review, as they challenge different final rules.[5]

### A.

Now that EPA has, as it warned, promulgated FIPs for States covered by the Transport Rule, State petitioners contend that EPA lacked authority to do so for the 2006 24-hour $PM_{2.5}$ NAAQS because "a FIP can cure a deficiency only in a *required* submission, and States were not required to include SIP provisions to eliminate 'significant contributions' not yet defined by EPA legislative rule." State Petrs' Br. at 31. If a State wished to object that under section 110(a) it had no obligation to include "good neighbor" provisions in its SIP until EPA quantified its "significant contribution" in emission reduction budgets, then the CAA required it do so at the time EPA found it had not met its SIP "good neighbor" obligation. State petitioners offer no response in their reply brief to EPA's

---

[5]  *See Ohio v. EPA*, No. 11-3988 (6th Cir.); *Westar Energy, Inc. v. EPA*, No. 11-1333 (D.C. Cir.); *Kansas v. EPA*, No. 12-1019 (D.C. Cir.); *Georgia v. EPA*, No. 11-1427 (D.C. Cir.). The court consolidated the two Kansas cases (Nos. 11-1333 and 12-1019) on January 10, 2012. *See* Order Case No. 12-1019 (Jan. 10, 2012). The court also severed from Kansas's Transport Rule petition, Case No. 11-1329, its challenge to EPA's disapproval of its "good neighbor" SIP submission. *See id.* On January 10, 2012, the Sixth Circuit granted the parties' joint motion to hold the case in abeyance pending the outcome of the instant case. On January 18, 2012, the D.C. Circuit issued orders holding the Kansas and Georgia cases in abeyance pending the outcome of the appeal in the present case.

10

position that this argument is a collateral attack barred by section 307(b)(1). *See* Resp.'s Br. at 46-47.

Ignoring the plain terms of section 307(b)(1) as well as this court's long-settled precedent, the court reaches the merits of this issue despite its lack of jurisdiction. In the Final SIP Rules finding States had failed to submit "good neighbor" SIPs, EPA put covered States on unambiguously "sufficient notice" that it interpreted the CAA as placing an independent obligation on each State to include adequate "good neighbor" provisions in its SIP regardless of whether EPA had prospectively quantified its amount of "significant contribution." *S. Co. Servs.,* 416 F.3d at 44. By the very nature of the Final SIP Rules, EPA was informing States that they had not met their obligation to submit "good neighbor" SIPs, an obligation States now contend they never had. Furthermore, EPA warned that its findings of failure to submit triggered the two-year FIP clock of section 110(c)(1), and not the SIP Call provision of section 110(k)(5). *See* Failure to Submit Good Neighbor SIP Finding, 75 Fed. Reg. at 32,673-74; Failure to Submit Good Neighbor SIP Finding (Tennessee), 76 Fed. Reg. at 43,180-81. In alerting States to the judicial review deadline, EPA reiterated that States had sixty days to file "*any* petitions for review . . . related to [] findings of failure to submit SIPs *related to the requirements of* [the 'good neighbor' provision]." Failure to Submit Good Neighbor SIP Finding, 75 Fed. Reg. at 32,676; Failure to Submit Good Neighbor SIP Finding (Tennessee), 76 Fed. Reg. at 43,183 (emphases added). Not having sought judicial review of the Final SIP Rules determining that they failed to submit *required* "good neighbor" SIPs, States may not now object that they were *not required* to submit "good neighbor" SIPs until EPA first quantified their reduction obligations. "The sixty day window provided by statute has long since closed, and we may not reopen it and entertain a belated challenge . . . now." *Med. Waste*, 645 F.3d at 427. Therefore, the court lacks jurisdiction over the collateral

11

attacks by petitioners Louisiana, Michigan, Nebraska, Oklahoma, Virginia, and Wisconsin, as part of the Transport Rule petitions, on EPA's interpretation of section 110(a) stated in the Final SIP Rules finding they failed to submit required "good neighbor" SIPs.

Similarly on notice, neither Alabama nor Indiana petitioned for judicial review of EPA's disapproval of their SIP submissions. In the Final SIP Rule disapproving Alabama's SIP submission, EPA quotes one commenter as stating:

> EPA has not stated the amount of reduction they believe is needed to satisfy the transport requirements. . . . [T]he finish line isn't even knowable (because EPA refuses to inform the states how much reduction is enough to satisfy the requirements). EPA seems to say that it has to be whatever the final Transport Rule says, even though there is no final Transport Rule.

76 Fed. Reg. at 43,131. EPA responded that "the state obligation stems from the CAA itself. . . . *States had an opportunity to conduct their own analyses regarding interstate transport*." *Id.* (emphasis added). EPA also warned that it was obligated to promulgate a FIP within two years of disapproving Alabama's SIP, *see id.* at 43,132, and rejected comments that the SIP Call revision process of section 110(k)(5) should apply, because, in its view, that provision applies only where there is an existing, approved SIP, *see id.* at 43,133. In its summary of Indiana's comments on the proposed disapproval of its SIP submission, EPA noted that Indiana took the position that EPA "should provide [the State] the opportunity to revise its [] SIP once the Transport Rule is completed" and that a "FIP is [] contrary to the spirit of the CAA by unnecessarily limiting [S]tate authority." 76 Fed. Reg. at 43,177. EPA responded, relying on the CAA's plain text, that Indiana was required by

12

section 110(a) to submit SIPs with adequate "good neighbor" provisions, and that upon disapproving its submission, EPA had a legal obligation under the CAA to promulgate a FIP.  *See id.* Alabama and Indiana's comments, along with EPA's responses, demonstrate that the two States were on clear notice of EPA's interpretation of the CAA as imposing an independent obligation on the States to submit "good neighbor" SIPs, even in the absence of EPA-quantified amounts of "significant contribution."  Yet neither Alabama nor Indiana sought judicial review of EPA's Final SIP Rules disapproving their SIP submissions, and their attempt now to collaterally attack those Final SIP Rules is barred.  *See Med. Waste*, 645 F.3d at 427.

Given EPA's clear statements in its Final SIP Rules disapproving States' SIP submissions and finding they failed to submit required "good neighbor" SIPs, there is no basis to conclude that State petitioners might *not* have perceived a substantial risk that EPA *meant* what it *said.  See S. Co. Servs.*, 416 F.3d at 45.  The instant case, involving consolidated petitions challenging the Transport Rule, is therefore not the appropriate forum to decide whether, under section 110(a), States have an independent obligation to submit "good neighbor" SIPs when EPA has not first quantified amounts of "significant contribution."  EPA promulgated Final SIP Rules in which it made its interpretation clear; judicial challenge to those rules is the proper forum to decide the question.[6]

---

[6] The same is true for Ohio, Georgia, and Kansas, which petitioned for judicial review of EPA's disapproval of their "good neighbor" SIP submissions. The court's "review in th[e] [instant] case is limited to" the Transport Rule, and the court thus "lack[s] jurisdiction over" challenges to those States' SIP disapprovals premised on whether they have an independent obligation to submit "good neighbor" SIPs. *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 149 (D.C. Cir. 2012).  The petitions filed by those

13

Indeed, the court itself forecasts this conclusion: "EPA's many SIP disapprovals and findings of failure to submit share one problematic feature: EPA made all of those findings *before* it told the States what emission reductions their SIPs were supposed to achieve under the "good neighbor" provision." Op. at 47 (emphasis in original).  However "problematic" the court views this "feature" of those Final SIP Rules, this is a "problem" this three-judge panel is powerless to resolve because it lacks jurisdiction under CAA section 307(b)(1) to entertain State petitioners' "back-door challenge" to EPA's interpretation of section 110(a) stated in those Final SIP Rules.  *Natural Res. Def. Council v. EPA*, 824 F.2d 1146, 1150 (D.C. Cir. 1987) (internal quotation marks omitted).

The court responds that the dissent "conflates" State petitioners' collateral attack on the Final SIP Rules announcing their Section 110(a) SIP obligations with State petitioners' supposedly distinct argument that EPA cannot promulgate a FIP simultaneously with its quantification of a State's emission

---

States challenging their SIP disapprovals are not consolidated with the petitions before the court today, *see supra* n. 5, and Ohio's petition is pending in the Sixth Circuit.  The court must therefore "decline [State] [p]etitioners' invitation to rule on the merits of cases which are properly before different panels."  *Id.* This is all the more important here, where EPA has not yet been afforded the opportunity to assert an improper venue defense in the two cases pending before the D.C. Circuit.  *See Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 867 (D.C. Cir. 1996); 42 U.S.C. § 7607(b)(1) (petitions for review of SIP disapprovals may be brought only in the court of appeals "for the *appropriate* circuit") (emphasis added).  If Georgia, Kansas, and Ohio wish to avoid enforcement of the Transport Rule FIPs because they contend EPA's SIP disapprovals were in error, the proper course is to seek a stay of EPA's disapprovals in their pending cases; if granted, a stay would eliminate the basis upon which EPA may impose FIPs on those States.  *See* 42 U.S.C. § 7410(c)(1)(B).

14

reduction obligations. *See* Op. at 8 n.1, 58 n.34. This response misleadingly quotes the statute, and in the process, proves the dissent's point. The court states "the statute says that EPA must issue a FIP within two years after a State fails to make a 'required submission' or submits a deficient SIP. But a State cannot be 'required' to implement its "good neighbor" obligation in a SIP 'submission' . . . until it knows the target set by EPA." *Id.* at 58 n.34.[7] That is *not* what the statute says. Section 110(c) provides that:

> (1) The Administrator *shall* promulgate a Federal implementation plan *at any time* within 2 years after *the Administrator* --
>
> (A) *finds* that a State has failed to make a required submission . . . or
>
> (B) *disapproves* a State implementation plan submission in whole or in part;
>
> unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, *before* the Administrator promulgates such Federal implementation plan.

42 U.S.C. § 7410(c)(1) (emphases added). EPA's FIP obligation is therefore not triggered, without more, by a State's mere

---

[7] Notice the circularity in the court's statement. The court says State petitioners' "simultaneity" argument can be "[p]ut another way," Op. at 58 n.34, as an argument that States had no section 110(a) SIP requirements until EPA quantified their emission reduction budgets. Under section 307(b)(1), that is exactly the argument that States were required to make in petitions for judicial review of the Final SIP Rules setting forth EPA's section 110(a) interpretation.

15

failure to submit a SIP required by section 110(a), but instead by an *explicit* EPA Final Rule *finding* that the State either failed to submit a required SIP or an adequate SIP.  A challenge to EPA's interpretation of section 110(a) must therefore be brought as a petition for judicial review of those Final SIP Rules announcing that States failed to meet their section 110(a) "good neighbor" SIP obligations.  *See Med. Waste*, 645 F.3d at 427.  Under the plain terms of the CAA, EPA's obligation (and authority) to promulgate a FIP is *triggered* by those Final SIP Rules, and the process by which EPA must promulgate a FIP is governed by section 110(c), not, as the court posits, by section 110(a).  The court therefore, and not the dissent, does the conflating by turning what should be a challenge to EPA's FIP authority under section 110(c) into a collateral attack on EPA's interpretation of section 110(a) set forth in the prior Final SIP Rules.

The plain text of section 110(c)(1) obligates EPA to promulgate a FIP "at any time" within two years of disapproving a SIP submission or finding a State failed to submit a SIP.  42 U.S.C. § 7410(c)(1).  Moreover, nothing in section 110(c) requires EPA to reveal to States the *content* (i.e., the emission reduction budgets) it intends to include in its FIP *prior* to *proposing* a FIP.  Although the CAA allows States to submit SIPs to "correct[] the deficiency," they must do so "before" EPA's promulgation of a FIP, which may occur "at any time" within two years.  *Id.*

The court thus rewrites section 110(c)(1)'s unambiguous grant of authority to EPA (and ultimate obligation of EPA) to promulgate a FIP *at any time* within the two year window to read: "~~unless~~ *but not until* the State corrects the deficiency and the Administrator approves the [SIP] or [SIP] revision, ~~before~~ *may* the Administrator promulgate~~s~~ such [FIP]."  "[A]s the Supreme Court has emphasized time and again, courts have no authority to rewrite the plain text of a statute."  *Kay v. FCC*, 525

16

F.3d 1277, 1279 (D.C. Cir. 2008). Because the CAA "means what it says," EPA was required, after publishing disapprovals and findings of failure to submit SIPs, to promulgate FIPs within two years, and it was not required to wait for States first to submit SIPs. *Landstar Express Am. v. Fed. Maritime Comm'n,* 569 F.3d 493, 498 (D.C. Cir. 2009). The court's attempt to ferret out an argument about "simultaneity" as a distinct challenge properly brought against the Transport Rule based on EPA's interpretation of section 110(a) is thus a straw man for its endorsement of State petitioner's collateral attack on EPA's interpretation of section 110(a) in the Final SIP Rules. Its rewriting of section 110(c) is made all the more remarkable by its recognition that "we must apply and enforce the statute as it's now written." Op. at 8.

### B.

Even if the court had jurisdiction over State petitioners' challenge to their independent obligation to submit "good neighbor" SIPs under CAA section 110(a), its statutory analysis proceeds with no regard for the plain text and structure of the CAA or for the deference owed to permissible agency interpretations of statutes they administer where Congress has left a gap for the agency to fill or the statute is ambiguous.

"As in all statutory construction cases," the court must "begin with the language of the statute." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Id.* at 461-62 (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (internal quotation marks and citation omitted)). Thus, under *Chevron U.S.A. Inc v. Natural Res. Def. Council*, 467 U.S. 837, 842-44 (1984), the first step in statutory interpretation requires a

17

determination of "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the mater; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," *id.* If, after applying traditional tools of statutory construction, the court determines "the statute is silent or ambiguous with respect to the specific issue," then, under step two, the court will defer to an agency's statutory interpretation if it "is based on a permissible construction of the statute." *Id.* at 843.

The questions regarding States' obligations to submit "good neighbor" SIPs are straightforward: (1) Do States have an independent obligation to submit SIPs with adequate "good neighbor" provisions; (2) if so, what triggers that obligation; (3) if there is an obligation, what is the deadline for the SIP submission; and (4) must EPA prospectively quantify each States' amount of "significant contribution" to downwind nonattainment? The plain text of the statute provides equally straightforward answers: (1) Yes; (2) promulgation of a NAAQS; (3) within three years of promulgation of a NAAQS (unless the EPA Administrator prescribes a shorter deadline); and (4) no, but EPA *may* do so if it chooses.

Section 109 of the CAA requires EPA to promulgate NAAQS, a national health-based standard. *See* 42 U.S.C. § 7409. Section 110, in turn, provides that

> (a)(1) Each State *shall* . . . adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) *after the promulgation of a national primary air quality standard* (or any revision thereof) . . . a plan which provides for implementation, maintenance, and enforcement of such [] standard . . . within such State.

ADD-77

18

> (2) Each implementation plan submitted by a State under this chapter . . . *shall*
> . . .
>> (D) contain adequate provisions–
>>> (i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will–
>>>> (I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such [NAAQS].

*Id.* §§ (a)(1) & (a)(2)(D)(i)(I) (emphases added).  The plain text requires that within three years of EPA's promulgation of a NAAQS, States *shall* submit SIPs, and those SIPs *shall* include *adequate* "good neighbor" provisions.  This is the unambiguous obligation and chronology established by Congress.  EPA has the first duty to set the NAAQS, and then States have series of follow-up duties, listed in section 110(a), to ensure attainment of the NAAQS.  Among the duties clearly assigned to States is the inclusion in SIPs of adequate "good neighbor" provisions.

    The court views this "interpretation" — that is, *reading the actual text of the statute* — as a scene from *Alice in Wonderland*.  *See* Op. at 50.  It concludes that "[i]n our view, determining the level of reductions required under Section 110(a)(2)(D)(i)(I) is analogous to setting a NAAQS.  And determining the level of reductions under the "good neighbor" provision triggers a period during which States may submit

19

SIPs." *Id.* at 51. Even if the court's analogy were sound,[8] the premise of its analogy does not support its conclusion that EPA's determination of emission reduction obligations triggers States' obligations to submit "good neighbor" SIPs. Rather, the court rewrites a decades-old statute whose plain text and structure establish a clear chronology of federal and State responsibilities. Nowhere does the CAA place a requirement on EPA to quantify each State's amount of "significant contribution" to be eliminated pursuant to the "good neighbor" provision, let alone include any provision relieving States of their "good neighbor" SIP obligations in the event EPA does not first quantify emission reduction obligations.[9] The court's "view" that EPA "determining the level of reductions under the "good neighbor" provision triggers the period during which States may submit SIPs" is irrelevant in view of the unambiguously plain text of section 110(a)(1) and (a)(2)(D)(i)(I), and, if the statute were ambiguous, the court

---

[8] The NAAQS are determined based on what is "requisite to protect the public health" and "public welfare," 42 U.S.C. §§ 7409(b)(1) & (2), and are a uniform national standard. The "good neighbor" provision, on the other hand, is not a separate national standard, but instead is simply one of the CAA's State-specific mechanisms to ensure attainment of the NAAQS. *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I).

[9] The court's comparison of section 110 to section 126, *see* Op. at 52, conflates direct federal regulation of *sources* with EPA's statutory authority to enforce requirements that *States* comply with their "good neighbor" SIP obligations. Given that Congress included a *specific* provision obligating EPA to promulgate FIPs if States fail to submit adequate SIPs within three years of promulgation of a NAAQS, *see* CAA § 110(c)(1); 42 U.S.C. § 7410(c)(1), and EPA relies on it in the Transport Rule, section 126's federal authorization to regulate specific *sources* of emissions has no bearing on the statutory analysis here.

20

would be required to defer to EPA's interpretation that States
have an independent obligation to submit "good neighbor" SIPs
within three years of promulgation of the NAAQS because that
interpretation is permissible under the statute, *see Chevron*, 467
U.S. at 843. The court's "role is 'not to 'correct' the text so that
it better serves the statute's purposes'; nor under *Chevron* may
[the court] 'avoid the Congressional intent clearly expressed in
the text simply by asserting that [the court's] preferred approach
would be better policy. The Congress has spoken plainly . . . ."
*Virginia Dep't of Med. Assistance Servs. v. Dep't of Health &
Human Servs.*, 678 F.3d 918, 926 (D.C. Cir. 2012) (quoting
*Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir.
1996)).

Furthermore, the court's holding is entirely at odds with the
holding in *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000), *see
LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en
banc). In *Michigan*, State petitioners contended that EPA
violated the CAA by prospectively informing States what their
nitrogen oxides ($NO_x$) emission reduction budgets needed to be
to adequately eliminate their amounts of "significant
contribution" under the "good neighbor" provision, thus
acknowledging their independent obligation to submit adequate
"good neighbor" SIPs, *see* 213 F.3d at 686-87. State petitioners
in *Michigan* argued that EPA had *no authority* to do what the
State petitioners now before the court contend EPA has *no
authority **not to do***. In *Michigan* the court deferred, pursuant to
*Chevron* step two, to EPA's interpretation it could set State
emissions budgets prospectively, given section 110's "silence"
on the question, as a permissible exercise of EPA's general
rulemaking authority under CAA section 301(a)(1), 42 U.S.C.

ADD-80

21

§ 7601(a)(1).[10] Inverting *Michigan*'s analysis of section 110, the court holds that under *Chevron* step one, *see* Op. at 53 n.32, section 110 itself *unambiguously requires* EPA to prospectively inform States of their "good neighbor" emission reduction requirements. *See id.* at 46-53. Nothing in section 110, section 301, or any other section of the CAA requires EPA to do this. Instead the court today turns "may" into "must," and holds that if EPA does not exercise its general rulemaking authority in the manner of the court's design, then section 110(a)(1)'s and 110(a)(2)(D)(i)(I)'s mandatory, unambiguous requirements that States submit adequate "good neighbor" SIPs within three years of the promulgation of a NAAQS are *erased from the statute* by judicial fiat — relieving States of the duty Congress imposed.[11] The court offers no explanation for how its holding can be squared with *Michigan* in this regard.

The court's rationale for rewriting the CAA's plain text is its *own* conclusion that "the upwind State's obligation remains *impossible* for the upwind State to determine *until EPA defines it.*" *Id.* at 48 (first emphasis added). In its words, the statute "requires each State to take its own stab in the dark . . . [and] apply [a] homemade definition using its own homemade methodology." *Id.* at 55. The court concludes EPA's

---

[10] Section 301(a)(1) of the CAA provides that "[t]he Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter." 42 U.S.C. § 7601(a)(1).

[11] Suffice it to say, it is extraordinarily unusual for a court to conclude, at *Chevron* step one, that it must delete mandatory obligations from a statute in order to accord with Congress's plain intent. *See* Op. at 53 n.32. It is all the more unusual to suggest that an agency's interpretation is "impermissible" at *Chevron* step two when the interpretation parrots the text of the statute.

22

interpretation (that is, following the statute's plain text) produces absurd results, *see id.* at 53 n.32. Pretermitting whether there is a shred of record evidence to show such an impossibility, a statutory outcome is absurd [only] if it *defies rationality*[;] . . . an outcome *so contrary to perceived social values* that Congress could not have intended it." *Landstar Express*, 569 F.3d at 498-99 (internal quotation marks and citations omitted) (emphases added). To the extent the court's rationale hinges on its speculation that States lack technical capability and information, this blinks at reality. As counsel for EPA emphasized at oral argument, *see* Tr. Oral Arg. at 59, 61, without contradiction by any petitioners' counsel during rebuttal oral argument, States are fully capable of measuring interstate transport of emissions by conducting modeling, and they have done so before and continue to do so: "The states can make that effort, and they can submit SIPs to EPA. Again, that is how the process works in the states that aren't included in these transport regions." *Id.* at 61. Indeed, as this court has recognized, States are charged with operating air quality monitors; "[e]xhaustive technical specifications regulate the States' operation of a network of air monitors that collect air quality data for any given area." *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 30 (D.C. Cir. 2009); *cf. ATK Launch Sys. v. EPA*, 669 F.3d 330, 334 (D.C. Cir. 2012). The air quality monitoring data collected by the States is publically available in the National Emissions Inventory.[12] That is, State air quality divisions are no strangers

---

[12] *See* U.S. EPA, Technology Transfer Network Clearinghouse for Inventories & Emissions Factors, *available at* http://www.epa.gov/ttnchie1/eiinformation.html (last visited July 23, 2012); *see also* U.S. EPA, Technology Transfer Network Clearinghouse for Regulatory Atmospheric Modeling, *available at* http://www.epa.gov/ttn/scram/aqmindex.htm (last visited July 23, 2012) (providing modeling tools).

23

to complex air quality and meteorological modeling of interstate transport of emissions.[13]

No petitioner suggests that States lack the capability to measure their interstate emissions of pollutants or to access that information from other States to independently determine emission reduction budgets, much less that they have not had time to do so; rather their reason for not doing so appears to stem from insistence (supported by industry sources) that their reduction of emissions not be one iota greater than is necessary for downwind States to attain and maintain NAAQS and that it is easier (and presumably less costly, *see* Oral Arg. Tr. 58) for EPA to figure this out than it is for the individual States to do so, working cooperatively and using any EPA guidance. This may be so but it does not demonstrate that Congress's scheme, protecting States' choices about how to meet NAAQS

---

[13] To cite one example: the State of Texas. The Texas Council on Environmental Quality ("TCEQ") has published an extensive description of its air quality modeling activities and capabilities on its website. "The TCEQ uses state of the art computer models to simulate the meteorological conditions and chemical reactions that contribute to the formation of air pollutants." TCEQ, Introduction to Air Quality Modeling, *available at* http://m.tceq.texas.gov/airquality/airmod/overview/am_intro.html (last visited July 23, 2012). Furthermore, "TCEQ uses state-of-the-science, four-dimensional computer models that incorporate atmospheric physical laws and measured observations to predict weather conditions over space and time." TCEQ, Introduction to Air Quality Modeling: Meteorological Modeling, http://m.tceq.texas.gov/airquality/airmod/overview/am_met.html (last visited July 23, 2012. Indeed, TCEQ uses the same model EPA used to model emission contributions — CAMx. EPA notes in its brief that Texas provided some of the technical data that led to its inclusion in the final Transport Rule. *See* EPA Br. at 109. These are far from "homemade" methodologies. *See* Op. at 55.

24

requirements, in part by independently determining ways to meet their "good neighbor" obligation as the States argued in *Michigan*, is absurd.

It is true, as the court notes, *see* Op. at 53-55, that in two previous "good neighbor" rulemakings EPA afforded States the opportunity to submit SIPs after announcing emission reduction budgets. But an agency is not forever restricted to its previous policy choices or statutory interpretations; instead, it may change course provided it acknowledges it is doing so, presents "good reasons" for doing so, and its approach is "permissible under the statute." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* The discretion agencies enjoy in modifying their policy approaches is particularly expansive where the agency declines to exercise its *discretionary* rulemaking authority, as EPA did here. "It is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking." *WWHT, Inc. v. FCC*, 656 F.2d 807, 818 (D.C. Cir. 1981).

Here, EPA acknowledged its previous approach, *see* Transport Rule, 76 Fed. Reg. at 48,217; NPRM, 75 Fed. Reg. at 45,222-223, and explained its decision in response to comments requesting States be given time to submit SIPs before EPA imposed the Transport Rule FIPs. EPA stated, first, that it had no authority to alter the statutory deadlines for SIP submissions and that the CAA did not require it to issue a rule quantifying States' "good neighbor" obligations, *see* Transport Rule, 76 Fed. Reg. at 48,220; second, that the court in *North Carolina*, in remanding rather than vacating CAIR, "emphasized EPA's obligation to remedy [CAIR's] flaws expeditiously" and thus "EPA d[id] not believe it would be appropriate to establish a

ADD-84

25

lengthy transition period to the rule which is to replace CAIR,"
Transport Rule, 76 Fed. Reg. at 48,220; and third, that in *North
Carolina* this court also required EPA to align upwind States'
emission reduction deadlines with the NAAQS attainment dates
of "2015 or earlier," *see North Carolina*, 531 F.3d at 930.[14]
EPA's decision to adhere to the plain text of the statute, and not
to exercise its discretionary general rulemaking authority, *see
Michigan*, 213 F.3d at 686-87, was thus well-explained by the
time pressures imposed *by this court*. *See Fox Television*, 556
U.S. at 515. Inasmuch as those time pressures were animated as
well by concern for the public health and welfare — Congress
required that attainment with the NAAQS occur "as
expeditiously as practicable." 42 U.S.C. §§ 7502(a)(2)(A) &
7511; *see North Carolina*, 531 F.3d at 930 — the instant case is
particularly ill-suited for overturning EPA's exercise of its
discretion in not adding an additional rulemaking step to the
process. Given that the court "will overturn an agency's decision
not to initiate a rulemaking only for compelling cause," and one
of those few compelling reasons is when the decision *declining*

---

[14] That EPA may, under different circumstances, view it as
preferable to prospectively quantify States' emission reduction
obligations, *see* Op. at 49, is irrelevant to whether EPA's stated
reasons for departing, in the Transport Rule from its previous
approach are adequate, given the court's instruction in *North Carolina*
to expeditiously replace the flawed CAIR and align NAAQS
attainment dates. The context of the federal register citations is,
EPA's points out, EPA's review of a submitted SIP; the preamble does
not state EPA must engaged in detailed interstate transport analysis
before States must meet their statutory SIP obligations. Furthermore,
consistent with the federal register citations noted by the court, EPA
has traditionally issued guidance to States on calculating their "good
neighbor" emission reduction obligations and it did so here, *see*, *e.g.*,
EPA Guidance on SIP Elements Required Under Sections 110(a)(1)
and (2) for the 2006 24-hour Fine Particle ($PM_{2.5}$) National Ambient
Air Quality Standards (NAAQS) (Sept. 25, 2009).

26

to promulgate a rule exacerbates "grave health and safety problems for the intended beneficiaries of the statutory scheme," *Midwest Indep. Transmission Sys. Operator, Inc. v. FERC*, 388 F.3d 903, 911 (D.C. Cir. 2004) (internal quotation marks and citation omitted), it hardly makes sense for the court to *require* EPA to promulgate a rule when the effect will be to *delay* health benefits. Indeed, the court is *most* reluctant to require agencies to promulgate rules "when the interests at stake are primarily economic," *id.,* and the court's view that it is "impossible" for States to comply with their independent "good neighbor" obligation under section 110(a) is animated by the burdens that obligation imposes on States and industry sources, *see* Oral Arg. Tr. 58.

In sum, the court's conclusion that it would have been a "homemade" "stab in the dark" for the States to submit adequate "good neighbor" SIPs prior to promulgation of the Transport Rule lacks a basis in fact, and the court's speculation that EPA would have inevitably disapproved such submissions, *see* Op. at 56-57, is just that — speculation. And if that happened, States could judicially challenge the disapprovals, seeking a stay to avoid application of the Transport Rule FIPs. Absent record evidence to suggest that the plain text of the CAA's "good neighbor" SIP obligation on States leads to "an outcome *so contrary to perceived social values* that Congress could not have intended it," *Landstar Express*, 569 F.3d at 498-99 (internal quotation marks and citations omitted) (emphasis added), the court is bound, in view of the host of responsibilities placed on States in the CAA, to enforce the statute as Congress wrote it in plain terms, to give deference to EPA's permissible interpretations where the CAA is silent or ambiguous, and to adhere to the court's interpretation of EPA's authority in *Michigan*, as well as acknowledge, as the expert agency has advised without contradiction, that States have demonstrated

27

competence to satisfy their plain statutory "good neighbor" obligations.

## II.

The court also is without jurisdiction to hold that EPA lacked statutory authority to use a different measure of "significant contribution" for setting emission reduction budgets, unrelated to its measure of "significance" for purposes of threshold inclusion of individual States in the Transport Rule. Op. at 34-37. Petitioners contended that there was a hypothetical possibility that "application of cost-effective controls [] could drive a State's emissions below the point that, under phase one, would have excluded the State from any regulation whatsoever." State Petrs' Br. at 35; Industry & Labor Petrs' Br. at 22-24.[15] Because no objection was made during the Transport Rule administrative proceedings to EPA's statutory authority to adopt its two-step approach, the court thus lacks jurisdiction to decide this issue. *See* CAA § 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B). The jurisdictional question is not *close*; the court's effort to avoid this court's well-settled precedent fails clearly.

### A.

Section 307(d)(7)(B) of the CAA provides that "[o]nly an objection to a rule or procedure which was raised with

_____

[15] As EPA responded, nothing in the record suggests this hypothetical possibility actually would occur as a result of the Transport Rule, *see* Resp.'s Br. at 33-34 & n.20; *id.* at 32 n.18, and the point of choosing a "cost" that is "effective" for each State assumes only a reasonable subset of emissions will be reduced. *See* Oral Arg. Tr. at 44-46. Furthermore, contrary to the court's suggestion, *see* Op. 37 n.23, EPA explained that selecting a cost below $500/ton of emissions would permit States to stop operating existing controls, thus increasing, rather than decreasing, pollution. *See* Transport Rule, 76 Fed. Reg. at 48,256-57.

28

reasonable specificity *during the period for public comment . . .  may be raised during judicial review.*" 42 U.S.C. § 7607(d)(7)(B) (emphasis added).  The court has "'strictly' enforce[d] this requirement," *Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1238 (D.C. Cir. 2004) (quoting *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998)); *see also Natural Res. Def. Council v. EPA*, 571 F.3d 1245, 1259 (D.C. Cir. 2009).  The court also has made clear that "[r]easonable specificity requires something more than a general challenge to EPA's approach."  *Mossville*, 370 F.3d at 1238 (internal quotation marks and alteration omitted).  The court's enforcement of this requirement has been most strict in the context of statutory authority objections:

> While there are surely limits on the level of congruity required between a party's arguments before an administrative agency and the court, respect for agencies' proper role in the *Chevron* framework requires that the court be *particularly careful* to ensure that challenges to an agency's interpretation of its governing statute are first raised in the administrative forum.

*Cement Kiln Recycling v. EPA*, 255 F.3d 855, 860 (D.C. Cir. 2001) (quoting *Natural Res. Def. Council, Inc. v. EPA*, 25 F.3d 1063, 1074 (D.C. Cir. 1994)) (emphasis added).  Consistently, until now, the court has held that failure to object specifically to EPA's lack of *statutory authority* is grounds for dismissal of such objections in this court.  *See, e.g.*, *Natural Res. Def. Council v. EPA*, 559 F.3d 561, 563-64 (D.C. Cir. 2009); *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1097 (D.C. Cir. 1996); *Ohio v. EPA*, 997 F.2d 1520, 1528 (D.C. Cir. 1993); *Linemaster Switch Corp. v. EPA*, 938 F.2d 1299, 1308 (D.C. Cir. 1991); *Natural Res. Def. Council v. Thomas*, 805 F.2d 410, 427 (D.C. Cir. 1986).

29

Notably on point, in *Cement Kiln* the court held that comments stating a policy preference to EPA were insufficient to preserve for judicial review objections that the preferred approach was statutorily required, 255 F.3d at 860-61. "[T]hese comments merely argued that EPA could permissibly *consider* [the approach], not (as petitioners now argue) that [the CAA] *requires* [the approach]." *Id.* at 860 (internal quotation marks and citation omitted) (emphases in original). And "the parties were not saved by the fact that they had made other technical, policy, or legal arguments before the agency. Indeed, if such were the rule, a party could never waive a legal claim as long as the party in fact appeared and argued *something* before the agency." *Nat. Res. Def. Council*, 25 F.3d at 1074 (internal quotation marks omitted) (emphasis added).

Petitioners rely on two comments in an attempt to show a challenge to EPA's statutory authority to the approach it adopted was presented during the Transport Rule administrative proceedings. *See* Industry & Labor Petrs.' Reply Br. at 6, n.1. Neither is sufficient. Tennessee commented that "[a] lower cost threshold should be considered for any State that can reduce their contribution below 1% significance using cost thresholds below the maximum values ($2,000/ton for SO2 and $500/ton for NO$_x$), if applicable." Tennessee Comments on 2010 Proposed Transport Rule, Attachment 1, at 1 (Aug. 27, 2010). But this comment does not suggest that EPA is statutorily barred from following its approach. *See Cement Kiln*, 255 F.3d at 860-61; *Natural Res. Def. Council*, 25 F.3d at 1073-74. Furthermore, Tennessee's comment does not even suggest a policy preference that the one percent of NAAQS threshold level be a floor. Rather, Tennessee's comment specifically mentions States reducing contributions *below* the threshold without suggesting that result would violate the CAA. Thus, the only thing Tennessee commented on with "reasonable specificity" was that EPA consider not using a uniform cost threshold for all States.

30

Wisconsin's comment also does not demonstrate the statutory authority challenge now advanced by petitioners in this court was preserved. First, Wisconsin stated that it "support[ed] the 1% contribution threshold . . . for identifying states that are significant contributors to downwind state's air quality nonattainment and maintenance problems." Wisconsin Comments, at 1 (Oct. 1, 2010). Wisconsin further stated:

> State final emission budgets (2014) need to be set with a stronger linkage to residual air quality impact from the [electricity generating unit ("EGU")] on downwind sites compared to the current proposed linkage of limiting emission reductions by an *arbitrarily low cost threshold*. EPA has set which states have contribution reduction responsibility based on air quality impact, but appears to default to a modeling of the most efficient regional EGU control program based exclusively on cost-effectiveness.

> In defining significant contribution, EPA *should* place a *greater emphasis* on air quality impact (contribution) remedy than the assessed state-by-state marginal control cost-effectiveness of proposed remedy in the setting of the 2014 state budgets for EGU reductions. Issues are both legal and a concern for some level of EGU system control installation equity between nearby states and between facilities with differing coal types which are dispatched within the same electricity markets.

*Id.* at 7 (emphases added). Wisconsin nowhere suggested that EPA is statutorily required to use the one percent inclusion threshold as a floor for emission reductions; it simply urged that EPA "should" put a "greater emphasis" on air quality impacts at the *individual EGU* level. Indeed, Wisconsin commented that

31

the cost threshold was *too low*, the exact opposite of what petitioners now claim. *See* Industry & Labor Petrs.' Br. at 31-34. The closest Wisconsin comes to raising a statutory authority argument is its statement that the "issues are [] legal;" but that vague comment is in a sentence indicating the State's preference that EPA regulate at the EGU, rather than the State level, in order to achieve "EGU system control installation equity." Wisconsin Comments, at 7.

Consequently, neither Tennessee's nor Wisconsin's comments argued "with reasonable specificity" that EPA was statutorily required to treat the threshold inclusion level in its two-step approach to defining "significant contribution" as a floor in calculating emission reduction requirements.[16] Nor do they even present a policy preference for such an approach and, indeed, can be interpreted as *supporting* sub-threshold reductions. Even if the comments *implied* a challenge, which they do not, an implied challenge is insufficient because

> that is not the way the regulatory system is structured. Such a standard would require agencies to review perpetually all of the 'implied' challenges in any challenge they receive. We will not impose such a burden on the agency. All that [petitioner] had to do was draft one sentence that specifically challenged EPA's decision. It did not, and that specific challenge is thus not preserved.

---

[16] The court adds a cite, *see* Op. at 34 n.18, to a comment from Delaware: "It is Delaware's opinion that an upwind state's emissions contribution is significant . . . based on the emissions and their effect on air quality, and is independent of cost considerations." This is not a statutory authority objection to the two-step approach, and in any event EPA's rejection of Delaware's "opinion" was sustained in *Michigan*, 213 F.3d at 679.

32

. . .

> [T]he only way [the comments] could be read as placing the EPA on notice is to place the burden on EPA to cull through all the letters it receives and answer all of the possible implied arguments. Such a rule would defeat the statutory requirement for "reasonable specificity."

*Mossville*, 370 F.3d at 1239-40. None of the comments during the Transport Rule administrative proceedings approaches the level of "reasonable specificity" required for this court to have jurisdiction over petitioners' new statutory authority argument.

## B.

Acknowledging this, the court nonetheless concludes that it has jurisdiction to address this new issue because "EPA was on notice that its disregard of the significance floor was a potential legal infirmity in its approach." Op. at 34 n.18. None of the three reasons the court offers for its conclusion that there need not be objections raised "with reasonable specificity during the period for public comment," 42 U.S.C. § 7607(d)(7)(B), is convincing.

*First*, the court states that EPA was required "to craft a new rule consistent with [*North Carolina*]," Op. at 32 n.18 (internal quotation marks and citation omitted), and thus should have been alerted to petitioners' new objection, raised for the first time now in this court. But in *North Carolina* the court specifically permitted the exact same approach in CAIR. Discussing this approach, the court explained:

> [S]tate $SO_2$ budgets are *unrelated* to the criterion (the "air quality factor") by which EPA included states in CAIR's $SO_2$ program. Significant contributors, *for purposes of inclusion only*, are those states EPA

33

> projects will contribute at least 0.2 μ/m$^3$ of PM$_{2.5}$ to a
> nonattainment area in another state.  While we would
> have expected EPA to require states to eliminate
> contributions above this threshold, EPA claims to have
> used [as its] measure . . . emissions that sources within
> a state can eliminate by applying "highly cost-effective
> controls."  EPA used a similar approach in deciding
> which states to include in the NOx SIP Call, which
> *Michigan* did not disturb since "no one quarrel[ed]
> either with its use of multiple measures, or the way it
> drew the line at" the inclusion stage. 213 F.3d at 675.
> Likewise here, the SO$_2$ Petitioners do not quarrel with
> EPA drawing the line at 0.2 μ/m$^3$ or its *different
> measure* of significance for determining states' SO$_2$
> budgets.  Again, *we do not disturb this approach.*

*North Carolina*, 531 F.3d at 916-17 (emphases added).  There
is no basis to conclude that EPA acted inconsistently with *North
Carolina* by replicating the approach the court left undisturbed.
It is true that in *North Carolina* the court rejected EPA's use of
fuel factors in allocating allowances for the CAIR trading
program because doing so redistributed reduction
responsibilities to the benefit of States with more coal-fired
electricity generation, *see id.* at 920-21.  The court stated that
EPA

> may not require some states to *exceed the mark.*
> Because the fuel-adjustment factors shifted the burden
> of emission reductions *solely* in pursuit of equity
> among upwind states — an improper reason — the
> resulting state budgets were *arbitrary and capricious.*

*Id.* at 921 (emphases added).  But a holding that EPA had acted
*arbitrarily* in designing its trading program cannot fairly be
deemed to alert EPA that it might exceed its *statutory authority*
in using an approach to measuring "significant contribution"

34

that the court *specifically* declined to disturb. *Cf. Natural Res. Def. Council v. EPA*, 571 F.3d 1245, 1259 (D.C. Cir. 2009) ("EPA cannot be expected to take [an] argument, raised in support of one specific objection, and apply it sua sponte to another provision."). EPA was entitled, in the absence of objection in the Transport Rule administrative proceedings, to rely in promulgating the Transport Rule upon the court's decision not to disturb its approach. And the fact that after *North Carolina* no comment in the Transport Rule administrative proceedings objected that EPA was exceeding its statutory authority in adopting its approach underscores the fact that EPA was not acting inconsistently with *North Carolina* in light of a few sentences about fuel factors plucked out of context.

*Second*, reaching farther afield, the court points to a comment submitted during the CAIR rulemaking that it deems sufficient, when combined with the holding in *North Carolina*, to "show that EPA 'had notice of this issue and could, or should have, taken it into account.'" Op. at 33 n.18 (quoting *Natural Res. Def. Council v. EPA*, 824 F.2d at 1146, 1151 (D.C. Cir. 1987)).[17]   The CAIR comment stated "that the threshold contribution level selected by EPA should be considered a floor, so that upwind States should be obliged to reduce their emissions only to the level at which their contribution to downwind nonattainment does not exceed that threshold level." CAIR, 70 Fed. Reg. 25,162, 25,176-77 (May 12, 2005). This comment, which was not cited in any petitioners' brief to this court but first mentioned by industry petitioners during rebuttal

---

[17] Remarkably, the court quotes a case in which the common law exhaustion doctrine, rather than CAA section 307(d)(7)(B), applied: the rule at issue was promulgated prior to enactment of section 307(d)(7)(B).  *See Natural Res. Def. Council*, 824 F.2d at 1150-51.

35

oral argument, cannot carry the weight the court assigns to it, particularly in light of the holding in *North Carolina*. The court generally does not entertain arguments raised for the first time in a reply brief, *see Altman v. SEC*, 666 F.3d 1322, 1329 (D.C. Cir. 2011); *North Carolina*, 531 F.3d at 924 n.6, let alone for the first time at oral argument, *see Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1181 (D.C. Cir. 2011); *Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003), much less during *rebuttal* oral argument, *see Coalition of Battery Recyclers Ass'n*, 604 F.3d at 623; *Old Dominion Dairy Products, Inc. v. Sec. of Defense*, 631 F.2d 953, 961 n.17 (D.C. Cir. 1980). The reason is simple: "in order to prevent 'sandbagging of appellees and respondents,' we do not consider arguments that were raised neither in the opening brief nor by respondents." *S. Coast Air Quality Mgmt. Dist. v. EPA*, 554 F.3d 1076, 1081 n.* (D.C. Cir. 2009) (quoting *Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1181 (D.C. Cir. 2000)). Here that reason has particular resonance because EPA was relying on the court's decision in *North Carolina*, 531 F.3d at 916-17, to "not disturb" its two-step approach to defining "significant contribution," and no one referenced the CAIR comment during the Transport Rule administrative proceedings.

Even setting aside the starkly novel forfeiture standard the court has chosen to apply to industry petitioners, the cited CAIR comment is insufficient to establish that the issue of EPA's statutory authority was properly preserved for the court to have jurisdiction to address it. The court relies on a footnote in *American Petroleum Institute v. EPA*, 52 F.3d 1113, 1120 n.1 (D.C. Cir. 1995), for the proposition that it is "highly relevant" if an agency previously "reject[ed] [] the same argument in a prior rulemaking," Op. at 33 n.18. Although the CAIR comment communicates a policy preference, this court has distinguished between comments presenting policy preferences and those presenting statutory authority objections, *see, e.g.*,

36

*Cement Kiln*, 255 F.3d at 860-61, and technical and policy arguments are insufficient to preserve objections to EPA's statutory authority. *See Nat. Res. Def. Council*, 25 F.3d at 1074. The CAIR comment that EPA rejected in the other rulemaking is therefore not "the same argument" that petitioners belatedly attempt to raise now. Furthermore, in *American Petroleum*, the court concluded that the jurisdictional question was "close" inasmuch as EPA had *explicitly* incorporated the docket from the previous rulemaking in the second rulemaking, and the previous rulemaking had been aborted, such that there was no intervening opportunity for judicial review. *See Am. Petroleum*, 52 F.3d at 1120 n.1. Neither of those factors that made *American Petroleum* a close case is present here. The Transport Rule was promulgated to replace CAIR, but the CAIR docket was never incorporated into the Transport Rule docket — perhaps because of the court's instruction in *North Carolina* that EPA "redo its analysis from the ground up." 531 F.3d at 929. EPA would have had no reason to reexamine the voluminous CAIR docket in search for objections that were not raised before the court in *North Carolina*. Also, unlike the aborted rule whose docket EPA incorporated in *American Petroleum*, in CAIR there was an intervening opportunity for judicial review. Yet no one sought judicial review of CAIR on the basis of the CAIR comment now relied on by the court. This precise circumstance was relied upon by the court in *North Carolina* in declining to disturb EPA's approach. *See id.* at 917; *see Med. Waste*, 645 F.3d at 427.[18]  Once the court in

---

[18] The fact that Kansas, Nebraska, and Oklahoma were *not* regulated under CAIR, and thus would have a newly ripened claim, *see Coalition for Responsible Regulation*, 684 F.3d at 129-32, does not mean that those States are relieved from *making* that claim during the Transport Rule administrative proceedings, as CAA section 307(d)(7)(B) requires. This is all the more true here because the petitioners who *were* subject to CAIR *abandoned* the CAIR comment

37

*North Carolina* declined to disturb EPA's approach, because no objection to EPA's authority to adopt its approach had been raised to the court, petitioners were required to inform EPA during the Transport Rule administrative proceedings that they objected to EPA's statutory authority to pursue that approach. *See* 42 U.S.C. § 7607(d)(7)(B). If *American Petroleum* presented a "close" jurisdictional question, then the jurisdictional question here is easily decided.

*Third*, the court concludes that "EPA's statements at the proposal stage indicated EPA was not open to reconsidering CAIR's earlier rejection of petitioners' argument," and that because EPA had dismissed "the two air quality-only approaches it considered," the comments of Tennessee, Wisconsin, and Delaware were "'reasonable' under the circumstances," Op. at 33, n.18. But there was no such "earlier rejection of petitioners' argument" in CAIR because the CAIR comment did not suggest that EPA *exceeded its statutory authority* by following its two-step approach to defining "significant contribution." *See Cement Kiln*, 255 F.3d at 860-61. Furthermore, industry petitioners acknowledge in their Reply Brief that they "are not advocating an 'air quality-only' approach," but instead a cost-based approach with a floor for emission reduction obligations. Industry & Labor Petrs' Reply

_____

now relied on by the court when they sought judicial review. To suggest that EPA should have foreseen that Kansas, Nebraska, and Oklahoma, despite *not making* an objection to the proposed Transport Rule on this ground, secretly *did* object on the basis of a comment made during a rulemaking to which they were not parties, and was abandoned on judicial review by those who made it, distorts the ripeness and CAA exhaustion doctrines beyond recognition and "give[s] parties to Clean Air Act proceedings a powerful weapon for delaying and sandbagging Agency action." *Lead Indus. Ass'n Inc. v. EPA*, 647 F.2d 1130, 1173 (D.C. Cir. 1980).

38

Br. at 10.  So, EPA's rejection of two alternative air quality-only approaches has no bearing on whether EPA would have been willing to entertain an objection during the Transport Rule administrative proceedings that the "good neighbor" provision required it to use the threshold level for a State's inclusion in the Transport Rule as a floor for emission reduction obligations.

Nothing in this court's precedent on CAA section 307(d)(7)(B), 42 U.S.C. § 7607(d)(7)(B), supports the court's tortured efforts to avoid the jurisdictional limits in the CAA and seize jurisdiction where petitioners clearly fall far short of preserving their claim by objecting to EPA's statutory authority during the Transport Rule administrative proceedings with "reasonable specificity."  The court does not acknowledge this court's precedent setting a strict standard for preservation of statutory authority objections, which demonstrates the inconsistency of the court's exercise of jurisdiction today.  *See, e.g.*, *Natural Res. Def. Council*, 559 F.3d at 563-64; *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 538 (D.C. Cir. 2009); *Natural Res. Def. Council v. EPA*, 571 F.3d 1245, 1259 (D.C. Cir. 2009); *Mossville*, 370 F.3d at 1238; *Cement Kiln*, 255 F.3d at 860-61; *George E. Warren Corp. v. EPA*, 159 F.3d 616, 629 (D.C. Cir. 1998); *Motor & Equip. Mfrs. Ass'n*, 142 F.3d at 462; *Natural Res. Def. Council*, 25 F.3d at 1074; *Ohio v. EPA*, 997 F.2d at 1528-29; *Natural Res. Def. Council v. EPA*, 937 F.2d 641, 647-48 (D.C. Cir. 1991); *Linemaster Switch Corp.*, 938 F.2d at 1308; *Thomas*, 805 F.2d at 425-27; *Lead Indus. Ass'n*, 647 F.2d at 1173.

Rather than confront the force of this precedent, the court relies on phrases from a few opinions suggesting a more flexible standard, *see* Op. at 31-34 n.18, but tellingly omits any discussion of the analyses or outcomes in those cases.  This is because even where the court has mentioned flexibility, the comments at issue were either significantly more specific than

ADD-98

39

the comments of Tennessee and Wisconsin, and were thus sufficient, or were more specific but nonetheless deemed wanting. For example, in *Natural Resources Defense Council v. EPA*, 571 F.3d 1245, 1259 (D.C. Cir. 2009), the court suggested there is "leeway" but concluded, in words that resonate here, that "EPA cannot be expected to take [an] argument, raised in support of one specific objection, and apply it sua sponte to another provision." *Id.* at 1259-60. The irony in the court's reliance on this case is that it expects EPA to read *North Carolina* in precisely the opposite manner — it concludes EPA should have taken a holding about "exceeding the mark" in the CAIR trading allowance program and *sua sponte* applied it to the methodology for calculating "significant contribution," even though the court explicitly declined to disturb that methodology. *See supra* Pt. II.B. In *Appalachian Power*, 135 F.3d 791, 817 (D.C. Cir. 1998), the court concluded the "argument . . . during the comment period [was] — in substance, if not in form, the same objection" raised before the court, whereas here the comments of Tennessee and Wisconsin did not raise the statutory authority objection now urged upon the court in either form *or* substance. The court also relies on *Natural Resources Defense Council v. EPA*, 824 F.2d 1146, 1150-51 (D.C. Cir. 1987) (en banc), which involved common law exhaustion, not CAA section 307(d)(7)(B), and in that case the issue was "explicitly raised . . . in comments" before the EPA, *id.* at 1151. And although observing in *South Coast Air Quality Management District v. EPA*, 472 F.3d 882, 891-92 (D.C. Cir. 2009), that petitioners have "some leeway," the court concluded that leeway did not permit the petitioner to rely upon a general procedural preference stated in a cover letter to its comments to alert EPA to the details of the objections to a final rule.

None of the court's proffered reasons for ignoring section 307(d)(7)(B)'s jurisdictional limitations has merit on its own,

40

nor in combination. "[Z]ero plus zero [plus zero] equals zero." *U.S. v. Clipper*, 313 F.3d 605, 609 (D.C. Cir. 2002).

## III.

The court's remaining reasons for vacating the Transport Rule are also either beyond its jurisdiction or unpersuasive.

First, the court concludes that EPA violated the CAA by not calculating the required emission reductions "on a proportional basis that took into account contributions of other upwind States to the downwind States' nonattainment problems." Op. at 38. This is so, the court says, because in *Michigan* the court only permitted cost to be considered as a way "to allow some upwind States to do *less* than their full fair share," not more. *Id.* Petitioners have not argued that EPA violated the CAA by not calculating emission reductions on a proportional basis, as the court suggests. *See Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 7 (D.C. Cir. 2009). The statement in industry petitioners' brief that the court quotes, *see* Op. at 37, instead maintains that EPA was *arbitrary and capricious* in the way it grouped States for 2014 sulfur dioxide (SO$_2$) budgets because, they claimed, EPA did so without "consider[ing] *relative* contributions of the various States," Industry & Labor Petrs' Br. at 33. This challenge is limited to the asserted *arbitrariness* of how certain States were categorized for one pollutant's budget for one year. The court lacks jurisdiction to consider *sua sponte* an objection to EPA's statutory authority not raised by petitioners within the sixty day period required under CAA section 307(b)(1), 42 U.S.C. § 7607(b)(1); *see Med. Waste*, 645 F.3d at 427. As this court has previously said, "[t]o rely on relief plaintiffs never requested on a claim they never made would be to conclude that zero plus zero equals more than zero." *NAACP, Jefferson Cnty. Branch v. U.S. Sugar Corp.*, 84 F.3d 1432, 1438 (D.C. Cir. 1996).

41

Second, even if petitioners *had* raised a "proportionality" statutory authority objection, this objection and the court's conclusion are premised on the speculative possibility that the Transport Rule might require States to reduce emissions to a level below the one percent of NAAQS inclusion threshold of EPA's two-step approach to defining "signification contribution," and thus *more* than their statutory fair share — an argument over which the court also lacks jurisdiction. *See supra* Part II. Further, the court's conclusion is at odds with *North Carolina* where the court concluded that EPA's measure of significant contribution need not "directly correlate with each State's individualized air quality impact on downwind nonattainment *relative to other upwind states.*" 531 F.3d at 908 (emphasis added); *see LaShawn A.*, 87 F.3d at 1395. It also ignores that in *Michigan* the court expressly permitted the use of uniform cost thresholds to measure "significance," and likewise permitted the "ineluctabl[e]" result of small and large contributors being required to make the same amount of reductions. 213 F.3d at 679. Without jurisdiction to reach an argument on whether the Transport Rule requires States to reduce *more* than their statutory fair share, *Michigan* requires the conclusion that EPA's choice of cost thresholds in the Transport Rule was permissible.

Next, the court concludes that EPA failed to consider the effect of in-State emissions of downwind States on their own nonattainment and interference with maintenance problems, *see* Op. at 38. Petitioners conceded at oral argument that this "in-State contribution" contention was "not actually an independent statutory authority argument," Oral Arg. Tr. at 32, but merely a repackaged version of the objection to the possibility of reductions below the one percent of NAAQS inclusion threshold, an argument over which the court lacks jurisdiction, *see supra* Part II. Even if the court had jurisdiction to address it, the court's conclusion is unsupported by the record. EPA

42

examined the various cost threshold for each State, and in so doing considered

> how much air quality improvement in downwind states result[ed] from upwind state emission reductions at different levels; whether, considering upwind emission reductions and *assumed local (in-state) reductions*, the downwind air quality problems would be resolved; and the components of the remaining downwind air quality problem (e.g., whether it is *a predominantly local or in-state problem*, or whether it still contains a large upwind component).

Transport Rule, 76 Fed. Reg. at 48,256 (emphases added); *see id.* at 48,259 (concluding remaining nonattainment problem in Liberty-Clairton was the result of local emissions).   EPA thus in fact examined the contribution of downwind States to their own nonattainment problems.

Finally, the court concludes that EPA "did not try to take steps to avoid" collective over-control, Op. at 39.   This conclusion too is unsupported by the record.   The Transport Rule was not projected to achieve attainment of all downwind nonattainment and maintenance problems attributed to upwind States.   *See id.* at 48,210, 48,232, 48,247-48; Resp.'s Br. at 38 n.24.   Because EPA's analysis demonstrated instances of "remaining downwind air quality problems," Transport Rule, 76 Fed. Reg. at 48,256, there is no support for the court's conclusion that the Transport Rule resulted in collective over-control.

43

## IV.

The Transport Rule, as EPA observes, represents "the culmination of decades of Congressional, administrative, and judicial efforts to fashion a workable, comprehensive regulatory approach to interstate air pollution issues that have huge public health implications." Resp.'s Br. at 12. The legislative history to amendments of the CAA documents Congress's frustration with the upwind States' historic failure to take effective action on their own to curtail their contributions to problems of pollution in downwind States, leading to amendments to strengthen EPA's hand. The court ignores Congress's limitations on the court's jurisdiction and decades of precedent strictly enforcing those limitations and proceeds to do violence to the plain text of the CAA and EPA's permissible interpretations of the CAA, all while claiming to be "apply[ing] and enforc[ing] the statute as it's now written." Op. at 8. The result is the endorsement of a "maximum delay" strategy for regulated entities, rewarding States and industry for cloaking their objections throughout years of administrative rulemaking procedures and blindsiding the agency with both a collateral attack on its interpretation of section 110(a) and an objection raised for the first time in this court, despite the court's previous decisions declining to disturb the approach EPA adopted in the Transport Rule.

To reach the result — vacating the Transport Rule — the court does several remarkable things. It seizes jurisdiction over the issue of States' independent "good neighbor" obligation by allowing States to pursue a collateral attack on Final SIP Rules from which they either failed timely to file petitions for review or their petitions challenging those rules have not been consolidated with the petitions challenging the Transport Rule that are before this three-judge panel. It asserts jurisdiction over industry's challenge to EPA's two-step approach to defining

44

"significant contribution" by excusing industry from its failure to preserve the issue by first presenting it to EPA and then resting jurisdiction on a comment in another rulemaking that was first cited by industry in *rebuttal* oral argument and cannot bear the weight the court assigns to it because it did not challenge EPA's statutory authority to adopt its two-step approach.  All this is contrary to Congress's limitations on the court's jurisdiction and this court's precedent enforcing those limitations.   The rest of the court's analysis recalibrates Congress's statutory scheme and vision of cooperative federalism in the CAA.  Along the way, the court abandons any consideration that an agency is entitled to repose, absent objection during its administrative proceedings, when a court, here on *two* occasion, expressly leaves undisturbed its two-step approach to enforcing a statute it administers and no objection is raised during the Transport Rule administrative proceedings. Then, in dictum, the court offers suggestions as to how EPA might fix the problems the court has created upon rewriting the CAA and trampling on this court's precedent in *North Carolina* and *Michigan*.

None of this is to suggest that EPA should be excused from the statutory limits on its authority or any material procedural missteps under the CAA or the APA.  But neither can the court ignore jurisdictional limits or substantive provisions that Congress wrote in clear terms and EPA's permissible interpretations of the CAA in addressing statutory silence or ambiguity.  Rather it underscores why, as a programmatic and public health matter, Congress concluded there are important reasons for jurisdictional limits and administrative exhaustion that this court heretofore has steadfastly acknowledged in recognizing both the  limits of its jurisdiction and of its role in enforcing the CAA as Congress wrote it.

Accordingly, I respectfully dissent.

## CERTIFICATE AS TO PARTIES AND *AMICI*

Pursuant to Circuit Rules 35(c) and 28(a)(1)(A), Respondent-Intervenors American Lung Association, Clean Air Council, Environmental Defense Fund, Natural Resources Defense Council, and Sierra Club (collectively, "Public Health Intervenors") hereby certify that the following are parties and *amici* in this and the consolidated cases:

### Petitioners

*Industry and Labor Petitioners*

AEP Texas North Co.
Alabama Power Co.
American Coal Co.
American Energy Corp.
Appalachian Power Co.
ARIPPA
Big Brown Lignite Company LLC
Big Brown Power Company LLC
Columbus Southern Power Co.
Consolidated Edison Company of New York, Inc.
CPI USA North Carolina LLC
Dairyland Power Cooperative
DTE Stoneman, LLC
East Kentucky Power Cooperative, Inc.
EME Homer City Generation, LP.
Entergy Corp.
Environmental Committee of the Florida Electric Power Coordinating Group, Inc.
Environmental Energy Alliance of New York, LLC

Luminant Holding Company LLC
Luminant Mining Company LLC
Midwest Food Processors Association
Midwest Ozone Group
Mississippi Power Co.
Municipal Electric Authority of Georgia
Murray Energy Corp.
National Mining Association
National Rural Electric Cooperative Association
Northern States Power Co. (a Minnesota corporation)
Oak Grove Management Company LLC
Ohio Power Co.
Ohio Valley Coal Co.
OhioAmerican Energy, Inc.
Peabody Energy Corp.
Public Service Company of Oklahoma
Sandow Power Company LLC

ADD-105

GenOn Energy, Inc.
Georgia Power Co.
Gulf Power Co.
Indiana Michigan Power Co.
International Brotherhood of
Electrical
Workers, AFL-CIO
Kansas City Board of Public
Utilities,
Unified Government of
Wyandotte County, Kansas City,
Kansas
Kansas Gas and Electric Co.
Kenamerican Resources, Inc.
Kentucky Power Co.
Lafayette Utilities System
Louisiana Chemical Association
Luminant Big Brown Mining
Company LLC
Luminant Energy Company LLC
Luminant Generation Company LLC

South Mississippi Electric Power
Ass'n
Southern Company Services, Inc.
Southern Power Co.
Southwestern Electric Power Co.
Southwestern Public Service Co.
Sunbury Generation LP
Sunflower Electric Power Corp.
Utility Air Regulatory Group
United Mine Workers of America
UtahAmerican Energy, Inc.
Westar Energy, Inc.
Western Farmers Electric
Cooperative
Wisconsin Cast Metals Association
Wisconsin Electric Power Co.
Wisconsin Paper Council, Inc.
Wisconsin Manufacturers and
Commerce
Wisconsin Public Service Corp.

*State and Municipal Petitioners*

City of Ames, Iowa
City of Springfield, Illinois, Office of
Public Utilities, d/b/a City Water,
Light & Power
Louisiana Department of
Environmental Quality
Louisiana Public Service
Commission
Mississippi Public Service
Commission
Public Utility Commission of Texas
Railroad Commission of Texas
State of Alabama
State of Florida
State of Georgia

State of Indiana
State of Kansas
State of Louisiana State of Michigan
State of Nebraska
State of Ohio
State of Oklahoma
State of South Carolina
State of Texas
State of Virginia
State of Wisconsin
Texas Commission on
Environmental
Quality
Texas General Land Office

ADD-106

### Intervenors in Support of Petitioners

San Miguel Electric Cooperative
City of New York (Nos. 11-1388 and 11-1395 only)
State of New York (Nos. 11-1388 and 11-1395 only)

### Respondents

United States Environmental Protection Agency ("EPA")
Lisa P. Jackson, Administrator.

### Intervenors in Support of Respondent

*Industry and Public Health Intervenors*

American Lung Association
Calpine Corporation
Clean Air Council
Environmental Defense Fund

Exelon Corporation
Natural Resources Defense Council
Public Service Enterprise Group, Inc.
Sierra Club

*State and Municipal Intervenors*

City of Bridgeport, Connecticut
City of Chicago
City of New York (all but Nos. 11-1388 and 11-1395)
City of Philadelphia
Mayor and City Council of Baltimore
State of Connecticut
State of Delaware

District of Columbia
State of Illinois
State of Maryland
Commonwealth of Massachusetts
State of New York (all but Nos. 11-1388 and 1395)
State of North Carolina
State of Rhode Island
State of Vermont

### Amici

American Thoracic Society
Putnam County, Georgia
Industrial Energy Consumers of America
Southern Legal Foundation, Inc.

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, Public Health Intervenors provide the following corporate disclosure statements:

Respondent-Intervenors Clean Air Council, Environmental Defense Fund, Natural Resources Defense Council, and Sierra Club state that they are nonprofit organizations focused on protection of public health and the environment.

Respondent-Intervenor American Lung Association states that it is a national not-for-profit public health organization dedicated to saving lives by improving lung health and preventing lung disease.

Public Health Intervenors have no outstanding shares or debt securities in the hands of the public, nor any parent, subsidiary or affiliate that has issued shares or debt securities to the public.

DATED:  October 5, 2012

/s/ Sean H. Donahue
Sean H. Donahue
Donahue & Goldberg, LLP
2000 L St. NW, Suite 808
Washington, DC 30036
(202) 777-7085
sean@donahuegoldberg.com